**JOHN B.**, Carrie G., Joshua M., Megan A. and Erica A., by their next friend, L.A.; Dustin P., by his next friend, Linda C.; Bayli S. by her next friend, C.W.; James D. by his next friend, Susan H.; Elsie H. by her next friend, Stacy Miller; Julian C. by his next friend, Shawn C.; Troy D. by his next friend, T.W.; Ray M. by his next friend, P.D.; Roscoe W. by his next friend, K.B.; Jacob R. by his next friend, Kim B.; Justin S. by his next friend, Diane P.; Estel W. by his next friend, E.D.; individually and on behalf of all others similarly situated, Plaintiffs,

v.

Dave **GOETZ**, Commissioner, Tennessee Department of Finance and Administration; Darin Gordon, Deputy Commissioner, Bureau of TennCare; and Viola Miller, Commissioner, Tennessee Department of Children's Services, Defendants.

No. 3:98–0168.

United States District Court, M.D. Tennessee, Nashville Division.

Jan. 28, 2010.

Barry Leigh Weissman, Leanna Marie Anderson, Sonnenschein, Nath & Rosenthal, Los Angeles, CA, George Gordon Bonnyman, Jr., Michele M. Johnson, Christopher E. Coleman, Tennessee Justice Center, Inc., Nashville, TN, Mary B. Anderson, Robert Thomas Joseph, Sonnenschein, Nath & Rosenthal, Chicago, IL, Victoria Reznik, Andrew Dunlap, Katherine L. McDaniel, Michael H. Reed, Kirkland & Ellis, New York, NY, Tony L. Richardson, for Plaintiffs.

### MEMORANDUM

WILLIAM J. HAYNES, JR., District Judge.

TABLE OF CONTENTS

I. History of this Litigation ................................................. 796
 A. Consent Decree and Earlier Proceedings ................................ 797
 B. The Court's 2001 Findings of the Defendants' Noncompliance ............... 801
 C. The Court's 2004 Findings of the Defendants' Noncompliance ............... 808
 D. The Recusal Order and Reassignment ................................... 811
 E. The 2006 Discovery Proceedings ...................................... 814

II. Plaintiffs' Renewed Motion to Compel ..................................... 819
 A. Findings of Fact ................................................... 819
 1. Information Requirements and Discovery Rights under the Consent Decree ......................................................... 819
 2. The Lack of Preservation of Relevant Records ........................ 821
 3. Inadequacies in the Defendants' 2006 Paper Production ................. 828
 4. The Necessity of Plaintiffs' ESI Discovery Requests ................... 833
 5. The Costs of ESI Production ........................................ 835
 6. Privileged Information in the ESI Production ......................... 839
 7. Defendants' Failures to Answer Plaintiffs' Requests for Admissions and to Comply with the January 14th Order ......................... 850
 8. Other ESI Production Issues ....................................... 857

B. Conclusions of Law ................................................857
 1. Discovery from the MCCs ...................................857
 2. Discovery Standards .......................................860
 3. Discovery Rules on Electronic Discovery ..................861
 4. Duty to Preserve .........................................867
 5. The Undue Burden Analysis ................................875
 (i) Types of ESI Data .................................875
 (ii) Defendants' and MCCs' Databases ..................881
 (iii) The Costs of Production ...........................881
 6. The Good Cause Showing and the Rule 26(b)(2)(C) factors ...884
 7. Privilege Issues .........................................889
 a. Attorney–Client Privilege ...........................892
 b. Work Product Privilege ..............................896
 c. Joint Defense Privilege .............................897
 d. Deliberative Process Privilege ......................898
 e. State Statutory Privileges ..........................899
 8. Defendants' Failures to Answer Plaintiffs' Requests for Admissions
 and to Comply with the January 14th Order ..............904

III. Remedies ...................................................908

Plaintiffs, John B., and other minors through their next friends, filed this action on behalf of themselves and other similarly situated minors under 42 U.S.C. § 1983, asserting jurisdiction under 28 U.S.C. § 1331, the federal question jurisdiction statute, with its statutory counterpart, 28 U.S.C. § 1343(a)(3) and (4). Plaintiffs' action is on behalf of a class of approximately 550,000 children who are entitled under federal law to medical services that include early and periodic screenings for their physical well being, including their dental and behavioral health needs. Federal law also requires any necessary follow-up medical services. The Plaintiffs' class includes children who are in the state's custody through the state's juvenile court system and other children's programs provided by the State of Tennessee.

Plaintiffs seek to enforce their rights under Title VI of the Social Security Act, 42 U.S.C. §§ 620–629 and 670–679 and Title XIX of that Act, 42 U.S.C. § 1396 *et seq.* as well as remedies for violations of the Due Process Clause of the Fourteenth Amendment to the United States Constitution. In essence, Plaintiffs allege that the Defendants deprived them of their rights to early and periodic screening, diagnosis and treatment (EPSDT) services and related medical care for children under State's TennCare program and children who are in the Defendants' legal custody and are also entitled to such services under Title VI.

The original Defendants were Nancy Menke, Commissioner, Tennessee Department of Health; Theresa Clarke, Assistant Commissioner, Bureau of TennCare; and George Hattaway, Commissioner, Tennessee Department of Children's Services. The successors in office and current Defendants are: David Goetz, Commissioner, Tennessee Department of Finance and Administration; J.D. Hickey, Assistant Commissioner, TennCare Bureau [1]; and Viola Miller, Tennessee Department of Children's Services. The Defendants are state officials who are in charge of the State programs for these services that are federally funded by Congress under Title VI of

---

**1.** The Defendant Hickey has since left state employment and substitution of his successor has not been sought.

the Social Security Act, 42 U.S.C. §§ 620–629 and 670–679 and Title XIX of that Act. The medical services at issue are provided under the State's TennCare program, a waiver program approved by the Center for Medicare and Medicaid Services ("CMS"). The actual providers of these medical services are the Managed Care Contractors ("MCCs") or Managed Care Companies ("MCOs") that have contracts with the State detailing their responsibilities. Some MCCs provide only management services and some MCCs specialize in dental or behavioral health services.

Contemporaneous with the filing of the complaint, Plaintiffs requested class certification and the parties agreed to entry of a Consent Decree to remedy Plaintiffs' claims and to certify the class. (Docket Entry No. 3). The Court certified the class and entered the Consent Decree (Docket Entry No. 12) that granted declaratory and injunctive relief on Plaintiff's EPSDT claims. The Consent Decree enjoined the Defendants, as state officials, from depriving Plaintiffs and members of their class of their rights to EPSDT services; set minimum percentages of screenings for different groups of children over a period of years for compliance with EPSDT laws; and required a detailed, multi-year remedial plan to ensure the Defendants' compliance with Consent Decree. Lengthy and complex proceedings followed, including several show cause and contempt hearings. (Docket Entry Nos. 79, 228, 270, 291, 465 and 558).

After a series of hearings and conferences on the parties' current discovery disputes, the Court ordered that discovery of electronically stored information ("ESI")[2] shall be provided and directed the parties' computer experts to develop a protocol for ESI discovery from the Defendants and their MCCs. On December 6, 2006, the Plaintiffs' and the State's computer experts agreed to a protocol for the ESI discovery that was subject to modifications for the search terms and consultations with the MCCs. (Docket Entry No. 764 at pp. 14–26 and Docket Entry No. 765). The Defendants continued to oppose the terms for production of Plaintiffs' ESI discovery. Plaintiffs then renewed their motion to compel.

Before the Court is the Plaintiffs' renewed motion to compel (Docket Entry No. 826) that asserts their discovery rights to ESI from the Defendants and the MCCs under Orders of the Court, the Federal Rules of Civil Procedure and the Consent Decree. Plaintiffs contend that the ESI is necessary to assess the Defendants' contention that they are now in compliance with the Consent Decree and to discover whether the Defendants' remain noncompliant, as earlier found by the Court. Plaintiffs ask the Court to compel the Defendants' compliance with the Court's earlier Orders for the Defendants to produce ESI and to require certain key custodians to certify that documents covered by the Plaintiffs' discovery requests have not been removed or destroyed. For their motion, Plaintiffs rely upon the Court's earlier Orders compelling the Defendants' production of:

1. Documents, ESI and information in the possession or control of the State's contractors.[3]

---

**2.** ESI can be defined as "any information created or stored in digital form whenever a computer is used to accomplish a task" Chung & Byer, *The Electronic Paper Trail: Evidentiary Obstacles to Discovery and Admission of Electronic Evidence*, 4. B.U. J. SCI. & TECH. L. 5, para. 8 (1998) or "any electronically-stored information subject to pre-trial discovery" Scheindlin & Rabkin, *Electronic Dis-*covery in Federal Civil Litigation: Is Rule 34 Up to the Task?, 41 B.C. L. REV. 327, 332–33 (2000).

**3.** Bench ruling of November 6, 2006 (Docket Entry No. 734 at pp. 72–73) and Order of November 21, 2006 (Docket Entry No. 743 at pp. 1–2).

2. ESI in the possession of the State's key custodians.[4]

3. The identities of former employees of the State and its contractors with substantial EPSDT responsibilities.[5]

4. Certifications from key custodians whether any responsive ESI has been removed.[6]

5. Files for a sample of TennCare children who sought care from the Children's Special Services (CSS) program.[7]

6. Answers, signed by all key custodians who participated in preparing the State's discovery responses to the Plaintiffs' requests for admissions and interrogatories seeking assurances that responsive documents and ESI had not been destroyed and had been produced.[8]

(Docket Entry No. 826, Plaintiffs' Renewed Motion to Compel at pp. 2–3). In sum, the Plaintiffs assert that their ability to protect the interests of the class requires a complete ESI production from the Defendants and their MCCs because a complete ESI production is a essential guide through the State's and MCCs' complex systems on this statewide healthcare system.

In their responses, (Docket Entry Nos. 893, 898, 907, 929 and 953), Defendants and the MCCs assert, in essence, that Plaintiffs' ESI production requests are unduly burdensome based upon the extraordinary costs of production. These costs are for the actual technical production costs and substantial personnel and lawyer time to conduct the necessary privilege reviews. Moreover, the Defendants cite their earlier production of hard copies of responsive documents for the period for 2004 to April 6, 2006.[9] In their view, that paper production precludes an ESI production for the same time period. In addition, the Defendants and MCCs rely upon federal and state privacy laws that preclude the discovery of some information

---

4. Bench ruling of November 6, 2006 (Docket Entry No. 734 at pp. 29, 68); Order of November 21, 2006 (Docket Entry No. 743 at p. 2).

5. Bench ruling of November 6, 2006 (Docket Entry No. 734 at p. 49) and Order of November 21, 2006 (Docket Entry No. 743 at p. 3).

6. Order of January 14, 2007 (Docket Entry No. 789 at p. 3), citing Docket Entry No. 785–2, Tigh Affidavit, ¶ C.

7. Bench ruling of November 6, 2006 (Docket Entry No. 734 at p. 65) and Order of November 21, 2006 (Docket Entry No. 743 at p. 4).

8. Bench ruling of November 6, 2006 (Docket Entry No. 734 at pp. 56–64); bench ruling of December 20, 2006 (Docket Entry No. 786 at pp. 41–42); Order of November 21, 2006 (Docket Entry No. 743 at p. 3). The Defendants filed partial responses on January 30, 2007. (Docket Entry No. 799). Yet, nine former employees, including two former TennCare directors or supervisors and the Governor, did not respond personally.

9. The Defendants also assert that if the Court would grant their pending motion to vacate the Consent Decree, these discovery issues would be moot. First, the Court previously addressed the contentions in their motion to vacate and the Court denied that motion. (Docket Entry No. 646, April 17, 2006 Conference at pp. 9–12). The Defendants did not appeal that ruling. Second, under Local Rule 16.01(e)(1), the pendency of a dispositive motion does not stay discovery. Third, the Court had been working on the Defendants' motion to vacate and from its research and the state of the record, the Court remains confident that ruling on the discovery disputes is appropriate. If the Defendants had not been so intransigent on discovery issues requiring extraordinary amounts of the Court's time, there would have been a ruling on the motion to vacate. The Court will continue its research on that motion, but the Court also has to give attention to other actions on this Court's docket because rulings in other actions have been delayed because of the extraordinary amount of time the Court has had to expend on the ESI issues in this action.

sought by the Plaintiffs. The MCCs also cite the need to exclude information protected by their contracts with other businesses and Medicaid programs in other states.

Also before the Court are the MCCs' related motions to allocate discovery costs. (Docket Entry Nos. 920, 921, 935) to which the Defendants responded. (Docket Entry No. 946). The MCC Doral filed a reply (Docket Entry No. 964). The MCC BlueCross /BlueShield has filed a motion to alter or amend the June 1, 2007 Order or motion for a partial new trial. (Docket Entry No. 931).

After extensive proceedings on the issues raised by the Plaintiffs' renewed motion to compel and shortly before the Court's filing of this Memorandum on Plaintiffs' renewed motion to compel, the Defendants filed a "Notice" of mootness. (Docket Entry No. 1023). Defendants stated that in contemplation of the Court's imminent adverse ruling, the Defendant were proceeding to produce the ESI discovery. Thus, the Defendants suggested the Plaintiffs' renewed motion to compel was moot. The Court delayed filing this Memorandum to allow Plaintiffs and any MCC the opportunity to respond to the Defendants' Notice. As reflected in the Plaintiffs' responses (Docket Entry No. 1024 and 1025) to which the Defendants filed a reply (Docket Entry No. 1027), Plaintiffs contend that the Defendants' Notice does not moot their renewed motion to compel and in fact, raises more issues. The Defendants' Notice among other things, would set a January 2007 time limit to the ESI production and limit any privilege review to a word search. Plaintiffs argue that the Defendants' Notice reflects the Defendants' bad faith litigation tactics

that caused the Plaintiffs, MCCs and the Court to expend extraordinary resources on issues the Defendants now declare moot.

The Court respectfully declines the Defendants' suggestions of mootness. First, the Plaintiffs' responses to the Defendants' Notice reflect the actual lack of mootness and additional issues created by this Notice. Moreover, as set forth in this Memorandum and as established by the record in this action, the Court observes: (1) that the Defendants have repeatedly violated their agreements set forth in the Consent Decree; (2) that the Defendants have failed to comply with Judge Nixon's Order to submit an Initial Work Plan to remedy the Defendants' violation of federal law to conform to the Consent Decree; (3) that the Defendants refused to corporate with the Special Master appointed by the Court to develop a plan for compliance with federal law as required by the Consent Decree; (4) that the Defendants have disavowed a clear command of the Consent Decree to develop a specific remedial plan; (5) that the Defendants breached their agreement with the Plaintiffs on the dates for ESI discovery and the ESI protocol; (6) that the Defendant have ignored the Court's directives to provide ESI to Plaintiffs; and (7) that the Defendants failed to comply with the Court's Orders on discovery. In these circumstances, the Court lacks confidence in the Defendants' assertions that the discovery disputes in this action are moot.

### I. History of this Litigation

To decide the Plaintiffs' renewed motion to compel and to understand the related issues before the Court, a brief discussion of the history of this litigation is necessary.[10] This review provides insights to

10. This section of the Memorandum is organized for the purpose of analyzing the factors in Fed.R.Civ.P. 26(b)(2)(C) as well as other rules in light of the 2006 amendments of the

Rules of Civil Procedure governing ESI. The Court deeply regrets the length of the Memorandum, but a reasoned resolution of the parties' contentions requires its length.

understand the ESI discovery sought by the Plaintiffs and the necessity for that discovery.

### A. The Consent Decree and Earlier Proceedings

The Consent Decree certified the class, conferred substantive relief to the members of the Plaintiffs' class and imposed obligations upon the Defendants and the MCCs to provide EPSDT services to the class members and to report on their provisions of such services. (Docket Entry No. 12). Here, the pertinent substantive provisions of the 1998 Consent Decree found certain facts and established criteria for compliance, subject to practical limitations and those provisions are as follows:

29. The timetable negotiated by the parties affords the state a period of more than five years within which to achieve full compliance with EPSDT and related laws. Settlement thus gives the state a grace period within which to achieve compliance, thereby countenancing partial noncompliance for five more years.

30. Nonetheless, present officials cannot correct problems overnight which have been years in the making. **Their development of the remedial plan is itself evidence of their genuine commitment to reform** ...

\* \* \*

33. The fact that state policy is still being developed poses special challenges for the drafting of an appropriate order in this case. On the other hand, **present problems point up the need to afford immediate protection to children who plaintiffs allege are not now receiving the care to which the law entitles them and who are liable to suffer serious, irreparable harm if such care is not provided. They cannot be asked to wait for additional months or years to know if policies now under development**

**by the defendants will some day adequately protect their rights.**

\* \* \*

46. A baseline periodic screening level will be calculated by the TennCare Bureau using HCFA 416 mathematical methodology and enrollment and encounter data to determine the number of periodic screens that should have occurred in the federal fiscal year ending September 30, 1996. The CPT–4 and ICD–9CM codes specified in HEDIS 3.0 as well-child visits and adolescent well-care visits will be the primary determinants of which encounters are counted as periodic screens. The baseline periodic screening ratio for the period from October 1, 1995 through September 30, 1996 will be calculated using HCFA 416 methodology. This baseline periodic screening ratio will be multiplied by 100 to calculate the baseline periodic screening percentage. Subsequent periodic screening percentages will be calculated using methodology identical to that used in calculation of the baseline periodic screening percentage.

\* \* \*

50. **For the period of October 1, 2000 through September 30, 2001, the [Adjusted Period Screening Percentage] APSP shall be no less than 80.** The APSP for the federal fiscal year ending on September 30, 2001 will be calculated by TennCare and made available to the plaintiffs by April 30, 2002.

**For the period of October 1, 2002 through September 30, 2003, the DSP shall be no less than 80.** The DSP for the federal fiscal year ending on September 30, 2003 will be calculated by

TennCare and made available to the plaintiffs by April 30, 2004.

\* \* \*

52. **The Defendants shall achieve complete screening of 100% of TennCare children in DCS custody within 18 months of the entry of this order, and shall maintain that level of screening thereafter.** The tracking system developed by DCS shall be the system which shall be used to report compliance with this standard.

\* \* \*

54. **Defendants shall ensure that within their respective spheres of responsibility, TennCare, the MCCs and DCS provide children all medically necessary EPSDT services as listed in 42 U.S.C. § 1396d(a) and as defined in corresponding Medical regulations. Services which are required under EPSDT law, when medically necessary,** are as follows:
(a) Inpatient hospital services (other than services in an institution for mental illness);
(b) Outpatient hospital services; rural health clinic services; and services offered by a federally-qualified health center;
(c) Other laboratory and x-ray services;
(d) EPSDT services, and family planning services and supplies;
(e) Physicians' services; medical and surgical services furnished by a dentist;
(f) Medical care, or any other type of remedial care recognized under state law, furnished by licensed practitioners within the scope of their practice as defined by state law;
(g) Home health care services;
(h) Private duty nursing services;
(i) Clinic services;
(j) Dental services;
(k) Physical therapy and related services;
(l) Prescribed drugs, dentures, and prosthetic devices; eyeglasses;
(m) Other diagnostic, screening, preventive, and rehabilitative services;
(n) Services in an intermediate care facility for the mentally retarded (other than in an institution for mental diseases);
(o) Impatient psychiatric services for individuals under age 21;
(p) Services furnished by a nurse-midwife;
(q) Hospice care;
(r) Case management services and TB-related services;
(s) Respiratory care services;
(t) Services furnished by a certified pediatric nurse practitioner or certified family nurse practitioner;
(u) Personal care services furnished to an individual who is not an inpatient or resident of a hospital, nursing facility, intermediate care facility for the mentally retarded, or institution for mental disease; and
(v) Any other medical care, and any other type of remedial care recognized under state law, specified by the Secretary of the United States Department of Health and Human Services.

In addition to the services identified in the above list, the TennCare waiver allows the used of cost-effective alternative services in certain situations. These cost-effective alternative services are identified as services which may or may not be included in the above list and which are medically appropriate and cost-effective when delivered in place of other services on

the list which have been determined to be medically necessary for an individual enrollee. The parties recognize that there are many kinds of services which fit under the above list of covered services and that delivery of medically necessary services may involve different service delivery mechanisms.

55. **The defendants shall review MCO practices with regard to making decisions about medical necessity and identify any practices that are inconsistent with the federal laws cited herein. The defendants shall issue clarifications and ensure compliance with such federal law, regarding medically necessary treatment,** including but not limited to, the following clarifications:

(a) The prior authorizations and medical determinations shall be made on a case-by-case basis for each service sought for a class member.

(b) That services are provided if necessary "to correct or ameliorate defects and physical and mental illnesses and conditions...." 42 U.S.C. § 1396d(r)(5).

(c) That the definition of medical necessity shall be applied so that services are covered if they correct, compensate for, improve, or prevent a condition from worsening, even if the condition cannot be prevented or cured.

(d) That medically necessary services shall be provided, whether or not the screener is under contract with the particular managed care entity.

(e) That defendants and their contractors and subcontractors are in compliance with HCFA Office of Managed Care Operational Policy Letter No. 96.045 (December 3, 1996), and do not have financial or contractual arrangements which undermine class members' access to covered services. (*See* Attachment 1).

(Docket Entry No. 12 at ¶¶ 29, 30, 33, 46, 50, 52, 54, and 55) (emphasis added).

The Consent Decree also set a series of deadlines for the Defendants to accomplish these substantive provisions:

39. Within 180 days of entry of the decree, the State shall adopt any policies and procedures necessary to ensure TennCare rules and guidelines clearly describe and allocate responsibility for and require compliance with each specific outreach and informing requirement under federal law ...

* * *

40. The Defendants or their contractors shall achieve within 240 days and shall maintain thereafter, EPSDT outreach efforts designed to reach all members of the plaintiff class with information and materials conform with Section V(B)(1)(a).

* * *

45. Within 120 days after this order is entered, a baseline percentage of screening compliance shall be determined. The defendants, in consultation with the plaintiffs, shall determine the percentage based on the best available data on recent screening levels.

* * *

53. Within 120 days of the entry of this order, the defendants shall establish and maintain a process for reviewing the practices and procedures of the MCOs and DCS, and require such modifications of those practices and procedures as are necessary to ensure that children

can be appropriately referred from one level of screening or diagnosis to another, more sophisticated level of diagnosis as needed to determine the child's physical health, behavioral health and development needs, as to medically necessary services.

\* \* \*

60. Within 120 days of this decree, TennCare shall develop a provider handbook to specify the responsibilities of MCOs and DCS related to the provision of medically necessary services for children in DCS custody. This handbook shall assist in delineating service duty responsibilities in the area where there is the most potential for overlap, and said provider book shall provide ... [And then it identifies a number of requirements.]

\* \* \*

62. Beginning no later than 180 days after the entry of this Order, the defendants shall require MCOs to provide each primary care provider participating in the EPSDT program an up-to-date list of specialists to whom referrals may be made for screens, laboratory tests, further diagnostic services and corrective treatment. This list shall be supplemented quarterly to indicate additions or deletion and shall comply with the access/availability standards of the 1115 waiver.

\* \* \*

65. Within 180 days of this order, the State shall issue any necessary policy clarifications so that the defendants and their contractors understand their duty to provide EPSDT diagnosis and treatment services consistent with 42 U.S.C. Section 1396(D), Subsection (r). Thereafter, the defendant shall inform in a timely manner and on an ongoing basis all of their contractors about what federal Medicaid law requires with respect to specific screens, diagnoses and treatments.

\* \* \*

72. Within 30 days of the entry of this Order the defendants shall submit a notice of proposed rulemaking to withdraw state rules establishing lifetime dollar limits and absolute service limits on behavioral health services to children under 21.

73. Within 120 days of the entry of this Order, the state or the state's contractor shall monitor a sample of children entering DCS custody and assess the adequacy of services provided to them by TennCare contractors prior to their entry into custody. The review will include an assessment of the effectiveness of the services provided to the child prior to the custody arrangement being made.

\* \* \*

82. Within 180 days, the defendant shall issue regulations and policy guidance to their contractors which incorporate strategies for ensuring coordination of EPSDT services among contractors and with other programs and services enumerated above.

\* \* \*

88. Within 120 days, the service testing process currently performed by the Tennessee Commission on Children and Youth which assesses all services, (medical, and non medical) provided to children in DCS custody, shall include, on an ongoing basis, an audit of EPSDT compliance with regard to the children sampled. Such testing may be con-

ducted by the State or a DCS contractor.

\* \* \*

92. **Within 60 days thereafter, the parties shall submit to the Court a proposed agreed order containing a specific remedial plan addressing the coordination and delivery of services under EPSDT law and laws contained therein for children.**

(*Id.* at ¶¶ 39, 40, 45, 53, 60, 62, 65, 72, 73, 82, 88 and 92) (emphasis added).

### B. The 2001 Findings of the Defendants' Non–Compliance

In several post-consent decree filings, the parties' counsel submitted several documents reflecting the Defendants' intention to file a "remedial plan." (Docket Entry Nos. 27, 31 and 38). The Defendants later filed a remedial plan, but after a period of time operating under the Defendants' remedial plan, the Defendants moved to stay and to modify the Consent Decree (Docket Entry No. 69) and the Plaintiffs moved for a finding of contempt (Docket Entry No. 79). After an evidentiary hearing, the Honorable John T. Nixon, the then presiding judge, found the Defendants' remedial plan to be fatally defective in structure and performance. In a ruling filed on December 18, 2001, 176 F.Supp.2d 786 (M.D.Tenn.2001) (Docket Entry No. 227), Judge Nixon made the following findings of fact and conclusions about the Defendants' remedial plan and their proposed revised remedial plan:

### I. Findings of Fact

*A. Defendants' Revised Remedial Plan—Findings of Fact*

1. Pursuant to the Consent Decree, the parties were to submit a specific remedial plan addressing the coordination and delivery of services under EPSDT law for children in State custody or at risk of entering State custody. After extensive negotiations, the parties jointly submitted a Remedial Plan for Children in State Custody and the Plan for children at Serious Risk for Entering State Custody (collectively, "Remedial Plan") on May 11, 2000. The Court approved the Remedial Plan on May 16, 2000, in two Agreed Orders. (Doc. Nos. 58, 60).

2. The May, 2000 Agreed Orders imposed on the Defendants several requirements designed to improve the care of children in, or at risk of entering, State custody. The children became a subclass that was to be carved out from the larger class implicated by the Consent Decree. The Remedial Plan had four basic components. First, Defendants were to develop a Best Practice Network (BPN) comprised of primary care providers and other health care resources. The BPN would coordinate the dissemination of medical and behavioral health services to children in the subclass.

\* \* \*

6. **Soon after the entry of the May 2000 Agreed Orders, the Remedial Plan proved to be unworkable.** The State created the Implementation Team, which was headed by a capable pediatrician, Dr. Larry Faust. Dr. Faust began recruiting for the Best Practice Network in May, 2000, by contacting pediatricians all over the State via e-mail, telephone, and in person, and also spoke to Steering Panel members. The Steering Panel was appointed, and subcommittees were formed. The Steering Panel and the Executive Oversight Committee met frequently.

7. However, the State has not fully adhered to the Remedial Plan. First, the

State was unable to recruit sufficient physicians for the BPN. The providers were hesitant to contract with the State's MCOs because of past negative experiences with the MCOs. The State was unable to contract with COE's because they, too, had concerns about dealing with the MCOs and about ultimately serving as "safety nets." These concerns were not unfounded, given the fact that Xantus was in receivership and Access MedPlus went into supervision. The Court notes that access MedPlus is no longer part of the TennCare system. Hence, the Remedial Plan was never fully implemented.

8. The State has now proposed a revised Remedial Plan. Central to the State's proposed revisions is a "carve-out" for the delivery of health services to children in State custody. The plan contemplates that these children will be enrolled in a single MCO and BHO, rather than being distributed among all of the TennCare contractors. As of July 1, 2001, the State has already reassigned all children in State custody to TennCare Select, to be administered by BlueCross.

9. The State believes that limiting the plan to only one MCO and one BHO will address many of the problems that providers had with the original Remedial Plan, including the hassle of having to deal with multiple TennCare contractors. The Revised Remedial Plan also allows advocates other than DCS to make referrals to the Implementation Team, and requires the State to contract with an advocacy group to make available additional resources for concerned individuals seeking to access services for children at risk of entering State Custody. Although the revised Remedial Plan proposes other changes, the forgoing are the most salient proposals.

10. The Revised Remedial Plan was formally approved by both the Steering Panel and the Executive Oversight Committee, with only Plaintiffs' counsel and an advocate disapproving. The State has begun to move forward with its plans for the revised Remedial Plan by working with Blue Cross to develop the infrastructure necessary to create the Best Practice Network. The State opines that only this Court's Order is necessary for it to proceed with the Revisions.

\* \* \*

### B. EPSDT Failures

#### Outreach

8. . . . . [T]he evidence presented at trial demonstrates that some outreach activities are more effective than others. While State officials have opined that "[n]o strategy [has] necessarily been proven better than the other," they implicitly acknowledge that other states have effectively and creatively conducted outreach activities. **The evidence submitted at trial proves that the State's strategy of mailing fliers and brochures to inform TennCare recipients of their EPSDT rights is inadequate. The State is aware that its outreach strategies are insufficient.** In fact, at least one TennCare employee recognized that a statewide broadcast and media campaign was necessary in order to inform children and their parents of EPSDT . . .

\* \* \*

10. Most importantly, the trial record demonstrates that at least some TennCare members and their parents were unaware of what EPSDT represents, or even that it con-

ferred certain benefits upon them....

*Screenings*

11. Under the Consent Decree, the State must comply with the federal requirements for EPSDT screens. An adequate screen must contain all components required by EPSDT law. The State was to create a committee that would devise a plan and specific guidelines to ensure the effectiveness of the screens. Additionally, the Consent Decree specified a method for quantifying and measuring screening performance, and established goals over time for adjusted periodic screening percentage (APSP) rates.

12. Specifically, the State agreed to improve its APSP annually, and reach a goal of 80% by September, 2001. The Defendants proof submitted at trial indicated that the State has failed to meet its goals. The adjusted screening rate for 1999 was 19.8% and rose to 31.5% in 2000, far short of the baseline goals for those years, and the ultimate goal of 80% for 2001. Dental Screening rates also, fell short of their targets.

13. The Consent Decree also required that 100% of Children in State custody were to receive full EPSDT screening after September 1999. As of May, 2001, 91% of children in State custody had received the appropriate screens. Although this figure is still short of the 1999 target, **the 91% may be inflated** because it may not represent fully EPSDT compliant screens **because the Department of Children's Services (DCS) reports a child having been adequately screened even if that child has not received the seven** components required by federal law ...

\* \* \*

[Conclusions of Law]

The Court agrees that the current Remedial Plan is unworkable, and that modification may, in theory be appropriate. However, the Court is not convinced that the revised Remedial Plan adequately addresses the main problem associated with the original Remedial Plan. Specifically, the managed care structure of TennCare may create the problems encountered by and among the State, MCOs and BHOs and providers. The new premedical plan does nothing to assuage the providers' distrust of the MCOs. **The Revised Remedial Plan also does not address the apparent disconnect between the Bureau of TennCare and the Implementation Team at the Department of Health.** A new Remedial Plan that still operates under the very same managed care system may not adequately address the Court's concerns with the TennCare system as it relates to the under–21 population. **The Defendants have not made a showing of how the revised Remedial Plan will ultimately succeed where the current Remedial Plan has failed.**

The Court also does not find sufficient reasons for modifying any part of the Consent Decree at this time, for the reasons discussed in relation to the Agreed Orders. The Defendants have failed to show how the factual situation in this case mandates revision of the Consent Decree under the *Rufo* [*v. Inmates of Suffolk County Jail,* 502 U.S. 367, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992) ] test.

(Docket Entry No. 227, 176 F.Supp.2d at pp. 809–10, 810–11, 793, 794–95 and 812) (emphasis added and footnotes omitted).

In its accompanying Order, the Court reiterated the Defendants' lack of an effective plan and stated: "The Court finds that a special master is necessary to mediate and ultimately to submit to the Court an EPSDT compliant plan." (Docket Entry No. 228). The predicates for the appointment of a special master are reflected in the following findings of fact of systemic deficiencies:

> The record demonstrates that the Defendants have been, for the most part, well-intentioned and diligent in attempting to comply with both the Consent Decree and federal EPSDT requirements. In fact, Defendant officials sometimes attempted to implement the very strategies that Plaintiffs' counsel advocated, but were constrained by the realities of State Government.

\* \* \*

**However, from the beginning, the State's efforts have been hampered by institutional inefficiencies and fundamental problems associated with the TennCare system.** The record shows that the Defendants' efforts were indeed scuttled because "essential providers and tertiary pediatric care centers refused to contract with all of the managed care companies currently participating in the TennCare program." The record also confirms that the Defendants have faced a challenging task in melding Medicaid and managed care-a challenge that is by no means unique to Tennessee. Nevertheless, the institutional difficulties faced by the Defendants do not excuse their failures to follow the law. **Defendants have not shown why their failure to fully comply with the 1998 Consent Decree or federal law should be excused, and thus have neither proven compliance nor any excuse for failure to comply with the federal EPSDT provisions.**

\* \* \*

Pursuant to the Consent Decree, Defendants have a responsibility to achieve and maintain outreach efforts designed to reach all members of the Plaintiff class with information and materials in conformance with federal law . . . The record reflects the fact that the Defendants mostly delegated the responsibility to conduct outreach to MCOs and BHOs, who have not successfully implemented the outreach requirements contained in the Consent Decree. However, the Defendants are ultimately responsible for conducting proper outreach. If the Defendants choose to delegate this responsibility, they must do so with the understanding that they will remain ultimately responsible for the failure of any delegatee.

\* \* \*

**TennCare employees appear to hold a laissez faire attitude toward the EPSDT outreach procedures of their contractors, preferring to allow the contractors to creatively reach out to their patient populations. That approach has not yielded effective outreach.** Creative government is only effective when that creativity spurs positive change. The MCOs' outreach efforts have been insufficient, and the State has failed to engage in adequate oversight to ensure adequate outreach. As the Seventh Circuit Court of Appeals recognized twenty-seven years ago, "EPSDT programs must be brought to the recipients; the recipients will not ordinarily go to the programs until it is too late to accomplish the congressional purpose [of EPSDT]." *Stanton v. Bond,* 504 F.2d 1246 (7th Cir.1974). **Indeed, without proper outreach, EPSDT is worthless.**

\* \* \*

It is clear from the record that not only have Defendants failed to comply with the Department of Health and Human Services' regulations, but Defendants have simply failed to meet the bare requirements of the EPSDT laws. Defendants indicate that low screening rates in this region are partly attributable to both an ill-informed physician corps and a patient population that is not as willing to see a doctor for well-child care. However, Governments' job is to inform both the provider and consumer communities of the federal screening requirements. In fact, federal law requires that the State engage in outreach to inform the patients of EPSDT. The Court agreed that Tennessee may have a "harder road to hoe" than some other states, but that does not mean that the entrenched attitudes of providers and patients can be used as a shield against liability for failure to implement EPSDT requirements. **Defendants concede that they "have not and will not meet the EPSDT percentages required by the Consent Decree." The Court agrees.**

*Id.* at pp. 790–91, 791, 792, 803, 804.

Judge Nixon cited as a causal factor of the Defendants' noncompliance, the Defendants' wholesale delegation of matters to the MCCs. Judge Nixon found that "most of what TennCare does has to happen through its contracts with the MCOs and BHOs." *Id.* at p. 801.

The State is also required to issue and implement procedures to facilitate coordination among various contractors. Although the State issued its contracts a list of other agencies and programs with which they should coordinate EPSDT services, the exchange of information between contractors remained "disorganized" and few of the Defendants' proposals to achieve coordination were implemented. **Coordination between various private health agencies is still inadequate. The lack of coordination among various non-governmental agencies is directly attributable to the very system under which public health is administered. Tennessee State government has failed to properly coordinate and implement proper case management and coordination services.**

*Id.* at p. 799.

In 2001, the Defendants relied on their contractors as witnesses to justify their request for modification.[11] Judge Nixon made specific findings and conclusions about the deficient performance of the MCCs or MCOs and BHOs:

15. **Defendants have made progress in achieving the target screening rates by contractually requiring their contractors to meet certain EPSDT screening goals. The most recent contracts show that an MCO that has not reached an 80% adjusted screening ratio is now required to contract with the county health department to perform EPSDT screening. . . .**

\* \* \*

11. *See e.g.*, Docket Entry No. 156, June 19, 2001 Transcript, Vol. 11, at pp. 282–294 (Dr. Gregory Preston, Chief Medical Officer of Blue Care, testified about the remedial plan and the development of a best practices network and moving all children in DCS custody into a single MCO); Vol. XVII–A, 8–1–01 at 2047–2115 (Deborah Cagle, Vice President for Planning and Programming at Advocate testified on network adequacy, coordination with the MCOs and PCPs, and prior authorization process and criteria). The Defendants acknowledge that "the MCCs play an intricate and important role in ensuring that the State fully complies with its obligations under both the Consent Decree and the federal EPSDT law." (Docket Entry No. 932, Exhibit A thereto).

17. As discussed above in relation to outreach and screening, systemic deficiencies have also made compliance with the Consent Decree's diagnosis provisions difficult. **First, where there are overlapping medical and mental health issues, the MCOs and BHOs quibble over which entity is responsible for providing coverage. The State's TennCare contracts contribute to this ambiguity by sometimes failing to specify the responsible party, even though the BHOs do have coordination agreements with MCOs.** In practice, individuals with overlapping issues sometimes "fall in the cracks" and fail to receive services from either a BHO or MCO, as with, for example, attention deficit disorder patients.

18. **Additionally, the MCO and BHO contractors often refuse to authorize health assessments.** Larry Faust of the Department of Health testified that even when MCOs and BHOs authorized services, they sometimes refused to pay the provider once the service was rendered.

19. **Even worse, the State's managed care system often provides incentives for financially-motivated denials of coverage by both MCOs and BHOs. TennCare's contractors essentially gamble that they will be able to provide services to TennCare enrollees and still be able to make a profit. Tennessee pays the MCOs and BHOs a set amount of money for all of the services that an individual requires. Hence, the contractors have an incentive to cut costs by denying coverage.**

20. **Further, as discussed above, MCOs and BHOs often lack adequate provider networks, creating a barrier to adequate diagnostic evaluations.** The lack of provider networks is attributable, in part, to the failure of the BHOs and MCOs to pay its providers for services rendered. The lack of a provider network is also attributable to a scarcity of certain specialists across the nation. While the State notes this problem, it has been unable to stop the hemorrhaging of the provider networks. The proof at trial demonstrates that, in some circumstances, provider participation has drastically declined....

\* \* \*

22. **[T]he record demonstrates that even where the TennCare Bureau agrees that the denied services is medically necessary, the State routinely grants the BHOs and MCOs a 'good cause' extension of time in which to provide services that the TennCare Solutions Unit has deemed medically necessary. The trial record is that children often wait for extended periods of time to receive medically necessary services ... The record reflects similar situations involving medically necessary services that, for various reasons, were either delayed or never provided to the patient.**

23. On the behavioral/mental health side, the BHOs sometimes fail to connect children to an appropriate diagnostic resource capable of performing the required behavioral health assessment. As with MCOs, there is an inadequate provider network for psychologists, psychiatrists and other behavioral health professionals. The record also demonstrates that State policy

makers are well-aware of the limited BHO provider network.

24. The record reveals that a number of the providers within the limited BHO provider network are not taking new patients, thus rendering those providers unavailable to new TennCare patients.

25. Additionally, there is only one BHO in Tennessee. The BHO does engage in some oversight, as the testimony of Deborah Cagle, Vice President at Advocare, demonstrates, Ms. Cagle testified that Advocare reviews and audits its providers, and has hired an independent auditor to review Advocare's providers. However, the record shows, that although there is only one BHO, the State has failed to adequately monitor the BHO's provisions of EPSDT and Consent Decree-mandated services. More specifically, the State has not ensured that the BHO strictly mandate that its providers offer adequate services to their patients. The testimony of Dennis Elliot, Manager of the Network Adequacy Unit at TennCare, demonstrates that TennCare does not adequately assure that the BHO corrects deficiencies in the BHO's provider network.

26. **Thus, children frequently do not receive appropriate diagnoses through the TennCare managed care system. Defendants admit that "sometimes the system breaks down, and the Court finds that in this case, the State Government's healthcare system has indeed broken down." However, the system itself is to blame for TennCare's failures. A depleted provider network and lack of proper oversight by MCOs and** **BHOs is directly attributable to the TennCare managed care system, which has proven to be unable to fully comply with both the EPSDT and the Consent Decree's requirements for proper diagnosis of children under 21.**

\* \* \*

**[Conclusions of Law]**

TennCare does not allow individuals to receive adequate diagnosis and treatment through various providers. The incentives created by capitated payments to the MCOs and BHOs result in a failure of the State system to assure that each State resident under the age of 21 receives the care that EPSDT mandates. As the Court has previously noted, there are "pecuniary incentives that MCOs [and BHOs] have for denying, suspending, or terminating care under the TennCare system...." *Daniels v. Wadley*, 926 F.Supp. 1305, 1308 (M.D.Tenn.1996)....

\* \* \*

**The proof shows that the State has failed to adequately ensure the coordination of EPSDT services among the various governments, private and nonprofit providers of services. The TennCare program, although well-intentioned, is disjointed.... Although the State has established an office that is essentially dedicated to ensuring EPSDT compliance, that office is powerless to address the Court's greatest concerns with the TennCare program because the office does not have the mandate to directly control the actions of the MCOs or the BHOs. Adding another sailor to a sinking ship will not prevent it from sinking. In the same way, adding yet another layer of bureaucracy to an ineffective**

TennCare system will not succeed in reforming it.

**In many instances children lack a case manager.** The *Frew [v. Gilbert]* court recognized that failure to provide case management services may constitute a violation of EPSDT. 109 F.Supp.2d [579] at 674 [(E.D.Tex. 2000)]. **This Court concurs, and finds that failure to provide adequate case management services in this case constitutes a violation of federal law.** Without effective case management, the individual child lacks an effective coordination of various services that he or she needs to ensure that EPSDT services are rendered.

*Id.* at pp. 795, 796–97, 797–98, 805–06 (emphasis added). Judge Nixon reserved a finding of contempt: "However, because the Court bases its decision on failure to comply with federal law, the Court will hold in abeyance a decision whether Defendants' actions thus far constitute civil contempt.... The record indicates that the State made great efforts to comply with the Court's Orders. However, the Court reserves the right to find the Defendants in contempt in the future." *Id.* at p. 806.

The Court then directed "[t]he parties ... [to] attempt to work to reach a consensus on a workable plan[, and i]f, and only if, the special master determines that the parties are unable to agree on a plan, the parties shall submit plans to special master for his consideration." (Docket Entry No. 275 at p. 2). In an October 14, 2002 Order, the Court required the Defendants to prepare an "Itemized Assessment Protocol" ("IAP") as well as an "Initial Work Plan" ("IWP"), under the Special Master's supervision. (Docket Entry No. 291 at pp. 3–4). In a subsequent Order, the Court ordered the Defendants to submit an "Initial Work Plan" ("IWP") to the Special Master and later granted the Defendants an extension "that defendants shall submit their initial work plan by December 13,

2002." (Docket Entry No. 303). As discussed below, the Defendants did not meet their obligation on the IWP or the IAP.

### C. The 2004 Findings of the Defendants' Non–Compliance

On June 16, 2004, Plaintiffs filed another motion to show cause (Docket Entry No. 403) asserting the Defendants' continuing violations of the Consent Decree. After discovery and an evidentiary hearing, in a Memorandum entered on October 22, 2004, citing testimony of two key state policymakers, Judge Nixon found that the Defendants were again not in compliance with the Consent Decree and significantly, lacked a reliable system to measure their progress.

On June 23, 2004, the Plaintiffs deposed Dave Goetz, Tennessee Commissioner of Finance and Administration, and on June 24, 2004, Plaintiffs took the deposition of Manny Martins, Deputy Commissioner of Finance and Administration for TennCare. Both deponents attested to sincerity, good intentions, and hard work of those State employees who have labored since 2001 to comply with EPSDT. Mr. Martins testified that the State is making inroads in the area of outreach. "From 1999 to 2003 we had a 175 percent increase, I believe, in our screening rates from, as an example, 19.8 percent to 53 percent. We've had a 60 percent increase in our dental screening rates, 55, 56 adjusted the raw is 36 to 62 for 2002, raw 54, adjusted 41.9." [Quoting the Martins Deposition at 57]. Mr. Martins also reported that TennCare has staffed 22 dental clinics and has contracted with the Department of Health for dental outreach, dental operatory, and mobile operatory. Mr. Martins has stated that by the way of a new contract with the Department of Health for $7 million, effective July 1,

2004, every single TennCare enrollee child would be contacted by their local health department from newly set-up call centers . . .

Mr. Goetz also made statements in his deposition which conveyed progress. With respect to screening results, Mr. Goetz noted "dramatic improvements" over the last couple of years and stated, "efforts to work through the county health officials have borne fruit, and that's also what we were funding, continuing outreach in the budget that was just passed into law" [Quoting the Goetz Deposition at 41]. Nonetheless, while some progress has been made since the Court's approval of the Consent Decree in 1998, testimony from Mr. Martins and Mr. Goetz along with reports made to the Court by the Special Master, make clear that not enough progress has not been made. **The Court is not convinced that Defendants, acting on their own, will reach full compliance with the terms of the consent decree within a reasonable period of time.** As the well-being of 550,00 children is at stake, something more must be done to ensure that the state's EPSDT requirements are met in accordance with the terms of the Consent Decree.

**As recently as August 2004, the Special Master concluded in his status report to the Court that no feasible plan yet exists to achieve compliance for an indispensable section of the Consent Decree. The Special Master reported that the State has failed to honor its renewed commitment to produce an IAP satisfactory to the Special Master, last made in September 2004, and still refuses to engage its key officials in planning efforts to achieve compliance, verification of the quality of its data, and evaluation of the successes or failures in attaining compliance.**

**The Special Master also reports that the State is incapable of reporting progress to the Court because it lacks a valid and reliable system of measuring progress in such key areas as provider network adequacy, case management, outreach, the effective use of information systems, and system level coordination, to name a few.** The Special Master's status report informs the Court that because Defendants have never created a list of precise "outcomes" towards which their efforts are focused, not only have they failed to meet the terms of the Consent Degree, but they are not even in a position to be able to assess their own shortcomings for the purpose of making improvements.

**The Court finds that the deposition testimony of Mr. Goetz and Mr. Martins conclusively support this Court's finding that, to date, the State has not achieved compliance with the terms of the Consent Decree.** Mr. Martins, the senior state official with direct responsibility for EPSDT compliance, testified, "I'm not sure that compliance with the consent decree is achievable." Martin's Dep. 29. He testified that the 100 percent screening requirement for children in state custody mandated by the Consent Decree "should be achievable" and that the Consent Decree's stated dental screening rate "can be achievable over a period of time."

Martins Dep. at 33. When asked about barriers to compliance that he saw, Mr. Martins replied, "There are numerous external barriers that are out there. Some of them involve coordination with other departments, some of them involve the inability to have good data in terms of being able to have information on the system-on the child and following that child through the system." Martins Dep. 35. Mr. Martins also discussed the

socio-economic barriers to achieving compliance with the consent decree and "barriers in understanding" on part of families of TennCare enrolled children who sometimes do not seek services for their children when they are healthy, in spite of the importance of preventative EPSDT measures to the continuing health of their children. Martins Dep. 35–36. Finally, Mr. Martins stated, "I think we have barriers from the standpoint of not totally understanding all the gaps that we have in our delivery systems." Martins Dep. at 36.

Specifically, with respect to the screening requirements in the Consent Decree, **Mr. Martins testified that the State is not meeting the 80 percent standard in the Consent Decree. Mr. Martins testified that while he would like to review the numbers, the last figures he had seen indicated that the state is not meeting the 100 percent screening requirements under the Consent Decree for children who are in State custody. Further, Mr. Martins stated that with respect to dental screening and dental service, the State is not in compliance with the Consent Decree.** Other areas of particular concern testified to by Mr. Martins include the current inadequacy of behavioral health networks, and the State's failure to meet the Consent Decree's required provision of EPSDT services to the children in DCS custody. Martins Dep. 187.

Mr. Goetz testified that one factor that impedes implementation of the Consent Decree is the sheer enormity of the task, given the 550,000 children enrolled in TennCare. Goetz Dep. at 37. He also testified to learning that breakdowns in communications have also created barriers to the State's ability to achieve compliance with the terms of the consent Decree. Goetz Dep. at 37. **This is not a finding that the State has acted in bad faith or has inten-**

**tionally failed to comply with the Consent Decree. To the contrary, the Court acknowledges, as set forth above, that the state has made some progress toward compliance in some areas. However, these efforts have not produced the results mandated by the Consent decree some six years ago. The Court is compelled to grant further relief to the Plaintiffs, 550,000 TennCare enrolled children, to ensure that their EPSDT needs are met as quickly as possible....**

... [A] motion for relief looks to the future, rather than the past. In looking to the future, the Court has instructed the Special Master and his experts to create a comprehensive plan to put the State in compliance with the terms of the Consent Decree. The plan is attached to this Order ... This plan is not a modification of the terms of the consent decree.

(Docket Entry No. 465, Memorandum and Order at pp. 4–8) (emphasis added). The Court then set a deadline for objections and authorized depositions and proposals for modifications of the plan attached to its Memorandum. *Id.* at p. 8.

On December 13, 2005, the Court ordered that the Defendants "immediately disclose to Plaintiffs and the Special Master the plan, if any, under which the State is operating to comply with the Consent Decree and the EPSDT law as well as file by January 31,2006, its Semi–Annual Report ..." (Docket Entry No 558, Order at p. 2). On December 19, 2005, Linda Ross, a Deputy Attorney General on behalf of the Defendants wrote the Special Master that:

Compliance with both EPSDT law and the Consent Decree is a high priority of the State, but neither require that the State develop a single document setting forth a "plan" for maintaining compliance. Rather, the State has put in place

a clearly defined process, under the leadership of the Governor's Office of Children's Care Coordination, to ensure that both the spirit and the letter of EPSDT law and the Consent Decree continue to be met.

(Docket Entry No. 559–2).

On January 9, 2006, the Defendants' submission to the Court construed the Court's December 13th Order to relieve the Defendants from submission of any plan. This submission reads, in pertinent part:

> **The Court's December 13 Order did not place an affirmative obligation on Defendants to have a written plan, and no such obligation is contained in either the Consent Decree or EPSDT laws.** At one time, the State was subject to an analogous obligation in this case. In its August 14, 2002 Order, *see* Doc. 291, at 3–4, ¶ 4b, the Court appointed a Special Master and his selected Experts to oversee the creation and implementation of an Itemized Assessment Protocol ("IAP") and Initial Work Plan ("IWP") to be used in evaluating the State's compliance with the Consent Decree and federal EPSDT law ... The IAP and IWP requirements were not resurrected in the Court's December 13 Order (Doc. No. 558 at 2). In fact, in this most recent order, the Court affir-

matively limited the Special Master's responsibilities to "evaluating the State's implementation of the terms of the Consent Decree and EPSDT law." (Doc. No. 558 at 2).

**Following the Court's December 13 Order, the State promptly informed both Plaintiffs and the Special Master in a letter dated December 19, 2005 that the State does not have a single document setting forth a "plan." Instead, the State has put in place a clearly defined process to ensure that both the spirit and letter of the EPSDT law and the Consent Decree continue to be met.**

(Docket Entry No. 569–2 at pp. 3–4).[12]

### D. The Recusal Order and Reassignment

In November 2004, Judge Nixon held this action in abeyance to facilitate settlement negotiations. (Docket Entry No. 495). During this suspension, the parties litigated other TennCare actions. (Docket Entry No. 550). The Consent Decree, however, remained in effect (Docket Entry Nos. 509 and 546) and during this period, the Defendants continued their discovery efforts in this action. (Docket Entry Nos. 498, 501, 508, 511, 512, 560 and 562). In particular, the Defendants issued discovery requests to depose the Special Master

---

12. The Court has concerns about Defendants' counsel's statements that the Consent Decree does not require a "plan." The Consent Decree reads in pertinent part, "Within 60 days thereafter, the parties shall submit to the Court a proposed agreed order containing a specific remedial plan addressing the coordination and delivery of services under EPSDT law and laws contained therein for children." (Docket Entry No. 12, Consent Decree at ¶ 92). As to Defendants' apparent reliance on Court Orders as limiting this provision of the Consent Decree, the Defendants have argued to the Court: "Thus, a consent decree depends, by definition, on the consent of the parties. The scope of the obligation to which

the parties have consented is set by the terms and conditions memorialized in the consent decree. Any attempt by a district court to hold a party to terms other than those to which it has agreed is an abuse of discretion *per se. See Local No. 93, Intern. Ass'n of Firefighters, AFL–CIO C.L.C. v. City of Cleveland,* 478 U.S. 501, 529 [106 S.Ct. 3063, 92 L.Ed.2d 405] (1986), *United States v. Ward Baking Co.,* 376 U.S. 327, 334 [84 S.Ct. 763, 11 L.Ed.2d 743] (1964); *King v. Walters,* 190 F.3d 784, 788 (7th Cir.1999)." (Docket Entry No. 739, Defendants' Memorandum in Support of Renewed Motion to Vacate the Consent Decree at pp. 2–3).

to inquire about discussions of the Special Master with Plaintiffs' counsel and the Court.

In the midst of these controversies, Judge Nixon set aside the plan that had been filed by the Special Master and re-cused himself, stating:

Without taking into account the October 22, 2004 order, the **history of this case reveals that this Court has consistent-ly found the State to be in violation of the Consent Decree and EPSDT re-quirements. Indeed, the State's own documents show that they are not in compliance with the terms of the Con-sent Decree. (See docket entry 546 at 1, (showing that, even in 2004, the State is still below screening targets that should have been achieved in 2001)). Notwithstanding this repeated finding, the Court took to the unusual path of not holding the State in con-tempt or imposing monetary sanc-tions. Indeed, the Court has attempt-ed to steer this case away from the needless and acrimonious litigation and focused on fashioning a solution that would increase compliance with the Consent Decree and federal EPSDT requirements.** This construc-tive approach has been fueled by one goal: To provide the underserved chil-dren of Tennessee the entire spectrum of medical benefits to which they are entitled under federal law.

**The State's pending Discovery Motion attempts to push this goal to the way-side and refocus the case on wholly unnecessary, time-consuming, costly, and highly divisive litigation. I refuse to condone a path that will waste re-sources and time in the face of the urgent need to improve healthcare for the children of Tennessee. Impor-tantly, no substantive activity has oc-curred in this case since November 2004; it is imperative that the parties now turn their attention to the merits** of the case. Accordingly, and after much consideration, I have decided to *sua sponte* recuse myself from this case to remove any barrier—perceived or real—to the ultimate goal of increasing the State's compliance with EPSDT re-quirements. **Let it be clear, however, that my recusal in no way adjudicates the merits of, or reflects an opinion on the allegations contained in, De-fendants' Discovery Motion. Rather, it is a reflection of my view that the healthcare of Tennessee's children must come first.**

Thus, I hereby **RECUSE** myself from the above-styled case, and direct the Clerk of the Court to reassign it to another United States District Court Judge in the Middle District of Tennes-see. In light of my recusal, Defendants' Discovery Motion and Defendants' Mo-tion to Expedite are **DENIED** as **MOOT.** Pending reassignment of the case, the Office of the Special Master shall remain intact, but **INACTIVE.** The new presiding Judge may decide the continuing necessity of the Office of the Special Master, and all motions pending at this time.

(Docket Entry No 584, Memorandum and Order at pp. 4–5) (emphasis added). As a related action, the action was transferred to this member of the Court.

As the succeeding judge, the Court set a status conference on February 10, 2006 to discuss outstanding issues with the parties' counsel. At that time, a point of conten-tion was whether the Defendants were re-quired to file a plan to remedy Judge Nixon's earlier findings of their violations of federal law. The Defendants' position on this issue, as quoted earlier, is as fol-lows:

Compliance with both EPSDT law and the Consent Decree is a high priority of the State, but neither require that the

State develop a single document setting forth a "plan" for maintaining compliance. Rather, the State has put in place a clearly defined process, under the leadership of the Governor's Office of Children's Care Coordination, to ensure that both the spirit and the letter of EPSDT law and the Consent Decree continue to be met.

(Docket Entry No. 559–2, Letter from Linda Ross to Richard Carter, MD). *See also*, Docket Entry No. 569 at p. 4 and Docket Entry No. 596, Transcript of Hearing of February 10, 2006 at p. 10.

At the February 10th conference, the Court reviewed those portions of the record on this issue. First, paragraph 92 of the Consent decree reads: "Within 60 days thereafter, the parties shall submit to the Court a proposed agreed order containing **a specific remedial plan** addressing the coordination and delivery of services under EPSDT law and laws contained therein for children." (Docket Entry No. 12 at ¶ 92) (emphasis added). In an Agreed Order submitted by counsel for the parties, counsel cited "the remedial plan called for by paragraph 92 of the consent decree." (Docket Entry Nos. 39 and 40). In an earlier submission, the Defendants reiterated that they were willing to engage a mutually agreeable expert "to facilitate further development of a plan." (Docket Entry No. 31 at p. 2). Later, the Defendants requested a conference with the Court, stating: "The

proposed remedial plan was developed pursuant to Paragraph 92 of the consent decree." (Docket Entry No. 52). *See also* Docket Entry Nos. 54, 55, 57, 58, 59, 60, 76 and 88 that refer to the Defendants' "remedial plan." In one Agreed Order, counsel stated: "Pursuant to paragraphs 88–92 of the consent decree, the parties submitted a "remedial plan"." (Docket Entry No. 59). In another Order, the Court stated that the "Consent decree provides for implementation of a remedial plan." (Docket Entry No. 103). *See also* Docket Entry No. 164, Order.[13] After reviewing these entries and Orders, the Court directed the Defendants to file whatever the Defendants deem to be their plan to comply with the Consent Decree.[14] (Docket Entry No. 601).

After a review of the record, the Court retained the former Special Master and his assistants as technical advisors so as not to lose the most knowledgeable experts who had expended extraordinary resources to inform the Court about the Defendants' compliance efforts. Given Judge Nixon's prior findings of non-compliance, the contentious exchanges between the parties' counsel, the extensive scope of the Consent Decree and the state of the record, the Court deemed necessary the appointment of monitors to assist the parties and the Court in identifying issues that remain for discovery and any evidentiary hearing. A strict protocol was defined for the monitors' activities. The Monitors filed a report that the Court deemed helpful in

---

13. To be sure, in a more recent Order, Judge Nixon stated that the Consent Decree does say that the state will implement a "plan" or "process for implementing the consent decree." (Docket Entry No. 578 at p. 4). This member of the Court deems paragraph 92 controlling and the parties' filings establish the requirement for the Defendants' filing and implementation of a remedial plan.

14. The Defendants filed a series of documents, (Docket Entry Nos. 581–1, 581–2,

624), but upon review, the Court seriously questions whether those submissions constitute a coherent plan. Of course, the Defendant insist that despite its clear language the consent does not require a plan. The Consent Decree reads, in pertinent part: "Nonetheless, present officials cannot correct problems overnight which have been years in the making. **Their development of the remedial plan is itself evidence of their genuine commitment to reform** ... " (Docket Entry No. 12, Consent Decree at ¶ 30) (emphasis added).

identifying the remaining issues in the litigation. (Docket Entry Nos. 795 and 796). Regrettably, despite Judge Nixon's prior repeated findings of their non-compliance, the Defendants expressed to the Monitors their concerns about this Court's continuing oversight of this program. (Docket Entry No. 795, Monitors' Report at p. 5).[15]

**E. The 2006 Discovery Proceedings**

At the February 10, 2006 conference, Michael Kirk, one of the Defendants' counsel announced that the Defendants had achieved compliance with the Consent Decree. (Docket Entry No. 596, Transcript at p. 47). "I would just like to note for the record that it is the State's view that they have been in compliance with the consent decree." *Id.* That contention resulted in the Plaintiffs' commencement of discovery.

The Court held a series of conferences that included discussions of ESI production. (Docket Entry Nos. 599, 601, 615, 642, 645 and 646). At a February 28, 2006 hearing, the Court heard the testimony of Brent Antony, the chief information officer of the TennCare Bureau, on the Defendants' motion for a protective order concerning a utilization data request from Mr. Carter, the former Special Master appointed by Judge Nixon. Anthony's experience is in health care and Antony's computer knowledge was "really from [his] job experience." (Docket Entry No. 614, February 28, 2006 Transcript at p. 82). Anthony described the Defendants' change of computer systems.

At the April 17, 2006 conference on the Monitors' review of relevant state data, the Court "suggested" to the Defendants that "whatever is electronically available ... be made available to the Monitors and the Plaintiffs in electronic form unless, of course, there is an issue of privilege." (Docket Entry No. 646 at p. 33). This instruction was to provide a common base of information so as to ensure a meaningful dialogue among the parties, the monitors and the Court on contested issues. *Id.* The Court then denied the Plaintiffs' motion to compel such information (Docket Entry No. 651), but without prejudice to renew because the Defendants were going to provide to Plaintiffs any ESI information provided to the monitors. (Docket Entry No. 656).

On March 31, 2006, Plaintiffs propounded discovery requests seeking information and documents, including ESI, related to the State's contention of compliance with the Consent Decree. (Docket Entry No. 711). Plaintiffs' interrogatories and related document requests included the following two definitions:

9. **"Communications" means any transmittal of information in any form or format, whether oral, written, or electronic,** including, without limitation, all correspondence, inquiries, discussions, conversations, negotiations, agreements, understandings, meetings, telephone conversations and message logs, letters, notes, memoranda, telegrams, faxes, **emails,** or recordings. It is understood that all categories of documents described above shall include with respect thereto all communications as defined, whether or not expressly stated. **The produc-**

---

**15.** This sentiment was also expressed in the Defendants' memorandum in opposition to Plaintiffs' earlier motion to compel: "As the Court is surely aware, the Governor's commitment to constitutional federalism and his abiding faith in policy-making by democratically elected state officers, **in preference to the commandeering of state agencies by fed-** **eral judges,** extends far beyond the present dispute over EPSDT." (Docket Entry No. 720 at p. 23) (emphasis added). In sum, the Court has intervened only when the Defendants repeatedly failed to meet their obligations to the children under the Consent Decree and federal law.

tion of electronic communications should be accompanied by a description of the software and technology used to prepare the communications and needed to read them.

* * *

15. The term "document" means all writings of any kind, including the originals and all non-identical copies, whether different from the originals by reason of any notation made on such copies or otherwise (including without limitation, correspondence, e-mail, memoranda, notes, diaries, statistics, checks, statements, receipts, returns, summaries, pleadings, affidavits, depositions, pamphlets, books, prospectuses, inter-office and intra-office communications, offer notations of any sort of conversations, telephone calls, meetings or other communications, bulletins, printed matter, **computer print-outs, information contained in any computer although not yet printed in hard copy, teletypes, telefax, invoices, worksheets, and all drafts, alterations, modifications, changes and amendments of any of the foregoing), graphic or oral records or representations of any kind, (including without limitations, photographs, charts, graphs, microfiche, microfilm, videotape, recordings, motion pictures) and electronic, mechanical or electrical records or representations of any kind, (includ-**ing without limitations, tapes, cassettes, discs, recordings).

(Docket Entry No. 626–2, at pp. 3, 4) (emphasis added). Plaintiffs' discovery requests also sought information and documents in the possession of the Defendants' agents and included an instruction that, "when answering an interrogatory, to the extent that an activity or responsibility has been delegated to a contractor, identify the contractor and the scope of the delegation." *Id.* at 2. Some interrogatories explicitly requested information related to contractors' actions and information.[16]

On May 15, 2005, the Defendants responded, but converted their ESI to hard paper copies. (Docket Entry No. 709, Plaintiffs' Brief in Support of Motion to Compel Discovery at pp. 14–15). The Defendants insisted that the hard paper copies were identical to any responsive ESI and therefore did not produce the documents in ESI computer format. (Docket Entry No. 720 at p. 13, Docket Entry No. 815–2 at p. 4 and Docket Entry No. 988 at p. 186). Nicole Moss, a defense counsel, conceded the Plaintiffs served discovery requests for electronic discovery. (Docket Entry No. 734, November 6, 2006 Transcript at p. 23). Of particular note is that the Defendants' following objection: "8. Defendants object to the Interrogatories' definition of "document" to the extent it reaches electronic versions of documents separate and apart from a hard-copy version of the identical document that has been identified and made available in the hard-copy form." (Docket Entry No. 815–2, Defendants' Response to Plaintiffs' Third Set of Interrogatories at p. 4) (em-

**16.** *See* Docket Entry No. 626–2, Interrogatory 18(f) ("Identify each class member whose death or injury has come to the attention of state officials or their contractors and that may have followed a denial of health care to the child or the child's inability to access health care"); Interrogatory 19(i) (seeking any process in place by Defendants or their contractors to ensure employment of the correct definition of "medical necessity"); and Interrogatory 54(c) (seeking information related to "any process or measure used by the Defendants or their contractors to assess compliance with the Consent Decree requirements.").

phasis added). The Plaintiffs provided ESI in response to the Defendants' discovery requests. *Id.* at pp. 24–38. Plaintiffs' ESI production included some metadata. (Docket Entry No. 719, Antony Declaration at p. 5, ¶ 7).

The Defendants objected to providing potentially responsive information or documents from the MCCs, contending that these files are not within their own possession, custody or control except documents already provided to the State by the MCCs.

> The State contends that it can fully and accurately respond to plaintiffs' discovery requests and that it need not require its EPSDT contractors to search their files for potentially responsive information or documents, and that the defendants are only obligated to produce documents or information that the contractors have already provided to the State because the rules only require the production documents in a parties' possession, custody or control. Further, the State contends that to require its contracts to have to independently respond to Plaintiffs' discovery requests would be unduly burdensome and prohibitively expensive.

(Docket Entry No. 711, Joint Discovery Statement at p. 4).

The parties' counsel continued to disagree on discovery issues and in an August 16th letter, the Plaintiffs' counsel reaffirmed that: "On that broader question regarding electronic production, we agreed to disagree, since it continues to be the Plaintiffs' position that we are owed such production under Rule 34." (Docket Entry No. 712–3 at p. 20). Further negotiations between the parties narrowed some issues, but as this Memorandum reflects, the parties did not resolve their significant discovery disputes.

On October 13, 2006, the Plaintiffs filed another motion to compel (Docket Entry No. 708), that the Defendants opposed. (Docket Entry No. 720). The Defendants also filed a motion to compel on non-ESI issues involving Plaintiffs' contacts with advocacy groups and law firms (Docket Entry No. 706) that was denied on First Amendment principles and the work product privilege. (Docket Entry No. 743). In support of their objections to Plaintiffs' ESI discovery requests, the Defendants submitted affidavits, but those affidavits made only generalized assertions of an undue burden and the interruption of the work of state employees to respond to the Plaintiffs' ESI requests. (Docket Entry No. 720 at Exhibits B and C thereto).

The Court held a discovery hearing on November 6, 2006 to decide the parties' pending discovery motions and to mediate the parties' differences on ESI discovery. As to the Plaintiffs' discovery request for ESI, the Court reiterated its understanding from the April 17,2006 conference that whatever ESI was given to the monitors was to be provided to the Plaintiffs. (Docket Entry No. 734, November 6, 2006 Transcript at pp. 34–36). The Court also expressed the view: "it makes sense to me that if it's available on an electronic data form, that you all would share that instead of generating all of this paper." *Id.* at p. 68. The ESI was to be produced for the fifty (50) key custodians as agreed upon by the parties.[17] (Docket Entry No. 734 at pp. 35, 68; Docket Entry No. 743 atp. 2). The Court further ordered the production of documents and information, including ESI, in the possession of the MCCs (Docket Entry No. 734 at pp. 71–74; Docket Entry No. 743 at pp. 1–2). The Court directed counsel to prepare an Order specifying the information sought from the MCCs, *id.* at pp. 69–70, because "[a]s I

---

17. The Plaintiffs' initial designation was for more than 100 key custodians.

understand it, there is no real objection to producing what the MCOs have." *Id.* at p. 69. The Court, however, directed that the ESI discovery would be produced under an agreed protocol, *id.* at pp. 65–66 and told the parties to exchange information about their computers and software among their computer experts. *Id.* at pp. 66–68, 74–75, and 86–87. The Court granted the Defendants leave to seek relief if the computer experts were unable to agree on the terms of the protocol. *Id.* at pp. 75, 82, 90.

At the November 6th hearing, Plaintiffs' counsel also expressed concerns about the Defendants' ambiguous responses to their discovery requests on destruction of evidence. The Court ordered the Defendants to give assurances that the State had preserved responsive information and responded fully and accurately to the Plaintiffs' discovery. The Court ordered that individuals identified by the Defendants as key custodians to answer Plaintiffs' revised and simplified requests for admissions about destruction of evidence and to sign their answers personally. (Docket Entry No. 734 at pp. 56–64; Docket Entry No. 743 at p. 3; Docket Entry No. 786 at pp. 40–42). The Plaintiffs propounded their third requests for admissions and fifth set of interrogatories on this issue. (Docket Entry No. 799).

In an Order entered on November 21, 2006, the Court ordered the Defendants to "provide responsive documents that are in electronic format." (Docket Entry No. 743, Order at p. 2.). In response to this Order, the Defendants offered Plaintiffs what the Defendants deemed an "eminently reasonable alternative solution," *i.e.*, to provide "production of supplemental materials and those documents where record of blind carbon copy may have been omitted from prior production." (Docket Entry No. 907 at 13–14). The Defendants offered to produce only ESI after April 15, 2006, and the ESI for any "documents prior to that date that were blind copied to any recipients." *Id.* at p. 14.[18]

On December 6, 2006, a conference was held with the parties' computer experts to decide unresolved issues on the protocol for the production of ESI under the November 21st Order. (Docket Entry No. 764 at pp. 28, 51).[19] In reliance upon precedents in this district involving complex matters, the Court directed the parties' computer experts to confer, without the presence of their counsel, to develop a protocol and/or memorandum of understanding to address the cited problems with electronic discovery. (Docket Entry No. 764, at pp. 5–6). The "experts only conference" was held without objection by any counsel and yielded positive results that were appreciated by the parties' counsel[20]. At the end of the December 6th

---

**18.** The Defendants assert that there was not any agreement or ruling previously about how far back discovery should run. (Docket Entry No. 907 at pp. 20–21). The parties agreed that discovery would relate back to June 2004, when the last round of discovery was conducted. This agreement is reflected in the Defendants counsel's letter to the MCCs that they needed to produce information since June 2004. (Docket Entry No. 899, Exhibit A at p. 5).

**19.** At this conference Plaintiffs insisted that without an enforced litigation hold, emails of state employees would be routinely destroyed.

(Docket Entry No. 764: Transcript of December 6, 2006 at pp. 28–30, 42–50). Plaintiffs' counsel also raised the lack of a litigation hold at the November 6, 2006 hearing. (Docket Entry No. 734 at pp. 61–62).

**20.** Counsel for both parties responded favorably to the first "experts only conference": [Plaintiffs' Counsel] MR. BONNYMAN: Thank you, Your Honor. We think this process has been very productive. It was very helpful for the two experts to talk. And I will acknowledge that part of the reason why that was so useful was because our side lacked—until the pro bono help

conference, the parties' experts announced their ESI discovery protocol and for the prospective preservation of responsive ESI, and electronic searches with keywords to be identified by the Plaintiffs. *Id.* at pp. 14–20. To ensure that all responsive ESI is preserved and searched, the Defendants were to survey the individuals identified as key custodians and ascertain whether those custodians had saved relevant ESI. At the December 6th conference, the Court also suggested that the parties hold a series of similar conferences with the MCCs, with a court reporter, to negotiate any further protocol issues on ESI production.

As requested, the parties' computer experts submitted an order that reflected their agreement. (Docket Entry No. 784–3 and Docket Entry No. 785). Mr. Tigh, Plaintiffs' computer expert, also submitted his declaration on the need to ask custodians an additional question as to whether the custodians had removed any responsive information to any non-attached media. (Docket Entry No. 785–2, Tigh Declaration ¶ C). On January 14, 2007, the Court entered another Order adopting Tigh's suggestion and ordered that "[t]he Defendants shall file certifications of the key custodians as to whether any material has been removed." (Docket Entry No. 789 at p. 3, citing the Tigh affidavit at ¶ C). In the Court's view, these certifications would ensure all relevant ESI would be retrieved.

Plaintiffs' proof is that the Defendants reneged on the computer experts' agreements at the December 6th conference to use 50 keywords or search terms, (Docket Entry No. 759) and the Defendants unilaterally selected two search terms and insisted upon a date-limited search. (Docket Entry No. 810, Exhibit A). Defendants initially responded that this restriction was necessary to complete the search to meet the Court's date for an earlier scheduled evidentiary hearing. Later, the Defendants would contend that the ESI production was too costly.

Based upon the parties' filings, the Court concluded that the out-of-court conferences of the experts had not been as productive as the Court contemplated. Once the parties left Court, their disputes over basic ESI issues resurfaced. Given the technical nature of the discovery controversy, the Court scheduled an "experts only" conference for April 11, 2007 for the parties' and MCCs' computer experts. (Docket Entry No. 857, Order) This conference was to define the parties' technical disputes and to implement the Court's Orders requiring the production of responsive ESI. A series of Orders were entered to ensure that the Court and the participants shared the same core information about the capabilities of the Defendants' and MCCs' respective computer systems, including their retention policies and software programs. (Docket Entry Nos. 858 and 859). Such information was ordered to be treated as confidential. *Id.* All participants were also requested to file a list of outstanding discovery issues. (Docket Entry No. 859). The Defendants filed a statement of disputed issues, requested that "the November 2006 orders be modified" and raised questions about the form

that Mr. Tigh has supplied we've lacked the sophistication to perhaps be as constructive in this as we needed to be. So we really welcome that and welcome to be able to be on a par with the resources of the State.

\* \* \*

[Defendants' Counsel] MS. MOSS: Your Honor, the State also welcomed this oppor-

tunity. We believe that this has greatly helped in coming up with a reasonable protocol that the State can live with and takes into account the limitations that the State has.

(Docket Entry No. 764, December 6, 2006 Conference at pp. 27, 51).

of the Plaintiffs' Third Request for Admission and Fifth Interrogatories. (Docket Entry No. 860, Exhibit G thereto).

The "experts only" conference was a discussion of the parties' and the MCCs' computer experts without the presence of the Court or counsel,[21] except to announce protocol for the conference and to hear the experts' reports on their progress. (Docket Entry No. 872). At the end of the conference, the parties' and the MCCs' computer experts unanimously agreed that the conference was productive. The Court directed the State's computer expert to prepare a written summary of the experts' agreements and to circulate that document among all experts for comment and file that report with the Court. (Docket Entry No. 872 at p. 228). After the April 11th conference, the parties and the MCCs had out of court conferences, and their disputes resurfaced.

The Plaintiffs renewed their earlier motion to compel on all outstanding discovery and ESI issues and the Court set an evidentiary hearing on that motion. With this brief history of the litigation, the Court sets forth below its findings of fact and conclusions of law on all outstanding discovery disputes.

## II. Plaintiffs' Renewed Motion to Compel

### A. Findings of Fact

#### 1. Information Requirements and Discovery Rights under the Consent Decree

In their motion, Plaintiffs rely, in part, upon the Consent Decree that requires the collection and maintenance of the data on the Defendants' compliance with the Consent Decree. In several paragraphs, under the heading, "Monitoring and Enforcement of MCO and DCS Compliance," the Consent Decree has the following paragraphs requiring the Defendants and the MCCs to track and report the medical screening and services to individual class members:

91. Upon request, **the evaluators shall be afforded access to such records (including electronic data files) or persons as necessary to fulfill the responsibilities imposed by this order. Each party shall have access to information and materials obtained by the evaluators;** however, except for information which originated with the parties' counsel, the evaluators may withhold the source of any information they have received. The evaluators may communicate *ex parte* with the parties, their agents or counsel; upon request, the evaluators shall disclose to the opposing party the general substance of such communications. The evaluators shall otherwise treat all records as confidential.

\* \* \*

94. Within 180 days, **the Defendants shall require their contractors to achieve and maintain the capability of tracking each child in the plaintiff class, for purposes of monitoring that child's receipt of the required screening, diagnosis and treatment. The tracking system shall have the capacity of generating an immediate report**

---

**21.** At the beginning of the conference, counsel for two MCCs objected to the conference format. The Court cited the absence of any objections by the parties' counsel to the first such conference and quoted the parties' counsel's favorable reactions to that conference. The Court overruled those objections. A transcript of that conference was deemed confidential and ordered to be filed under seal. At the end of the conference, the Court again inquired whether any counsel objected. Plaintiffs' counsel did not object to this conference, but all counsel for the Defendants' and the MCCs objected. The legal authority for that conference is noted *supra*.

on the child's EPSDT status, reflecting all encounters reported to the contractor more than 60 days prior to the date of the report.

95. Within 150 days, DCS shall achieve and maintain a tracking system as reflected above. The tracking system shall have the capacity to generate a report on the child's EPSDT screening status and shall reflect all screens received by the child more that 30 days prior to the report. DCS shall establish a procedure for notification of TennCare if a DCS case manager suspects that action or inaction by an MCO in performing its duties under the TennCare contract has caused a child to inappropriately enter DCS custody. TennCare shall receive such notification as part of its complaint processes and take whatever action is appropriate. DCS shall include this procedure as part of its departmental training.

97. The state shall compile, in a standardized electronic format capable of supporting flexible, customized analysis and reporting, data on all pertinent provider encounters which involve children, and which are covered by the TennCare program.

98. The state shall conduct ongoing audits for the purpose of authenticating such encounter data. In order to ensue the integrity of the audit reports, such audits shall be conducted by qualified personnel and shall meet generally accepted standards regarding sample size and selection.

(Docket Entry No. 12, Consent Decree at ¶¶ 91, 94, 95, 97 and 98) (emphasis added). In addition, the Consent Decree created a "process for monitoring and reporting [by the Defendants] their compliance with the requirements of this order." *Id.* at ¶ 96. For these tracking and monitoring systems, the Consent Decree sets a semiannual reporting requirement for the Defendants. *Id.* at ¶ 104.

Another provision of the Consent Decree also grants Plaintiffs' counsel a right of access to the data on monitoring and tracking compliance through the Defendants. Upon Plaintiffs' counsel's request, the Defendants agreed to produce this data to Plaintiffs' counsel.

Upon 30 days prior notice to TennCare, plaintiff's counsel shall have access during normal business hours to any public records relating to the state's compliance with the terms of this order, or to the monitoring, auditing or testing of such compliance. Subject to any applicable federal laws limiting the authority of a court to grant access to such records, plaintiffs' counsel shall have access to the records of members of the plaintiff class. All information related to plaintiff class members provided to plaintiffs' counsel shall be considered to be confidential and shall not be used for functions other than those directly related to compliance with this order. All such records shall be obtained, if necessary, and provided to plaintiffs' counsel through TennCare, rather than through individual MCOs.

*Id.* at ¶ 105. (emphasis added).

The Defendants' and MCCs' contracts contain the following provisions on the Defendants' and other governmental agencies' access to any MCC's information about any TennCare enrollee:

The CONTRACTOR shall insure within its own organization and pursuant to any agreement the CONTRACTOR may have with any other providers of service, including, but not limited to providers, subcontractors or any person or entity receiving monies directly or indirectly by or though (sic) TennCare, the TENNCARE representatives and authorized federal, state, and Comptroller personnel including but not

limited to TENNCARE, the Office of Inspector General (OIG), the Medicaid Fraud Control Unit (MFCU), the Department of Health and Human Services, Office of Inspector General (HHS OIG) and the Department of Justice (DOJ) and any other duly authorized state or federal agency shall have immediate and complete access to all records pertaining to the medical care and services provided to TennCare enrollees.

(Plaintiffs' Exhibit 28) (emphasis added).

## 2. The Lack of Preservation of Relevant Records

From the Court's perspective, the core of this ESI discovery controversy is the absence of any effective attempt by the Defendants to preserve and segregate relevant ESI, since the filing of this action in 1998. Despite the entry of the Consent Decree in 1998, the proof is that only in March, 2004 did the Defendants prepare a litigation hold memorandum for its employees and MCCs in the TennCare program. This March 17, 2004 memorandum, prepared by then counsel for the Governor and a member of the State Attorney General's office, sets forth a detailed process for the retention, segregation and preservation of documents on this and other TennCare actions.[22]

The March 17th memorandum referred to this action by name and stated that it was "critical that we take every reasonable step now to preserve the information, documents, and/or data produced or received by the work teams, whether in hard copy or electronic form." (Plaintiffs' Exhibit 24A).[23] This memorandum refers to a variety of electronic records to be preserved, including such information from "outside sources":

[The material that must be preserved] includes, but is not limited to: (1) email and other electronic communications; (2) word processing documents, including drafts of documents; (3) spreadsheets; (4) databases; (5) power point presentations; and (6) personal notes. The material to be preserved also includes any information or data received by a work team from outside sources.

(Docket Entry No. 828, Exhibit 20 thereto).

In summary, this memorandum constituted a "litigation hold" for the preservation of all potentially responsive materials as well as the collection and review of such materials by designated records custodians. Provisions for contemporaneous designation and segregation of privileged materials communications are included, as

---

**22.** The March 17, 2004 memorandum or litigation hold appears to represent a shift in the Defendants' focus to a litigation strategy to seek relief from the Consent Decree on its Medicaid programs in this and related actions. The Defendants' proof is that this shift was because the Governor wanted relief from the Consent Decrees. Another manifestation of this policy shift, beyond the March 17, 2004 litigation hold memorandum, was the retention of new counsel shortly thereafter. (Docket Entry No. 383, 385).

**23.** At one point, Defense counsel asserted that their duty was only to issue the litigation hold, not to ensure that it was implemented. (Docket Entry No. 828, Exhibits 9, Moss Letter to Bonnyman at p. 2 ("I did suggest that the State does not have an obligation to preserve all documents simply because a consent decree is in place, but my comment was merely directed to the issue of whether the State had an obligation to do *more* than instruct state officials to preserve documents relevant to this litigation, which the State has done.")). There is not any documentary evidence of a litigation hold issued by current private counsel. Plaintiffs note that current lead counsel describes his firm as well experienced in "cases [that] were paper intensive, involving literally millions of documents, which we were able to index, store, and search electronically." (Plaintiffs' Exhibit No. 35 at p. 2).

this memorandum described in some detail:

> An initial step that needs to be implemented immediately is the appointment of a records custodian for each work group, who will be responsible for maintaining and preserving all data received and produced by each work group. In order to assist these individuals in this task, it is imperative that they receive copies of all documents, including drafts, and other materials and that they be included in all communications, including electronic. Further, any materials that are privileged either as attorney client communication or as attorney-work product should be designated as such, so that the record custodians can segregate out those materials to preserve their confidentiality . . .

> Limit written documents, especially the distribution of written documents . . . Mark all draft materials "Working Drafts": Keep in mind that any written document could be deemed a "public record" and publicly distributed.

> \* \* \*

> Preservation of all records pertaining to TennCare Reform is of the highest priority. This includes all electronic documents (email, memo [ ], etc.).

> \* \* \*

> To preserve documents as efficiently as possible: All e-mails and attachments should be cc to: AG TennCare Team. All email and attachments should be cc to: The F & A team Representative ("records custodian")

> All future documents and email should be saved immediately to the server or as email archive or filed if "hard copy" only.

> Should any employee involved in this effort leave state service, their hard drive should be imaged and retained.

Plaintiffs' Exhibit Nos. 24–F and 24–G. (emphasis added). Notwithstanding these documents, the TennCare Team mailbox was not made available by December 2, 2004, and there remained a "need to establish a policy of centralized retention of all electronic documents, (emails, files, reports, presentations, etc.), for returning to Medicaid." Plaintiffs' Exhibit 24–B.

The extent, if any, of the actual distribution of this Memorandum is unclear as the Defendants did not offer any proof on this issue. The Defendants did not present any proof from the working group's designated records custodians whose positions were identified in the March 17th Memorandum to collect all ESI from their groups so as to implement the memorandum. At the November 6, 2006 hearing, defense counsel stated that privileged documents had not been reviewed nor segregated for the Plaintiffs' ESI discovery requests until beginning in December 2006 or January 2007.

> The State is not equipped today to be able to do this sort of electronic production. It doesn't have the in-house capabilities to do it. Mr. Antony's declaration that we filed with our responses to their motion to compel details the very convoluted and complicated process that we would try to come up with, which would require State officials to try to forward all of their e-mails and electronic documents to a separate e-mail account, then have attorneys to on that account and try to review each one, and then forward it either to a non-responsive e-mail box or a privileged email box. We're talking a tremendous amount of time and expense, both that attorneys' time certainly in the review, but we're talking time that the State officials are going to have to take time away from their normal obligations to send literally thousands and thousands of e-mails.

(Docket Entry No. 734, Transcript at p. 26). These facts are inconsistent with any effective implementation of the March 17, 2004 memorandum/ litigation hold, as described by its terms.

The proof establishes that even if the March 17, 2004 litigation hold memorandum were distributed, there was not any implementation of its provisions.[24] The

---

24. After the June 2006 evidentiary hearing, the Defendants submitted the affidavit of Linda Ross, a Deputy Attorney General and counsel for the Defendants. (Docket Entry No. 998). Defendants' counsel contended that for the "first time" in closing argument, Plaintiffs' counsel argued that private defense did not issue a litigation hold. (Docket Entry No. 997 at p. 5). In her affidavit, Ross asserts that she wanted to assure the Court that the Defendants' private counsel "fully supported" and "fully implemented" the March 17th litigation hold. *Id.* The Court disregards this affidavit for several reasons.

First, the Court made it clear that live testimony would be required for the issues at that hearing. The Court earlier struck affidavits submitted on this motion. (Docket Entry Nos. 1008 and 1009). The reasons for this requirement are that the Defendants' prior discovery affidavits have been conclusory, inadequate and at times, inaccurate. *See* Docket Entry No. 596, February 10, 2006 Transcript at pp. 35–36. Ross's affidavit exemplifies this problem with her conclusory references that private defense counsel "fully supported" and "fully implemented" the litigation hold. Ross's assertions are unsupported by any specifics facts as to what private defense counsel actually did so as to assess the credibility of her conclusory assertions. This affidavit is written, as other affidavits submitted by the Defendants' counsel, with conclusory assertions to support an argument.

Second, Plaintiffs' counsel raised the issue of the absence of a litigation hold at the November 6, 2006 conference (Docket Entry No. 734 at pp. 14–19, 49–64) and the December 2006 conference (Docket Entry No. 764 at pp. 28–30, 42–50). Plaintiffs' counsel expressly raised this issue in their brief **before** the June 19th hearing:

> **B. The Defendants nonetheless failed to monitor and maintain an effective litigation hold within state government.**
> Although the litigation hold was issued, it was not implemented. Present defense counsel assert that their duty was only to issue the litigation hold, not to ensure that it was implemented. (Doc. 828, Ex. 9 and 10). **[FN4]** But the state failed to perform

this duty as well-the litigation hold was never disseminated to the staff of the Governor's Office for Children's Care Coordination (GOCCC), the agency responsible for coordinating and overseeing implementation of the Consent Decree in this case. (*See* Doc. 938, Flener Deposition at 42:11–43:12; *cf* Doc. 569 at Paras. 2–4). Nor was there monitoring of state agencies to determine whether to document and ESI preservation procedures outlined in the litigation hold were being observed. (Doc. 938, Flener Deposition at 54:8–55:6).

The State's failure to implement the procedures outlined in the litigation hold was widespread, if not universal. Defense counsel reported to the Court at the November 6, 2006 hearing that yet custodians had not been forwarding potentially responsive information, and that privileged documents had not been reviewed or segregated. (Doc. 734 at 26).

N.4 The March 17, 2004 litigation hold, which was developed by the Attorney General and the Governor's Counsel, acknowledged the duty and intention not merely to issue the memorandum but to take steps to ensure the actual preservation of relevant evidence. The role of lead counsel in this case passed to outside counsel shortly thereafter. (Doc. 383.385).

(Docket Entry No. 941–1 p. 8).

Third, Nicole Moss, a defense counsel, earlier acknowledged on this issue that: "I did suggest that the State does not have an obligation to preserve all documents simply because a consent decree is in place." (Docket Entry No. 828, Exhibit 9, Moss letter at p. 2). Moss added: "my comment was merely directed to the issue of whether the State had an obligation to do *more* than instruct state officials to preserve documents relevant to this litigation, which the State has done. The State believes that the document preservation policies and instructions it has issued fulfill its obligations to reasonably ensure that all documents relevant to this case are not destroyed and that there is no further legal requirement that all documents created by the State, even those not related to this litigation, be preserved for all time." *Id.* (emphasis supplied).

proof is undisputed that the March 17th memorandum was never disseminated to the staff of the Governor's Office for Children's Care Coordination (GOCCC), the agency that was created to coordinate and oversee implementation of the Consent Decree. (Docket Entry No. 938, Flener Deposition at pp. 42–43; cf. Docket Entry No. 569–4, Declaration of Thomas Catron at ¶¶ 2–4), nor to the TennCare official in charge of information technology. (Docket Entry No. 984 at p. 192). Pertinent State agencies were not monitored for compliance. (Docket Entry No. 984 at pp. 194–95 and Plaintiffs' Exhibit 23 at p. 54). GOCCC did not monitor the state agencies within its charge for document and ESI preservation procedures. *Id.* at pp. 54, 55. Rob Bushong, the State's paralegal in charge of document preparation had never seen the March 17th Memorandum. (Docket Entry No. 988 at p. 203). Neither counsel who prepared the March 17th Memorandum testified as to the distribution of that memorandum nor how the litigation hold was implemented.

If this litigation hold were implemented, as outlined in the March 17th memorandum, then these complex discovery issues about ESI discovery and related costs of privilege review issues would be moot as, for example, all privileged documents would have been aggregated, centrally located, preserved, and segregated after a privilege review by the State Attorney General's office. As the circumstances now stand, the Defendants' counsel argue that none of this ESI should be produced because an expensive and costly privilege review of this information is necessary and that this review is so costly that members of the class or class counsel should be

required to pay for the Defendants' privilege review and ESI production.

To be sure, at the December 6th hearing, Nicole Moss, one of the defense counsel, did state that after Plaintiffs renewed their discovery, a litigation hold was issued in June, 2006, but those instructions, if written, were not introduced at the June 19th hearing. At the December 6th hearing, Moss told the Court that there was not any litigation hold until 2004 because this was a consent decree case. (Docket Entry No. 764 Transcript at p. 42). According to Moss, "[w]hen this case went into litigation, at that point, we put a litigation hold on responsive documents." *Id.* The Court finds this assertion flawed, given the clearly contested contempt proceedings in this action in 2000 and 2001 (Docket Entry Nos. 63, 65, 69, 79, 123 and 124) as well as the contested issues in 2002 (Docket Entry No. 281, Defendants' Motion to Modify the Consent Decree) that was set for a hearing in 2003 (Docket Entry No. 332). On May 20, 2004, Plaintiffs filed a motion for an evidentiary hearing. (Docket Entry No. 375).

In addition, the Defendants cite the testimony of GOCCC director Natasha Flener that there was a litigation hold and that she tried to save everything on her computer. Flener's actual testimony was: "You know, after I had been there a few months, I **think** I was told that we needed to be keeping all e-mail correspondence." (Defendants' Exhibit 17, Flener deposition at p. 44) (emphasis added). Flener also testified: "I mean, we had conversation, obviously, about it, because we were all doing it. I don't know that—I don't know if we talked about specifics on, you know, what we needed to be producing." *Id.* at 68 (emphasis added).[25] On the critically

---

The Court concludes that the Defendants cannot utilize Plaintiffs' counsel's closing argument to justify proof that should have been presented at the June 2007 hearing where Ross's conclusory assertions could be tested.

**25.** The only other uncertainty she expressed about the litigation hold concerned whether it extended to every single draft of a document, even hard copy drafts that merely reflected nonsubstantive grammatical and stylistic

important issue of preservation of records by the person in charge of oversight of this part of the TennCare programs, the Court would expect greater clarity in her testimony or a reference to the March 17th memorandum.

Defendants also cite Brent Antony, the TennCare official designated by the State to address the technical aspects of electronic discovery. Antony testified about a litigation hold in 2000, but there is not any documentary evidence of such. In his earlier affidavit, Antony described the collection of ESI in a single mailbox, as requested by the Plaintiffs, as an undue burden. (Docket Entry No. 720, Exhibit C thereto). Later, Antony characterized this method as "very convoluted and complicated process ... which would require State officials to try to forward all of their emails and electronic documents to a separate e-mail account," for the ESI production. (Docket Entry No, 734, November 6, 2006 Transcript at p. 26). These assertions are contrary to the March 17th memorandum/litigation hold that actually requires a single mail box for all relevant ESI at two offices; Finance and Administration and the State Attorney General's offices. The Defendants did not actually have a single mail box for all emails until 2006 or 2007.

Plaintiffs argue that the lack of a litigation hold resulted in the destruction of responsive information from the Governor's Office for Children's Care Coordination, and e-mail boxes of some key custodians in other agencies, *citing* Docket Entry No. 799 and Docket Entry No. 828, Exhibit 11 at TJC 85, TJC 173, TJC 188, TJC 209 and Exhibit 16 at TJC 196. Plaintiffs argue that the Defendants are well aware

of the importance of e-mails as evidence because in 2001, the Defendants submitted numerous emails as evidence to support their assertions of compliance. *See* Docket Entry No. 223, admitting Plaintiffs' Exhibit D1, H09, H11, H14, H19, H39, H51. Defendants strongly dispute this destruction of evidence assertion.

The Defendants' standard retention policies on ESI are that items older than 180 days would roll off the system. In their discovery report to the Court, the Defendants described the loss of ESI in their system and the lack of organized retention of ESI:

For email the State has policies and procedures regarding the removal of aged emails, and backups for disaster recover purposes. The State regards emails that have been in a mailbox for six calendar months as aged emails. **When emails reach the 6 month age they automatically become eligible for removal. Unless specific action is taken by a mailbox user, emails are removed from the system one month following their six month anniversary. The State performs disaster recovery backups on its email servers on a daily basis. The backup media is retained for a period of five days from the day of the backup. If during that five day period an email server were to fail and lose the mailboxes it supports, the disaster recovery backup would be used to restore the mailboxes on a repaired or replaced server. Backup media is not maintained following the five day period. It is reused for backup, recycled into other uses, or destroyed.**

changes. *Id.* at 42 ("Like, if we had, you know, multiple drafts of something we were working on, I don't know that I really knew whether or not I needed to keep every draft hard copy of it.") Flener further testified that she received instructions regarding her pres-

ervation duties at the time Plaintiffs' Third Set of Interrogatories and Third Set of Document Requests were disseminated. *See id.* at 80 (testifying that she received instructions regarding "what things we might need to be keeping or maintaining or saving").

While the State has issued instruction to archive emails so as preserve them from automatic deletion as described above, **the State does not have a specific policy or procedure on how to archive emails for future reference since there are so may myriad places and ways to archive. It is the responsibility of each email account owner to maintain archival copies of emails as instructed by their supervisors, or if not instructed, as they believe appropriate.** (Docket Entry No. 740–2, TennCare E–Discovery Report at p. 10) (emphasis added).

Defendants elicited some proof that some custodians were instructed to retain relevant ESI in their archives. (Docket Entry No. 984, June 20, 2007 Transcript at pp. 162–63). Defendants' key custodians have individual work stations, where they maintain individuals' "my documents" file/folders and "home folders." These work stations lack any backup retention. In a word, "there are no tapes for the designated custodians." (Docket Entry No. 786, December 20,2006 Transcript at pp. 7–10). Only at the December 2006 conference did Antony describe the measures taken in 2006 to collect the key custodians' mail boxes into a single tape. *Id.* at p. 7.

Yet, in a December 7, 2006 response to the Plaintiffs' second request for admission, the Defendants acknowledged "a few isolated instances in which individuals had not archived their emails" and admitted that there was "one isolated instance" in which a former employee's entire email box had been deleted. (Docket Entry No. 771, Exhibit A thereto at pp. 5–6). The Defendants also admitted that "many electronic documents, in particular email, having been produced in hard copy form may no longer exist electronically." *Id.* at p. 5. In response to the Plaintiffs' Third Request for Admissions, the Defendant disclosed that when several key custodians left employment, they were never told to preserve relevant documents and their computers were reconfigured for other reasons. *See* Docket Entry No. 828, Exhibit 16 at pp. 4–7; *id.* at Exhibit 11 at pp. 1–3; *id.* at pp. 11–13; *id.* at pp. 4–7; *id.* at pp. 8–10. Plaintiffs cite as other proof lost emails.[26]

As discussed earlier, some key custodians did not provide any email. Plaintiffs note that several of the 50 key custodians failed to produce any responsive e-mails; notably the Governor, Dave Cooley, the governor's deputy, and David Goetz, the Commissioner of Finance and Administration who is in charge of TennCare and a named defendant in this action. These omissions are reflected in emails from other officials that were copied to these key custodians or mention their involvement. (Docket Entry No. 828, Exhibit 1, at p. 2 ¶ 9 and Plaintiffs' Exhibits 3, 4, 5, and 15). Plaintiffs' proof is that these state officers have been "actively involved" in the shaping of TennCare policy affecting EPSDT over the preceding two years. (Docket

---

**26.** See e.g., Rebecca Poling: Docket Entry No. 980 at 89 of 90 ("I don't typically have documents that relate to John B. What I would have would be emails concerning specific cases. So … I don't have anything stored anywhere on my computer that relates directly to John B. (Except where I've stated saving the emails") with Docket Entry No. 799 at pages 44–45 of 64).

Jim Shulman; Docket Entry No. 980–2 at 15 ("I do not archive documents nor do I put them in folders. I am not very good with the computer.") with Docket Entry No. 799–10 at pp. 18–19.

Dick Chapman: Docket Entry No. 980–2 at 66 of 71 (GroupWise archive is empty).

Carol Kardos: Docket Entry No. 980 at 85 of 90 ("[N]o email archived.") with Docket Entry No. 799–13 at pp. 20–21.

(Docket Entry No. 996, Plaintiffs' Post–Hearing Memorandum of Facts and Law at pp. 12, 13).

Entry No. 709 at 23–24; Docket Entry Nos. 712 and 713). As examples, Plaintiffs introduced Goetz's handwritten notes of weekly meetings with the Governor, who is identified in Goetz's notes by the initials, "PNB", and other state officials in 2004 and early 2005 that were produced in discovery in March 2005 in the *Rosen* action.[27] Plaintiffs' proof also includes an email addressed to Cooley about this action and a copy of another email to Cooley on issues in this action. (Plaintiffs' Exhibit Nos. 3 and 5). Two former directors of TennCare were not asked for their answers to the RFAs, and others purported to answer on behalf of the Governor and others. (Docket Entry No. 828, Exhibit 16 at pp. 1–3, 11–13; *id.* at pp. 8–10; *id.* at pp. 14–16). These facts are also inconsistent with the March 17th memorandum. Moreover, the Defendants failed to instruct some key custodians regarding their responsibilities to archive ESI or how to do so that leads the Court to find that in all likelihood, significant responsive ESI was destroyed after 180 days. (*See* Docket Entry No. 786 at p. 43; Docket Entry No. 734 at p. 62; Docket Entry No. 740–2, TennCare E–Discovery Report at p. 5).

Significantly, the Defendants did not tell the MCCs (where most EPSDT services are processed or provided) to preserve and produce responsive information until weeks after the Court's bench ruling of November 6, 2006. (Docket Entry No. 734 at pp. 73–74). After the Court's Order of November 21, 2006, the Defendants informed its contractors of the existence of the outstanding discovery requests. (*See* Docket Entry No. 745 at pp. 1–2; Docket Entry No. 751 at pp. 1–2). The Defendants did not require its contractors to institute a litigation hold and some MCCs did not issue preservation or litigation holds until December 2006 and in some cases January 2007. (Docket Entry No.

872, April 11, 2007 Transcript at p. 165). As a result, the MCC's document retention policies systematically overwrote or otherwise destroyed e-mails and other responsive documents. (*See, e.g.,* Docket Entry No. 751 atp. 2; Docket Entry No. 745 atp. 2; Docket Entry No. 828 at pp. 5–6). At the April 11, 2007 conference, some MCC representatives cited their continued destruction of potentially responsive ESI in December 2006 or in January 2007. (Docket Entry No. 872 at p. 165).

In contrast to the Defendants' preservation practices, when the MCCs were advised to preserve responsive information, some MCCs issued directives to "lock down" any responsive ESI to avoid deletion by individual custodians or by routine document retention policy. (Docket Entry No. 986 at pp. 115–116 (AmeriChoice); Docket Entry No. 984 at pp. 96–97 (Doral); Docket Entry No. 988 at p. 84 (BlueCross); Docket Entry No. 986 at p. 91 and Docket Entry No. 872 at p. 154 (Unison)). Prior to that, MCCs' policies resulted in the automatic destruction of ESI on a daily basis without protection of responsive materials. (*See* Docket Entry No. 816, Exhibit 10: 12/19/06, Roberts letter on behalf of Doral at p. 2 of 28; Docket Entry No. 816, Exhibit 10:12/19/06, Paul letter on behalf of United Healthcare at p. 7 of 28; Docket Entry No. 816, Exhibit 10: 12/19/06 Norwood letter on behalf of VHP at p. 10 of 28; Docket Entry No. 816, Exhibit 10:12/19/06 Miller letter on behalf of PHP at pp. 14–15 of 28; Docket Entry No. 816, Exhibit 10: 12/18/06 letter on behalf of Memphis Managed Care at p. 21 of 28). Thus, except for Blue Cross's preservation of materials starting in January 2006, the other MCCs continued the destruction of responsive materials until at least November 2006.

27. *Rosen v. Goetz,* No. 3:98–627 (M.D.Tenn.).

The Defendants initially denied any duty to provide any MCC information, contending that except for documents provided to the State, such information was not in the Defendants' "possession, custody, or control." (Docket Entry No. 711 p. at 4). Defendants' counsel repeated that argument in their post-hearing brief.

[I]t is well settled that a party has no obligation to preserve evidence that is not in its possession, custody or control. *See, e.g., MacSteel, Inc. v. Eramet N. Am.,* No. 05–74566 [2006 WL 3334011, at *1], 2006 U.S. Dist. LEXIS 83338, at *4 (E.D.Mich. Nov. 16, 2006). ("[T]he duty to preserve evidence does not extend to evidence which is not in a litigant's possession or custody and over which the litigant has no control.") (quotation marks and alterations omitted) . . .

(Docket Entry No. 997 at p. 25).

At the November 6th conference, Defendants' counsel told the Court:

MS. MOSS: And I want to be clear on the State's position. We're not saying that these documents are not in the State's custody or control or that we can't produce documents from our contractors. In fact, we've produced _____ our response to details, entire categories of documents that we have produced from our contractors.

(Docket Entry No. 734, November 6, 2006 Transcript at p. 42).

### 3. Inadequacies in the Defendants' 2006 Paper Production

In their fourth request for production of documents, Plaintiffs focused on two major categories of ESI. First, Plaintiffs sought transactional or quantitative data that the Defendants are required to maintain so as to monitor, track and report their compliance with the Consent Decree. As the Court understands, for the Defendants and most MCCs, with some exceptions, the transaction data controversy is now moot. The second and contested category includes e-mails and other such ESI among persons, including the Defendants' employees and the MCCs' employees with substantial responsibility to implement, monitor and measure compliance with the Consent Decree as well as other ESI about class members.

Plaintiffs challenge the adequacy of the Defendants' 2006 paper production and the Defendants' and MCCs' estimated costs of recovering the ESI sought by the Plaintiffs. At the June 19th evidentiary hearing, Plaintiffs' proof established several substantial and serious deficiencies in the Defendants' June 2006 paper production. As stated earlier, Plaintiffs note that several of the 50 key custodians failed to produce any responsive e-mails, notably the Governor, Dave Cooley, the governor's deputy and David Goetz, the Commissioner of Finance and Administration who is in charge of TennCare. These omissions are reflected in emails from other officials that were copied to these key custodians or mentions their involvement. (Docket Entry No. 828, Exhibit 1, at p. 2 ¶ 9 and Plaintiffs' Exhibits 3, 4, 5, and 15). Plaintiffs' proof is that these state officers have been "actively involved" in the shaping of TennCare policy affecting EPSDT over the preceding two years. (Docket Entry No. 709 at 23–24; Docket Entry Nos. 712 and 713). As examples, Plaintiffs introduced Goetz's handwritten notes of weekly meetings with the Governor, who is identified in Goetz's notes by the initials, "PNB", and other state officials in 2004 and early 2005 that were produced in discovery in March 2005 in the *Rosen* action.[28] Although incomplete, Goetz's notes reflect that the Governor, Commissioner, and other senior officials discussed not just TennCare in general, but specific TennCare

---

28. *Rosen v. Goetz,* No. 3:98–627 (M.D.Tenn.).

matters relating to children. (Docket Entry No. 728–3). As another example, despite the Defendants' denial of the involvement of Dave Cooley, the deputy governor, in overseeing TennCare or making policy affecting EPSDT, Plaintiffs' proof included an email addressed to Cooley about this action and a copy of another email to Cooley on issues in this action. (Plaintiffs' Exhibit Nos. 3 and 5). On the cited inadequacy of this production, Defendants' counsel elicited from Thomas Tigh, Plaintiffs computer expert, testimony about the likely prospect for differences among custodians in their selection of documents for production. This fact, however, underscores the need for an independent entity to collect discoverable ESI, as Tigh testified is an industry standard for ESI production.

Second, Thomas Tigh, Plaintiff's computer expert who is well experienced in ESI production with twenty-seven years experience in complex litigation, scanned the Defendants' June 2006 paper production for search capabilities. In his electronic search of the Defendants' June 2006 paper production, Tigh found that J.D. Hickey, a key TennCare official, was named in about 500 emails in the Defendants' 2006 paper production. Tigh compared that number to the Defendants' ESI contractor's compilation of Hickey's emails from the Defendants' database. The Defendants' ESI contractor lists 30,000 emails in Hickey's files. In Tigh's opinion, this substantial disparity undermines the integrity of the Defendants' June 2006 paper production. The Court agrees.

Third, Tigh reviewed the Defendants' proof about the burdensomeness of the Plaintiffs' ESI. The Defendants identify millions of pages of responsive documents. According to the Defendants, using Plaintiffs' search words, the State's files from June 2004 forward resulted in 193 gigabytes of information from a total of 430 gigabytes. (Docket Entry No. 984 at p. 131). This 193 gigabytes comprises 118 gigabytes of data for the period prior to April 2006 and 75 GB for the period after April 2006. *Id.* at pp. 157, 158. A gigabyte in the State's system is equal to 77,000 pages. *Id.* at p. 116. The Defendants contend that, using Plaintiffs' key term searches and upon review by their counsel, twenty percent of the documents located are responsive to Plaintiffs' requests. (Docket Entry No. 988 at p. 193). The calculation of 1.8 million responsive pages is: 118 gigabytes data for the period of June 2004 through April 2006 × 77,000 pages per GB = 9.1 million pages, and then 20% yield of responsive documents × 9.1 million pages = 1.8 million pages. (Docket Entry No. 984 at pp. 213–214).

Tigh testified that the Defendants' June 2006 paper production contains only approximately 71,0000 documents. (Docket Entry No. 982 at p. 88). Defendants' counsel contend that their 2006 paper production included their 2005 production in *Rosen v. Goetz,* a related action. Yet, Rob Bushong, the Defendants' paralegal in charge of documents testified that the *Rosen* documents were made available for Plaintiffs' inspection, but were not copied unless Plaintiffs requested copies. (Docket Entry No. 988 at p. 187). On cross-examination, the Defendants' counsel suggested that Tigh cited a larger number of pages (183,000) in the State's paper production at the April 11th "experts only conference." Accepting the Defendants' assertions of the higher number, the actual number of responsive ESI in the Defendants' ESI contractor's database remains multiples of the total documents produced in Defendants' 2006 paper production.

Fourth, Tigh explained that the Defendants' method of collecting of ESI from its key custodians was flawed because the Defendants' custodians were left to determine

for themselves whether to exclude unfavorable ESI on their computers. In addition, the Defendants provided little guidance or supervision for this production. Natasha Flener, GOCCC's director whose agency coordinates compliance under the Consent Decree, did not receive any such directions or instructions. (Docket Entry No. 938, Flener Deposition at pp. 67, 68). The Defendants did not issue instructions to the MCCs beyond the copies of the State's written objections and responses to the interrogatories and requests for production. According to Tigh, the Defendants' method of collection is known to leave gaps in production and violates industry standards for ESI collection. (Docket Entry No. 982 at pp. 38, 39). For example, under industry standards, an independent entity collects relevant ESI and industry protocol provides for an audit to ensure that the search is properly conducted. An independent entity's collection of all responsive ESI from individual custodians ensures against the non-production or destruction of e-mails that a particular custodian deems unfavorable. *See also* Docket Entry No. 764 at pp. 19, 20.

Fifth, Plaintiffs noted that the May 2006 log identified 3,201 pages of documents produced from the Department of Finance and Administration, but the log did not identify the specific individual(s) in the Department from whom the documents were collected.

Sixth, the Court ordered a survey of the custodians on removal of documents, but some of those surveys were oral, not written. (Docket Entry No. 734 at p. 26). Defense counsel assured the Court that, "... the survey, my understanding was most of those answers were oral, not written. So there is nothing to submit or provide to the plaintiffs ..." (Docket Entry No. 984 at p. 150). When the Court ordered any completed written survey to be filed, the written survey responses were 161 pages. (Docket Entry No. 980). The survey questions do not reflect the Court's question about whether a custodian removed any data to another media. *Id.* Thirteen (13) custodians did not provide any information regarding the location of documents and files pursuant to the first question in the survey and thirty-nine (39) custodians did not provide information regarding the location of emails. *Compare* Plaintiffs' Exhibit 2 (list of custodians) with Docket Entry No. 980 (survey responses).

Out of thirty-one DCS custodians, four people responded and three gave a standard non-responsive answer: "According to state policy and software program defaults, all created documents are stored on user directories and shared folder locations that reside on servers." (Docket Entry No. 980–2 at p. 13 (Miller); *id.* at p. 19 (Franklyn); *id.* at p. 21 (Jones)). Other custodians responded that they did not have any responsive documents. (Docket Entry No. 980–3 at p. 54 (Williams); *id.* at p. 56 (Whitlock); *id.* at p. 58 (Dwivedi); *id.* at p. 85 (Kardos); *id.* at p. 89 (Poling)). These answers are non-responsive because the survey was to elicit information on the custodians' storage or removal of responsive documents. (See Docket Entry No. 789 at p. 2–3).

Seventh, prior to Antony's production of the surveys for the January 14th Order, the Defendants asserted that the custodians' answers to the Plaintiffs' Third Request for Admissions and Fifth Interrogatories were also responsive to the January 14th Order. (Docket Entry No. 799; Defendants' Notice of Filing, January 30, 2007; Docket Entry No. 816–1 at pp. 14–15). Plaintiffs' counsel disagreed and requested the certifications required by the January 14th Order, and defense counsel refused. (Docket Entry No. 828, Exhibit 15: Bonnyman letter of February 5, 2007).

Many of the emails sent from the custodians to Antony and then filed with the Court after the Court's June 20th Order have also been redacted without explanation about the information removed. (*See, e.g.,* Docket Entry No. 980-3 at p. 49 (Outlaw); *id.* at p. 52 (Burley); *id.* at p. 54 (Williams); *id.* at p. 56 (Whitlock); *id.* at p. 58 (Dwivedi); *id.* at p. 61 (Edgar); *id.* at p. 68 (Carver); *id.* at p. 70 (Dean); *id.* p. 80 (Carter)). The Court finds that the Defendants never complied with the January 14th Order requirement that each custodian must certify that none of the responsive ESI had been removed.

Eighth, a paper production that is converted from ESI to hard copy undergoes a process that strips "metadata" from the electronic version of the documents. "Metadata" is information created with an electronic document to capture imbedded edits and other non-screen information that are integral elements of the ESI documents. (Docket Entry No. 720 at p. 3). Tigh explained that in his experience, metadata is important and reliable information that describes the path of a document among the Defendant's officials, when the document was created and edited. Metadata provides information that is not present in the State's paper production. As examples of metadata, Plaintiffs cite the following:

1. **BegAttach,** associated with the first page of a document

2. **EndAttach,** associated with the last page of an attachment

3. **Master_Date,** the actual date of the parent document

4. **Create_Date,** the date a document was created

5. **Create_Time,** the time a document was created

6. **LastMod_Date,** the date the document was last modified

7. **LastMod_Time,** the time the document was last modified

8. **ParentFolder,** which denotes the full path and folder information of a document

9. **BCC,** which displays the names of the blind copyee(s) of a document

10. **Custodian,** the custodian of a document

11. **Nativepath,** the full path to a native copy of a document

12. **Attachcount,** the number of attachments to a document

*See* Docket Entry No. 941, Plaintiffs' Reply Brief at p. 16.

Tigh testified that the absence of metadata in the Defendants' hard copy production creates a deficiency in information as to who received the document, who received copies of the document or email, who edited the documents, whether there were attachments to the documents and when the document was created. Plaintiffs deem metadata critical to their ability to understand any ESI provided and to challenge the Defendants' assertion of compliance with the Consent Decree, especially given Judge Nixon's finding that the Defendants lack reliable statistical measures of their actual progress.

Finally, Tigh analyzed the MCCs' responses to interrogatories and noted several instances in which some MCCs did not respond at all. (Plaintiffs' Exhibit No. 9). Significantly Plaintiffs cite a disturbing and misleading discussion with a state official about the Defendants' answer to Plaintiffs' Interrogatory No. 22:

*INTERROGATORY NO. 22* **Wendy this is a tricky one since the MCC's would have files, but we have answered that this is unanswerable.**

During the twelve-month period prior to January 10, 2006, how many members of the plaintiff class received TennCare services that, since that date, have been

excluded by TennCare Rule. 1200–13–13.10 as non-covered services?

a. With respect to each such child, identify the pertinent documents relating to the now-excluded service. This request includes documents that identify the child, identify the service and address the child's purported need for the service.

b. Identify any documents that discuss, analyze, evaluate, justify, criticize or implement the exclusion or speculate on their potential impact on members of the plaintiff class; this request includes any documents containing potential cost saving estimates or other budget effects associated with the exclusions as applied in plaintiff class members; this request also includes any documents containing analyses or estimates of the number of children or number of service requests that might be affected by the exclusions.

(Plaintiffs Exhibit 12–D at p. 16).

The Defendants introduced their actual response to this interrogatory.

Defendants reiterate their General Objections as if each is specifically set forth immediately below in response to this interrogatory. In addition, Defendants object to this Interrogatory to the extent it implies that the items on the exclusions list in TennCare Rule 1200–13–13–.10 are newly non-covered services. Defendants further object to this Interrogatory to the extent it would require them to impose on their contractors to provide information not kept in the ordinary course and not tracked in a manner that would allow them to readily respond to this request without undue burden and expense. Because the information Plaintiffs appear to be seeking in this Interrogatory is not maintained in a readily accessible database, a response would require Defendants to review potentially hundreds of thousands of individual children's medial files, which is an unreasonable and objectionable request not contemplated by the Federal Rules or sanctioned by any court order in this case. Without waiving these objections, Defendants respond as follows.

TennCare Exclusions Rules were promulgated through the ruling making process with a public hearing conducted on August 15, 2005. The rules became effective January 10,2006. Further clarifications were promulgated as Public Necessity Rules on May 3, 2006 to reflect TennCare's compliance with EPSDT and the John B. Consent Decree. Coverage policy defined in the exclusions rules, including identification of certain services that are non-covered even for children under age 21, are not changes in TennCare's policy regarding these services, but rather, clarifications of coverage policy, and reflect services that the State believes are not covered even under EPSDT because they are services for which FFP is not available and/or are never medically necessary for children. These are not "now-excluded" services, but rather services which have always been excluded from coverage and for which clarification that such services are not covered has now been provided. **While the State acknowledges that it is possible that an MCC, absent these clarifications, may have, in fact, covered one of these services in the past, it is not because such services were covered under TennCare or mandated by EPSDT. Furthermore, because the kinds of services identified are services for which FFP is not available and/or are never medically necessary for children, obtaining claims information regarding possible inappropriate payments by an MCC for these services is impossible.** There are no ICD–9 or CPT codes for such items as

Lovaas therapy, trampolines, or swimming pools.

For documents generally responsive to this request, in addition to all documents previously produced in this and the *Rosen* matter and being generally produced herewith, see documents produced at TCJB0406–D–00233 to 00315; TCJB0406–D–00480 to 00516; TCJB0406–D–00537 to 00554; TCJB0405–D–0056–00612; TCJB0406–D–00631 to 00655.

(Defendants' Exhibit 12) (emphasis added). Both parties emphasized different portions of the underscored portions of this interrogatory answer.

Neither "Wendy" nor the person writing to Wendy testified about this statement: "Wendy this is a tricky one since the MCC's would have files, but we have answered that this is unanswerable." (Plaintiffs Exhibit 12–D at p. 16). It is unclear to the Court if this discussion occurred before or after the Defendants' response quoted above. The Defendants' failure to call "Wendy," an employee of the Defendants' about this controversy adds to the Court's concern, as does the inclusion of the statement in the Defendants' actual answer to Interrogatory 22, *i.e.*: "Furthermore, because the kinds of services identified are services for which FFP is not available and/or are never medically necessary for children, **obtaining claims information regarding possible inappropriate payments by an MCC for these services is impossible.**" (Defendants' Exhibit 12), The latter statement, without explanation, is inconsistent with the statement "Wendy this is a tricky one since the MCC's would have files, but we have answered that this is unanswerable." (Defendants' Exhibit 12). This increases the Court's confusion about the Defendants' answer to Interrogatory 22. The Court will order a complete a response and will further address this issue at a conference with counsel.

### 4. The Necessity of Plaintiffs' ESI Discovery Requests

As to the probative value of Plaintiffs' ESI discovery requests, Plaintiffs initiated this recent round of discovery based upon Defendants' counsel's assertion that the Defendants were in compliance with the Consent Decree. Given Judge Nixon's findings in 2001, 2004 and in his statements about the Defendants' non-compliance in his Order of recusal in 2006, the Court finds that Plaintiffs' ESI discovery requests are for legitimate purposes. In addition, in his 2004 opinion, Judge Nixon found that the Defendants had not cooperated with the Special Master and at one point, refused to "honor [the State's] renewed commitment to produce an IAP [Initial Action Plan] satisfactory to the Special Master, last made in September 2004, and still refuses to engage its key officials in planning efforts to achieve compliance, verification of the quality of its data, and evaluation of the successes or failures in attaining compliance." (Docket Entry No. 465, Memorandum at p. 5).

Significantly, Judge Nixon also noted that "[t]he Special Master also reports that the State is incapable of reporting progress to the Court because it lacks a valid and reliable system of measuring progress in such key areas as provider network adequacy, case management, outreach, the effective use of information systems, and system level coordination, to name a few. [T]he ... Defendants have never created a list of precise "outcomes" towards which their efforts are focused, not only have failed to meet the terms of the Consent Degree, but they are not even in a position to be able to assess their own shortcomings for the purpose of making improvements." *Id.* at pp. 5–6.

Moreover, Judge Nixon found that the MCCs that actually provide the EPSDT services were also contributors to the De-

834

fendants' violations of the Plaintiffs' class's rights under the EPSDT statutes and the Consent Decree.

> [W]here there are overlapping medical and mental health issues, the MCOs and BHOs quibble over which entity is responsible for providing coverage. The State's TennCare contracts contribute to this ambiguity by sometimes failing to specify the responsible party, even though the BHOs do have coordination agreements with MCOs. In practice, individuals with overlapping issues sometimes "fall in the cracks" and fail to receive services from either a BHO or MCO, as with, for example, attention deficit disorder patients.

(Docket Entry No. 227, Findings of Fact and Conclusions of Law 176 F.Supp.2d at p. 796).

As to the need for transactional data, the Consent Decree sets agreed percentages for screenings of children. In 2004, six years after the decree, the medical screening for most class members was 53% (Consent Decree set no less 80% by 2001 and dental screening was 41.9%) (Consent Decree requires no less than 80% required by September 2003). *Id.* at p. 4. In 2004, the Defendants had not met the 100% screening of children in DCS's custody that was to be achieved by September 11, 1999. *See also* Docket Entry No. 12, Consent Decree at ¶¶ 50 and 52. As Judge Nixon found, as of 2004, none of these percentages had been met.

Dr. Rose Ray, Plaintiffs' expert reviewed the transactional data from the Defendants for her analysis. Dr. Ray and other scientists at her research firm perform a failure analysis and design quality improvement tests using statistics about various products, including medical products and medications. Dr. Ray who was awarded a Ph.D. in statistics from the University of California at Berkeley in 1972, specializes in statistical analyses of

business practices and products with an emphasis in medical research analysis. Dr. Ray's analysis of the Defendants' transactional data to date, reveals that for children who are members of the Plaintiffs' class and between ages 0 to 24 months, the number of paid screening visits at 12 months reveals that 20% of these children had three (3) or fewer screenings and 72% have had 5 or more screenings. (Plaintiffs's Exhibit No. 18). For children in this group, at 23 months, 26% have had 5 or fewer screenings and 56% have had nine (9) or more screenings. *Id.* For children who have had a mental health diagnosis 34% are rehospitalized within 30 days of their mental health diagnoses. *Id.* This latter fact on readmission within 30 days is 2 to 30 times more likely than for children admitted within 30 days in 16 other States. *Id.* at p. 2. In the Consent Decree, the Defendants committed to achieve an eighty percent (80%) screening rate. Dr. Ray's initial report raises serious issues on whether the Defendants are currently meeting the screening percentage standards in the Consent Decree.

The most significant remaining transactional database dispute is between Plaintiffs and some MCCs arising from Plaintiffs' demand for data underlying Health Employer Data and Information Set ("HEDIS") that are calculations to measure a provider's compliance with Medicaid regulations, rule and standards. HEDIS is cited in the Consent Decree as one standard to measure and set screening percentages. (Docket Entry No. 12, Consent Decree at ¶ 46).

HEDIS is a nationally recognized set of standardized measures of MCO performance. The MCCs collect HEDIS data according to detailed specifications developed by the National Committee for Quality Assurance ("NCQA"), a private, non-profit entity dedicated to improving health care

quality. NCQA assesses and scores a MCC's performance and serves as an independent accrediting organization for MCOs. Selected HEDIS measures are evaluated and scored by NCQA as a part of the accreditation process. NCQA requires that MCOs submit HEDIS data annually. For collection of HEDIS data, NCQA specifications requires each MCO to have an independent NCQA-certified HEDIS auditor to conduct the detailed analysis to validate the accuracy and reliability of MCC's reported HEDIS data. NCQA licenses auditors for these audits. *See* Docket Entry No. 907.

Dr. Ray seeks the MCCs' HEDIS data that are extracts and summaries of a class member's medical history as well as the HEDIS score reports. Some MCCs respond that HEDIS data is available from the State's production and in some instances is unavailable because that data is compiled on outside vendors' proprietary software. Several MCCs agreed to provide their HEDIS data to Dr. Ray, but other MCCs object because to do so imposes significant burdens upon them, and Dr. Ray lacks the qualifications to perform the only task for which she anticipates using the data. Unison and PHP asserted that to produce HEDIS-related data would require "extract[ing] and review[ing] for production medical record review data that already underlies audited HEDIS reports," a process these MCCs asserted is "unduly burdensome." (Docket Entry No. 907, Exhibit 10 thereto, PHP Letter). Except for HEDIS data on independent entities' proprietary software, the Court finds that this HEDIS should be provided by all MCCs in their native format.

### 5. The Costs of ESI Production

For their cost assertions, the Defendants explain that in January, 2007, the Defendants retained Document Solutions, Inc. ("DSI"), an ESI contractor to assist with the ESI production sought by Plaintiffs. Under the experts' protocol, DSI's search result was actually 350 gigabytes, but that data was uncompressed and thereby increased to 430 gigabytes. (Docket Entry No. 907 at p. 11; Docket Entry No. 984 at pp. 116, 120–22; 131). Defendants do not justify the need to uncompress their extract that yielded a 25% increase in the ESI production. Plaintiffs note that the Defendants' brief cited 600 gigabytes. (Docket Entry No. 907 at pp. 9–10). With Plaintiffs' revised search terms, the Defendants' proof is that the search from June 2004 to present for 50 search terms and the 50 key custodians would capture 493 gigabytes of data. A gigabyte can range from 75,000 to 77,000 pages and Defendants determined that their gigabyte is 77,000 pages. Tigh explained that a software program can be used to "deduplicate" or eliminate duplicate documents from the 493 gigabytes, resulting in approximately 193 gigabytes that represents about 15 million pages of documents for review. The Defendants have reviewed approximately 75 gigabytes of non-duplicative e-mails and other ESI and found only 20 percent of that data is non-privileged and actually responsive to Plaintiffs discovery requests.

Once the initial search is performed, DSI then provides a post-search process or "delivery" to render the data collected reviewable to the human eye. To perform these post-search processes, DSI charges the State $1200 per gigabyte for the first 50 gigabytes "delivered" over the total life of the contract, $1000 per gigabyte for the next fifty "delivered," and $800 per gigabyte for delivery of any additional gigabytes. The Defendants assert that $458,000 that has been spent in gathering and preparing their data for review. Any search itself would cost over $70,000 (430 gigabytes × $165 per gigabyte) and to "deliver" or translate the selected documents into a format reviewable to the hu-

man eye would cost approximately $184,000. The latter figure is calculated with 193 gigabytes at $1200 per gigabyte for the first 50 gigabytes, $1000 per gigabyte for the next fifty, and $800 per gigabyte for the final ninety-three.

With the earlier results of 20 percent of the 193 gigabytes as responsive and non-privileged documents, Defendants project that from 193 gigabytes, only 39 gigabytes, about 3 million pages, of documents will have to be produced. At six cents a page, the Defendants estimated an additional $180,000 to Bates-stamp these documents in a producible format. In addition to the $458,000 in consolidation and "extraction" costs to run the Plaintiffs' final search terms, the search of the TennCare file server and the 50 key custodians would cost the State approximately $434,000.

Another component of their costs projections Defendants cited are TennCare and other child-serving agencies' employees who examined the individual computers of the over 150 custodians to capture the ESI from their email archives, "My Documents," equivalent folders servers and home directories. The Defendants consolidated the active e-mail boxes of those custodians onto a single e-mail server to facilitate harvesting their active e-mail as well. The costs of this process is approximately $200,000. The State also captured the ESI on the TennCare file server and the Defendants cite the substantial costs of time to State's agencies' personnel.

A significant element of the Defendants' estimated costs is for privilege review by Defendants' and the contractors' counsel, including the costs of Defendants' attorneys and paralegals to create a privilege log and conduct a responsiveness review of the millions of pages generated in response to Plaintiffs' searches. The Defendants' estimates are based on a manual review by their counsel of the electronic documents for privilege. (See Docket Entry No. 907 at p. 11).

The Court finds the Defendants' costs estimates are highly exaggerated for several reasons. First, the Defendants' representative who is charge with overseeing this production explained that the State has two servers containing ESI, a report or document server and an email server. Michael Kirk, defense counsel, conceded that the Defendants' real concern is with the email server, as the document server has data compilations, such as public reports, spreadsheets and statistics. Thus, the volume of documents requiring attorney review is greatly reduced.

Second, as Tigh, Plaintiffs' computer expert, testified, the amount of time to search for potentially attorney client and work product privileges can be efficiently accomplished by use of selective search terms, such as names of counsel to identify and words such as "confidential" and "privilege" to identify potentially privileged information. The Court finds that independent of the Defendants' data systems, the defense counsel's firm's computers should be readily able to identify all clearly privileged correspondence with their clients from their computers.

Third, as Tigh explained and as the Defendants' private counsel have actually done, contract attorneys can be hired to perform any privilege reviews at significantly lower costs than the hourly rate of the Defendants' current counsel. Plaintiffs noted that Defendants' lead counsel's description of his firm's significant experiences on ESI discovery and his firm's use of contract attorneys to control costs in ESI discovery. "Our use of well-trained, closely supervised contract lawyers to assist with document discovery is designed to hold down the ratcheting litigation costs of our Clients. In document-intensive litigation, deploying expensive litigation asso-

ciates to perform the initial review, indexing, and electronic coding of documents would dramatically increase the client's litigation expense." Plaintiffs Exhibit No. 35 at p. 2 (emphasis added). For any oversights by contract attorneys, the Court's November 21st Order made ESI production "[s]ubject to Defendant's right to 'claw-back' privileged documents." (Docket Entry No. 743 Order at p. 2).

As to the Defendants' estimated costs and time for review for privilege issues, the Court adopts Tigh's testimony that the use of attorney names and other privilege filters as well as the use of contract attorneys should substantially reduce the Defendants' and MCCs' costs for any privilege review. (Docket Entry No. 988 at pp. 279, 282; Docket Entry No. 984 at p. 133).

Another significant factor to reduce production costs is a clawback right for any inadvertent production of privileged material. At an earlier conference, the defense counsel complained that the Court had not afforded it clawback protection for privileged documents that were inadvertently disclosed. (Docket Entry No. 720 at pp. 19–20). In their pre-hearing brief, the Defendants stated that "Plaintiffs at various points have urged the Court to compel the State to avoid the costs and delays involved in the State's review for privilege and responsiveness by compelling the State to produce the documents without reviewing them under a 'claw-back' agreement." (Docket Entry No. 907, Defendants' Response to Plaintiffs' Renewed Motion to Compel at p. 11). Citing a Committee Report on the 2006 Rule amendments, the Defendants argue that only a voluntary claw-back agreement is permitted by these rules.

The Court discussed this clawback provision with Nicole Moss, a defense counsel and as the Court understood her, Moss agreed to a clawback agreement for any ESI production to Plaintiffs.

THE COURT: And if we've got a claw back provision, as I understood the plaintiffs agreed to, then, if something sort of slips through, then you have the right to come back and claim it as privileged. I mean, that's what I understood you wanted, isn't it?

MS. MOSS: We do, Your Honor. Certainly that would be part of the provision.

(Docket Entry No. 734 at p. 80). Thus, it was at the Defendants' counsel's request and with the Plaintiffs' counsel's agreement, the Court entered an order with a clawback provision for the Defendants. *Id.* at p. 74. and Docket Entry No. 743, Order at p. 2. In a word, the Court did not impose any "compulsory" or "mandatory" clawback upon the Defendants, and neither did the Plaintiffs.

The Defendants' also expressed concerns about disclosures of ESI to their unnamed "political enemies" and "political opponents." (Docket Entry No. 907, Defendants' Response at pp. 11, 13). A protective order limits the disclosure of sensitive information for use solely in this action. (Docket Entry No. 878).

Assuming the correctness of the Defendants' gigabytes, the Court also credits Tigh's testimony that in his experiences in complex litigation, such estimates are reasonable for this complex action. This action involves a class of more than 550,000 children and their rights to various medical services, including dental and behavioral services provided throughout the State. The EPSDT statutes and the Consent Decree clearly contemplate multiple screenings and any necessary followup medical care for each member of the class through TennCare or more MCCs. In these circumstances, vast amounts of data are inherent in the operation of this system that the Defendants elected to establish. Even with the 2006 paper production, ESI is

necessary to restore relevant metadata that was removed when the Defendants converted electronic documents to hard copy before producing them to the Plaintiffs in 2006. (Docket Entry No. 982 at pp. 49, 58).

For the MCCs, Plaintiffs accepted all of the contractors' proposed lists of key custodians and developed a protocol and search terms. Plaintiffs' ESI requests have been resolved with the largest MCOs Bluecross/Blueshield of Tennessee, Doral and the smallest MCO (Memphis Managed Care). (Docket Entry No. 893; Collective Exhibit A). The Court notes that BlueCross estimated a review of the 42GB of information would take 30 days to review with 10 reviewers. (*See* Docket Entry No. 988 at pp. 72, 76). BlueCross BlueShield and Doral also agreed to impose filters to eliminate its non-TennCare business. Plaintiffs Exhibit 26 at p. 4. BlueCross BlueShield also agreed on production of HEDIS data and case management data. BlueCross BlueShield, Doral and Memphis Managed Care seek an equitable allocation of costs for the ESI, primarily for attorney review for confidential and privileged information.

As to the other MCCs, AmeriChoice, First Health, Magellan, Memphis Management, and Unison agreed to produce transactional data and HEDIS data as well as care plan data. PHP agreed only to produce transaction data from January 1, 2006 to April 11, 2007. UAHC agreed only as to the number of custodians (11) for the ESI search as well as transaction data and case management information. As to the other ESI searches, AmeriChoice estimates that reviewing the search results from its estimated 17–19 gigabytes of information would take 8 months to 1.5 years with 10 reviewers. (*See* Docket Entry No. 986 at pp. 122, 129). First Health, has estimated its cost for Plaintiffs' e-mail production demands would run as high as $1.6 to $1.7 million. Prior to the April 11th Status Conference, First Health had "estimate[d] that undertaking the key word search proposed by plaintiffs would require close to 18,000 hours of work and cost almost $3.0 million dollars." (Docket Entry No. 907, Exhibit 2 thereto). *See also* Docket Entry No. 907, Exhibit 3 thereto, Moss Letter dated May 24, 2007 (reporting First Health's estimate that it will take "two and one half years to harvest and produce ESI for the six First Health custodians"). Unison asserts, "[i]t is clear that, for the seven relevant Unison custodians within the relevant time frame, the costs to conduct the ... search and review [methodology on which Plaintiffs currently insist] will be excessive and, depending on the costs of outsourcing, may well approach seven figures." *Id.* at Exhibit 5.

At the June 2007 evidentiary hearing, the Court inquired of Tigh whether an ESI word search limited to the terms "John B." "EPSDT" and "TennCare," coupled with the names of MCC personnel who responded to or wrote to the Defendants about any compliance or complaint(s) as well as the names of those responding TennCare officials, would alleviate any undue burden for the ESI production for the MCCs. A similar question was put to Unison's chief of information who teaches college courses on computer science. Both witnesses agreed. Thus, the Court finds that for the remaining ESI searches for those MCCs that have not reached agreements with the Plaintiffs, will be so limited. Plaintiffs, however, may renew an ESI request if the initial search is shown to be inadequate or seriously deficient.

Some MCC contractors have taken the position that cost allocation issues must be resolved prior to commencement of any electronic production. *See e.g.,* (Docket Entry No. 907 at Exhibit 8 thereto) ("Sixty

days from a final determination of who bears the costs of production, BCBS will have collected and processed all of the data from its twenty-two key custodians."). The MCCs' contracts with the State provide that the costs of production are to be borne by the contractor. Yet, in this discovery dispute, the Court will assess costs of production at issue on Plaintiffs' renewed motion to compel under federal law.

Since the entry of the Consent Decree the State has received $7,434,375,701 in federal funds for class members of which $6,691,980,359 constitute the total federal funds for the direct provision of health care services to class members. (Docket Entry No. 948 at p. 2). The difference in these two amounts, $742,395,342, was expended on "outreach, case management, disease management, claims processing, provider network maintenance and other administrative services related to providing care." *Id.* at pp. 2–3. In addition, the State receives separate and undisclosed amount of federal funds "for administrative costs incurred by state personnel to operate the TennCare program." *Id.* at p. 3.

The gross amounts of the federal funds that the State has distributed among the MCCs for services for the class members, since the entry of the Consent Decree, are reported as follows:

Americhoice $115,853,341.67;
Blue Cross/Blue Shield of Tennessee $1,413,851,994.20
Doral Dental of Tennessee $74,757,246
First Health Services $28,795,619

Magellan (TennCare Partners) $1,428,295,294.26

Preferred Health Partnership of Tennessee $520,116,405.14

Unison Health Plan of Tennessee $152,638,134

Windsor Health Plan, Inc. $77,777,037

Volunteer State Health Plan $1,413,851,994.20

(Docket Entry Nos. 947, 950, 951, 953, 954, 957 and 958).[29]

### 6. Privileged Information in the ESI Production

Defendants assert various privileges to bar production of some ESI. Defendants first assert the attorney-client and work product privileges for documents that are principally drafts of documents that defense counsel or in-house counsel commented upon, revised, or reviewed. These drafts are mostly of semi-annual reports ("SARs") required to be filed under the Consent Decree as well as initial assessment protocol ("IAP") and initial work plan ("IWP") that were ordered by the Court. (Docket Entry No. 303; *see also* Docket Entry No. 485).

At the November 6, 2006 hearing on discovery motions, the Court discussed with both counsel potential privilege issues in the ESI production.

> THE COURT: So the drafts would be moot. If we work out the electronic protocol, the drafts would be moot

---

**29.** The Defendants and MCCs provided this data in response to an Order (Docket Entry No. 885) to state the amounts of federal funds provided to each entity. The Order also required data on the amounts expended on class members, but the MCCs' responses on the latter varied. Without more information on the different methodologies for their various statements on expenditures, the Court elected to present the gross amount of federal funds received by each MCC. Under Fed.

R.Evid. 614, the Court can question witnesses at an evidentiary hearing. Given the Defendants' and MCCs' submissions about the costs of Plaintiffs' ESI production, the Court intended to ask questions on the amounts of federal funds given to the Defendants and the MCCs for the benefit of the class. See Fed. R.Civ. P. 26(b)(2)(C). Because the responses may require some time to compile, the Order was entered prior to the June 19th evidentiary hearing.

MR. BONNYMAN: Correct. And the advantage of that is, we would then be able to compare and—

THE COURT: All I want to know is whether it's moot or not.

MS. MOSS: Does that then moot our obligation to log as privileged those drafts which were exchanged with counsel?

THE COURT: Yes. What I said on the electronic protocol is that there is a claw back provision so that you—so you have the right to come back and assert the privilege if there is some disclosure of privileged—inadvertent disclosure of privilege information.

MS. MOSS: But Your Honor, an additional large part of the burden is knowing that a substantial amount of these drafts, maybe hundreds and hundreds of them, are privileged. And if we are going to produce some, do we then have to take each one of those drafts individually, log them on a privilege log as a draft of the SAR,—

THE COURT: I take it that these policy writers are a relatively small group. So I would think that, of that relatively small group, you would be able to identify what's on the electronic database that they wrote that they think is privileged.

MS. MOSS: But, Your Honor, there are—

THE COURT: And I'm saying this on the basis of what I saw *en camera* in Rosen.

MS. MOSS: Sure. In terms of reports that discuss—the State puts together—I mean, it probably is not an exaggeration to say 20, 30 reports. Every MCO has an outreach report; there's annual external quality review reports.

THE COURT: Now let me say this. I know there are cases out of the Sev-

enth Circuit that say, just because a lawyer wrote it doesn't mean it's work product. If it's a document that is written in the course of the business of the client, then it's not work product, because just because a lawyer wrote it. It's *Searles*, out of the Seventh Circuit. (actually the Eighth Circuit).

So what I'm saying to you is, you ought to think about that in terms of—you know when you make these assertions of work product. Just because you put a lawyer's name on it doesn't necessarily means that it's a work product.

MS. MOSS: But Your Honor, I think if they are reviewing documents to offer advice on compliance with the consent decree and compliance with this Court's orders, it's the same work product that they have asserted over their own materials.

THE COURT: Yes, but that's the point. You can't—I'm uncertain as to whether you can take a lawyer—take lawyers, put them as part of the deliberative process, and blanket from discovery everything you have to do under a consent decree. I don't know that you can do that.

You look at this Searles case. It may be a little dated, but you look at it, because that's what I'm going to be looking at. That's why I'm telling you about it.

MS. MOSS: I guess, Your Honor, I would direct your attention—I don't have the name off the top of my head, but in our memorandum, we also cited some case law that suggests that reports that are created as part of the consent decree, even if it's a consent decree in another case, that are reviewed and created and overseen by counsel, are entitled to work product protection. So I would suggest there

is, at a minimum, competing authority out there on this issue.

THE COURT: Well, I've cited and approved of Searles on prior occasions. So just keep that in mind. What I'm saying is, if you apply Searles, then I think that should reduce that number of truly work product assertions. And if we've got a claw back provision, as I understood the plaintiffs agreed to, then, if something sort of slips through, then you have the right to come back and claim it as privileged.

I mean, that's what I understood you wanted, isn't it?

MS. MOSS: We do, Your Honor. Certainly that would be part of the provision. It was offered, I suggest, less in terms of these drafts and more in terms of the State reviewing all of the metadata associated with these documents that would be produced electronically, which would be extraordinarily burdensome. And their suggestion, well, just produce it, and you can claw it back. And to provide them with privileged information that they are not otherwise entitled to,—

THE COURT: Well, every part of preparing anything in compliance with the report is going to be mental impression. I mean, how can you go through the exercise without forming a mental impression? And that way you insulate everything.

I think that's overly broad. I'm not sure it's work product.

MS. MOSS: Well, the objection was, **the substantive reviews and edits pri-** **marily come from attorneys,** whereas the typographical or formatting edits—and it was simply a—

THE COURT: I think that's what Searles addresses, is where the lawyer is placed in the posture of actually doing the business of the client.

MS. MOSS: Well, when it's a consent decree that governs the Medicaid program, where we're under a court order—

THE COURT: Yes, but it's also policies for the State. I mean, thus far, Judge Nixon hasn't found anything that complies with the consent decree.

MS. MOSS: It isn't the policies. It would be substantive edits about the—it would be substantive edits about the compliance with the decree. This is a lawyer's advice to the client on how to follow the consent decree.

THE COURT: **Well, you can submit them under seal like we did in *Rosen,* if we get to that. I mean, if we're going to get to the finer points, you will just have to submit it under seal.**

MS. MOSS: **Again, we would welcome that . . .**

(Docket Entry No. 734 at pp. 77–81) (emphasis added). Despite the Court's instructions, the Defendants did not submit any purportedly privileged documents for an *in camera* inspection. Once again, Defendants' counsel ignored the Court's instructions.

As to drafts of documents, the privileges asserted and the specific document purportedly covered by privileges are as follows:

| Bates Number (Range) | Document Type (Letter, Date of memo, Email, etc. | Date of Document | Document Author (Title/Agency) | Document Recipient(s) (Title/Agency) | Basis of Privilege (subject Matter - detailed) | Privilege Type (A/C, W/P) |
|---|---|---|---|---|---|---|
| JB-A-001 57-001 65 | Email | 7/31/2002 | Susie Baird | Mary Griffin | Attorney-client communication re Andrea Thaler's proposed final draft | A/C, W/P |
| JB-A-001 09-001 12 | Draft Remedial Plan | | Laura Stewart | Mary Jane Davis | Draft remedial plan prepared for counsel's review | A/C |
| JB-A-00268-00270 | Email with Attachment | 4/28/2004 | Susie Baird | Linda Ross | Attorney-client communication re request from counsel for client's review of draft EPSDT | A/C |
| JB-A-00282-00287 | Email with Attachment | 4/6/2004 | Linda Ross | Susie Baird, Betty Boner | Attorney-client communication requesting comments re draft letter to Special Master | A/C, W/P |
| JB-A-01 581-01 584 | Draft Policy | 6/4/2003 | Mary Griffin | | Counsel's working copy of draft EPSDT transportation assistance policy | A/C, W/P |
| JB-A-01 775-01 778 | Email | 5/21/2004- 5/24/2004 | Mary Griffin | Michael Drescher, Tam Gordon, Theresa Lindsey | Attorney-client communication re counsel's edits to the content of EPSDT brochure | A/C, W/P |
| JB-A-01 574 | Email | 3/19/2002 | Mary Griffin | Stephanie Anderson | Counsel's edits to EPSDT section of contract and attaching documents | A/C, W/P |

| JB-A-01099-01210 | Draft Contract | | Patricia Newton | | Draft amended and restated CRA with counsel's edits and notes | A/C, W/P |
|---|---|---|---|---|---|---|
| JB-A-01 820-01 825 | Email with Attachment | 2/24/2004-3/15/2004 | Annette Goodrum | Mary Jane Davis | Attorney-client communication discussing draft of EPSDT guidelines | A/C |
| JB-B-00020-00022 | Email with Attachment | 7/11/2002 | Mary Griffin | Stephanie Anderson | Counsel's edits to MCO Contract | A/C, W/P |
| JB-B-01917-01929 | Draft Agreement | 11/21/2002 | Christy Ballard | | Counsel's edits to Interagency Agreement | W/P |
| JB-00598 | Email | 5/25/2004 | Tam Gordon | Mary Griffin | Attorney-client communication re providing instructions for the IWP/IAP to the clients; the IWP was drafted and/or reviewed by counsel during each stage of process | A/C, W/P |
| JB-C-00541 -00553 | Email | 3/18/2004 | Theresa Lindsey | Mary Griffin | Attorney-client communication re DOH's proposed outreach plan for the IAP, the IAP was drafted and/or reviewed by counsel during each stage of process | A/C, W/P |

844

| JB-C-00557-005564 | Email | 4/8/2004 | Theresa Lindsey | Linda Ross | Attorney-client communication forwards counsel copy of the DOH outreach plan for the IAP, previously sent to Mary Griffin; the IAP was drafted and/or reviewed by counsel during each stage of process | A/C, W/P |
|---|---|---|---|---|---|---|
| JB-C-00573 | Email | 3/26/2004 | Theresa Lindsey | Robert Cooper, Tam Gordon | Attorney-client communication re previous draft of format for EPSDT activities and the responses received to the initial draft. | A/C, W/P |
| JB-C-00607 | Memo | 6/17/2003 | Betty Boner | Robert Barlow | Comments from counsel on contract draft. | A/C |
| JB-C-00608 | Memo | 6/21/2004 | Betty Boner | Robert Barlow | Comments from counsel on contract draft. | A/C |
| JB-C-00609 | Memo | 6/21/2004 | Betty Boner | Robert Barlow | Comments from counsel on contract draft. | A/C |
| JB-C-006010 | Memo | 6/30/2003 | Betty Boner | Robert Barlow | Comments from counsel on contract draft. | A/C |
| JB-C-006011 | Memo | 6/30/2003 | Betty Boner | Robert Barlow | Comments from counsel on contract draft. | A/C |

| JB-C-006012 | Memo | 6/30/2004 | Betty Boner | Robert Barlow | Comments from counsel on contract draft. | A/C |
|---|---|---|---|---|---|---|
| JB-C-006013 | Memo | 7/1/2002 | Betty Boner | Robert Barlow | Comments from counsel on contract draft. | A/C |
| JB-C-006014 | Memo | 7/1/2002 | Betty Boner | Robert Barlow | Comments from counsel on contract draft. | A/C |
| JB-C-006015 | Memo | 6/17/2003 | Betty Boner | Robert Barlow | Comments from counsel on contract draft. | A/C |
| JB-C-006016 | Memo | 6/30/2003 | Betty Boner | Robert Barlow | Comments from counsel on contract draft. | A/C |
| JB-C-006017 | Memo | 6/30/2003 | Betty Boner | Robert Barlow | Comments from counsel on contract draft. | A/C |
| JB-C-006018 | Memo | 6/30/2003 | Betty Boner | Robert Barlow | Comments from counsel on contract draft. | A/C |
| JB-C-006019 | Memo | 6/21/2004 | Betty Boner | Robert Barlow | Comments from counsel on contract draft. | A/C |
| JB-C-006020 | Memo | 6/21/2004 | Betty Boner | Robert Barlow | Comments from counsel on contract draft. | A/C |
| JB-C-006021 | Memo | 6/30/2003 | Betty Boner | Robert Barlow | Comments from counsel on contract draft. | A/C |
| JB-C-006022 | Memo | 7/1/2002 | Betty Boner | Robert Barlow | Comments from counsel on contract draft. | A/C |

| JB-C-006023 | Memo | 6/30/2003 | Betty Boner | Robert Barlow | Comments from counsel on contract draft. | A/C |
|---|---|---|---|---|---|---|
| JB-C-006024 | Memo | 7/17/2003 | Betty Boner | Robert Barlow | Comments from counsel on contract draft | A/C |
| JB-C-006025 | Memo | 6/30/2003 | Betty Boner | Robert Barlow | Comments from counsel on contract draft. | A/C |
| JB-C-006026 | Memo | 6/21/2004 | Betty Boner | Robert Barlow | Comments from counsel on contract draft. | A/C |
| JB-C-006027 | Memo | 6/21/2004 | Betty Boner | Robert Barlow | Comments from counsel on contract draft. | A/C |
| JB-C-006032 | Memo | 7/1/2002 | Betty Boner | Robert Barlow | Comments from counsel on contract draft. | A/C |
| JB-C-006033 | Memo | 6/17/2003 | Betty Boner | Robert Barlow | Comments from counsel on contract draft. | A/C |
| JB-C-006034 | Memo | 6/30/2003 | Betty Boner | Robert Barlow | Comments from counsel on contract draft. | A/C |
| JB-C-006035 | Memo | 6/30/2003 | Betty Boner | Robert Barlow | Comments from counsel on contract draft. | A/C |
| JB-C-006036 | Memo | 6/30/2003 | Betty Boner | Robert Barlow | Comments from counsel on contract draft. | A/C |
| JB-C-006037 | Memo | 6/21/2004 | Betty Boner | Robert Barlow | Comments from counsel on contract draft. | A/C |

| JB-C-00643 | Memo | 6/30/2003 | Betty Boner | Robert Barlow | Comments from counsel on contract draft. | A/C |
|---|---|---|---|---|---|---|
| JB-C-00644 | Memo | 7/1/2002 | Betty Boner | Robert Barlow | Comments from counsel on contract draft. | A/C |
| JB-C-00645 | Memo | 6/30/2003 | Betty Boner | Robert Barlow | Comments from counsel on contract draft. | A/C |
| JB-C-00646 | Memo | 6/21/2004 | Betty Boner | Robert Barlow | Comments from counsel on contract draft. | A/C |
| JB-C-00647 | Memo | 6/30/2003 | Betty Boner | Robert Barlow | Comments from counsel on contract draft. | A/C |
| JB-C-00648 | Memo | 6/17/2003 | Betty Boner | Robert Barlow | Comments from counsel on contract draft. | A/C |
| JB-C-00649 | Memo | 6/21/2004 | Betty Boner | Robert Barlow | Comments from counsel on contract draft. | A/C |
| JB-C-00650 | Memo | 6/30/2003 | Betty Boner | Robert Barlow | Comments from counsel on contract draft. | A/C |
| JB-C-00651 | Memo | 6/17/2003 | Betty Boner | Robert Barlow | Comments from counsel on contract draft. | A/C |
| JB-C-00652 | Memo | 6/21/2004 | Betty Boner | Robert Barlow | Comments from counsel on contract draft. | A/C |
| JB-C-00653 | Memo | 6/30/2003 | Betty Boner | Robert Barlow | Comments from counsel on contract draft. | A/C |

| JB-C-00654 | Memo | 7/1/2002 | Betty Boner | Robert Barlow | Comments from counsel on contract draft. | A/C |
|---|---|---|---|---|---|---|
| JB-C-00655 | Memo | 6/30/2003 | Betty Boner | Robert Barlow | Comments from counsel on contract draft. | A/C |
| JB-C-00656 | Memo | 6/21/2004 | Betty Boner | Robert Barlow | Comments from counsel on contract draft. | A/C |

The Defendants' privilege log (Docket Entry No. 941–3) is not the model of clarity, as the first sixteen pages list the documents and the next sixteen pages list the privileges. The Court does not know the capacities of several of these persons, except for counsel of record and Mary Griffin who was named as in-house counsel and Tarn Gordon. (Docket Entry No. 720, Moss Declaration). At the June 2007 conference, Defendants did not offer any proof on these privileges. In her prior declaration, Moss cited counsel's necessity to review documents prior to submission to the Court and referred "substantive edits to the [SAR] report come from counsel." *Id.* at p. 19. The SAR is a technical document. *See e.g.,* Docket Entry No. 728.

In their response to the Plaintiffs' renewed motion to compel, the Defendants assert a privilege based upon various state statutes. Plaintiffs' ESI requests include various health information from different state agencies and the MCCs about children in the certified class. The purpose of Plaintiffs' requests for this data is to allow Dr. Ray, one of Plaintiffs' experts, to cross reference or validate any failures revealed by her statistical analyses. This data is from principally three state agencies. The Tennessee Department of Mental Health and Developmental Disabilities ("DMHDD") has a "Incident Reporting System" database that is utilized by the State's five Regional Mental Health Institutes (RMHIs) to record information on incidents affecting mental health patients in these institutes. This database contains narrative descriptions of various incidents (such as elopements, falls, injuries, assaults, or property destruction) relating to mental health patients, including demographic information about the patient, the nature and circumstances of the incident and any injury resulting therefrom, the names of witnesses to the incident, and medical and management review of the incident.

Plaintiffs also seek the DCS Incident Reporting data to study the consequences of the lack of available and appropriate health care to members of the Plaintiffs' class. This DCS information discloses the treatment needs of children in DCS custody and what medical and mental health treatment the children are actually receiving. Dr. Ray analyzed this data for children in DCS's custody to determine if all of a child's medical and mental health needs are being met while the children are in state custody.

Plaintiffs also request the TNKids database that includes a child's case manager's narrative case recordings about the child or any information the case manager deems appropriate. For example, a narrative case recording might include a case manager's summary of medical services received by the child, visits of DCS Health Advocacy nurses describing health services the child is receiving, and number and

frequency of case management contacts with the child. A database count of the records on April 10, 2007 showed that since January 1, 2004 there have been 5,377,286 case recordings. Since April 1, 2006 there have been 1,431,048. The TNKids system data can range from a few paragraphs to several pages for each recording. A child in custody will typically have multiple recorded entries. The sort of health services information that would be responsive to Plaintiffs' requests are in any one of four narrative fields. These fields are labeled to record the purpose, the content, the observation/assessment, and the plan. However, each field is a free form text field without any required format.

The Defendants contend that there is not any automated method to determine if these records contain the health services information responsive to Plaintiffs' requests. Some MCCs contend that this information is already available to Dr. Ray and the Plaintiffs through other sources, such as the State's Interchange database, DCS's monthly EPSDT reports, and the Face–To–Face Contact reports. As to the readmission statistics on mental health issues for children, the Defendants contend that Dr. Ray earlier stated that this information would not be useful because this data cannot be converted to Excel as she had originally anticipated. (Docket Entry No. 907 at 35). The Defendants also cite Dr. Ray's April 6, 2007 email to Brent Antony in which she states: "Large numbers of .pdf files do not suit Plaintiffs purposes very well." *Id.* at Exhibit 1. The Court finds that if Plaintiffs assert that they can access this data for their experts, the Defendants must provide the data in its current or native format.

The Defendants also object to disclosure of incident reporting data because of privacy protections under state and federal laws and related policy considerations. For ex-

ample, Defendants presented proof that if persons who report abuse of children, knew that their statements and identity could be disclosed to others, then such persons would not report abuse. For these privilege concerns, Plaintiffs agree to an appropriate protective order to protect the identities of any person reporting a serious incident and assure the Court that they do not seek the information to identify particular clinicians or physicians. The state and federal statutes cited by the Defendants will be addressed *infra*.

The proof establishes that the Defendants already provide this information to a private group, Tennessee Assistance Committee that monitors the Defendants' TennCare program. Two magistrate judges earlier ordered the Defendants in this and a related action to produce these same materials. Moreover, the Defendants actually file this data regularly in another action in this Court. *Brian v. Sundquist,* No. 3–00–0445 (M.D.Tenn.). (Docket Entry No. 219 at p. 14; Docket Entry No. 244 at p. 18; Docket Entry No. 245; Docket Entry No. 253 atp. 3; Docket Entry No. 262). As quoted *supra* at pp. 819–20, under the MCCs' contracts that includes behavioral or mental health providers, the MCCs and the State agreed to provide any information "pertaining to" a class member's care to a number of state and federal agencies.

Although there was testimony from some MCC witnesses that email has not been required to be provided to the Defendants under their TennCare contracts, the Court deems controlling the unequivocal language in the MCCs' contracts that create a legal duty to provide any information "pertaining to" a TennCare member to the state or other federal agencies upon their request. (Plaintiffs' Exhibit 28). In these circumstances, the Court finds that the disclosure of MCC email about TennCare

is appropriate information to disclose to class members' counsel under a protective order in recognition of the privacy interests of the affected individuals.

The MCCs also have privacy concerns arising under federal law, HIPPA, and their contractual obligations with customers and providers under separate contracts, non-Medicaid contracts and business as well as business in other states. Plaintiffs agreed to a filter in the ESI search to exclude protected information involving other businesses and programs in other states. As to HIPPA disclosures, Judge Knowles ruled earlier in this action that disclosure of class members' protected information to class counsel does not violate federal law. (Docket Entry No. 103, Order). The MCCs have not shown that a properly tailored protective order would not adequately address their concerns. If any such report or data is presented at an evidentiary hearing, the names of the persons involved can be redacted.

Subject to the legal analysis of the privileges asserted, the Court finds that these collective facts establish the Plaintiffs' need for transactional data and ESI, including policy statements, drafts thereof and emails for several purposes to discover how the Defendants and the MCCs deliver services to class members; to evaluate the Defendants' purported compliance with the Consent Decree; and to understand the measures the Defendants considered in remedying their past violations found by the Court.

### 7. Defendants' Failures to Answer Plaintiffs Requests for Admissions and to Comply with the January 14th Order

Plaintiffs next contend the Defendants' custodians' responses to Plaintiffs' requests for admissions ("RFAs") on destruction of ESI were inadequate because "for nine former employees . . . as well as the Governor, the State did not provide responses from the custodians themselves." (Docket Entry No. 828–1, Plaintiffs' Renewed Motion To Compel at p. 16). Plaintiffs also contend that the Defendants also did not comply with the January 14th Order requiring the Defendants to file certifications with the Court that ESI had not been "removed" from the Defendants' designated custodians' work station computers.

The first of Plaintiffs' revised two RFAs asked key custodians if they were aware of any documents, including ESI, that had been "destroyed, deleted, thrown away or lost for any reason." *See e.g.,* Docket Entry No. 828–12 at p. 1. The second RFA asked custodians if they had searched "all paper and electronic records in their possession or control (including both state and private email accounts and computers, including removable drives or storage)." *See id.* at p. 2 (emphasis added). Two companion interrogatories sought information that had been destroyed or lost. If the person answered "NO" to RFA No. 2, then Interrogatory No. 2, requested the identity of "any record, e-mail account (including *removable* drives or storage) in your possession or control that you believe potentially contained information or documents requested by the plaintiffs and that you did not search." *See id.* at p. 2 (emphasis added)

As for the "nine former employees" to whom Plaintiffs refer, Defendants explain that these former employees no longer work for the State and that Defendants lack the authority or control over their responses. The State officials who actually performed searches of former employees' files, and participated in preparing the State's discovery responses on their behalf signed a Request for Admission for each former employee. These signed assurances were offered to satisfy any concerns Plaintiffs might have "to obtain assurances

on completeness of discovery responses." (Docket Entry No. 743 at p. 3). Yet, three former employees who performed their own searches, left employment before the Requests for Admission were served on the Defendants. In Plaintiffs' view, the RFAs and interrogatories were also intended to resolve gaps in the State's paper production in May, 2006.

Plaintiffs argue that in the 318 pages of documents submitted on behalf of 166 custodians, none provided the information required by the January 14th order. Plaintiffs cite correspondence with Defendants' counsel and a February 13th meeting with defense counsel, at which Plaintiffs' counsel stated that neither the RFAs nor companion interrogatories had asked each custodian for the information required in the Court January 14th Order. (Docket Entry No. 828, Exhibit 5 Bonnyman letter of February 5, 2007; Exhibit 4, Bonnyman letter of February 23, 2007). The Defendants' counsel responded that the custodians' responses to Plaintiffs' RFAs also answered the question in the January 14th Order and refused to provide any further responses. (Docket Entry No. 828, Exhibit 5: Moss letter of February 27, 2007). In a letter, defense counsel responded that it would be too burdensome to comply with the January 14th Order:

> ... [W]ith respect to the issue of burdensomeness in sending yet another survey/request to custodians asking them "whether any material has been removed," to be clear the State's burdensomeness objection is based both on the fact that these custodians have already been asked to sign and did in fact submit RFA responses which covered this issue, but in addition, **because the Court's Order requiring a certification came after the custodians had already been surveyed about the location of their My Documents or equivalent folders. It is our strong belief that yet another survey will be confusing and will prompt numerous questions and concerns and will further task the resources of the State's IT personnel who have already expended hundreds of hours already in attempting to respond to the Plaintiffs' overly broad discovery requests.**

*Id.* (emphasis added)

The Court finds that the Defendants' custodians' RFA answers do not comply with the January 14th Order that required certifications on whether any ESI had been **"removed"** from any storage media. Plaintiffs' RFAs asked only if **"removable"** files had been **"searched"**. The January 14th Order addressed actual removal of ESI by anyone. The Defendants' custodians' RFA replies are not responsive to that issue. The Defendants did not seek relief in the January 14th Order nor ask the Court to treat the Defendants' custodians' RFA responses as satisfying the Order. Defense counsel elected to nullify the Court's Order. The Court finds the Defense counsel's position reflects yet another instance of the Defendants' disrespect and disregard for the Court's Orders in this action.

The sole remaining factual dispute involves the Governor's failure to sign a copy of his responses to Interrogatories and Requests for Admission that were signed by Steve Elkins, his legal counsel. *See* Docket Entry No. 799. Defendants argue that Plaintiffs' insistence on a personal assurance from the Governor is groundless, impugns the integrity and intolerably intrudes upon the prerogatives of the State's Chief Executive, as well as impugning the credibility of the Governor's legal counsel. The Defendants designated the Governor as a key custodian and emails were sent to the Governor who also attended a meeting on this action. The Defendants' counsel has disclosed the Governor's response. Whether to compel the

Governor's personal signature is discussed *infra.*

At the April 11, 2007 "experts only" conference, there were two occasions on which the Court inquired of the experts' progress and at such times, the Court received reports on their agreements in the presence of their counsel. At the conclusion of the hearing, the Court then directed Brent Antony, the Defendants' expert, to prepare a written "summary" of those agreements and circulate that document to all experts at the conference for comment, and thereafter to file the summary agreement with the Court. Counsel for the parties were present when the experts gave their reports and when the Court gave its directive to Antony. From the Court's review of the transcript of that conference, the experts gave two reports of their agreements, as follows:

### [First Report]

MR. TIGH: Your Honor, this is Tom Tigh. We have spent—shall we review the morning as well?

THE COURT: Well, it's really more of a report on how much longer you think you might need to complete your discussions.

MR. TIGH: We finished the discussions on the transactional data. **We have a plan to move forward that provides a two week delivery schedule for the analysis of plaintiff's—of the MCCs data, and a schedule for when they can provide that data to the State for distribution to the plaintiffs.**

THE COURT: That's the transaction data?

MR. TIGH: That's the transactional data. That was finished before lunch. Since one o'clock, we've been reviewing the ESI, which is proving to be a little bit more difficult to get our hands around.

**We have identified the fact that all of the MCCs currently have a litigation hold in place. In many cases, that litigation hold was put into place in December or January of 2007. December of 2006 or January of 2007. And that data back to 2004 is not available. All of the MCCs have in place or will have in place a preservation system so that no data from the point when they put their litigation hold into place forward will be eliminated from their systems.**

The point that we were just about to cover was how we can reduce the search terms to something that would be suitable for each of the systems. The largest or the most feedback comes from the fact that there may very well be a significant number of documents that have to be reviewed, even after the search terms are applied, in order to determine what has to be produced.

THE COURT: For the State? The State experts?

MR. ANTONY: Yes, Your Honor. **As reported, following the morning session, with respect to both the transaction systems and the searching of electronic data, the parties were largely in agreement as relates to the State, and so the bulk of the focus has been on the contractors.** The process after lunch has been somewhat more tedious. We've made it through a discussion of really preservation and collection of material, and not so much into the search protocol.

I would like to sort of clarify or at least at add my perspective on two points. We did address the issue of the litigation hold and the preservation techniques that the plans are im-

plementing. Mr. Tigh noted that that data was not available back to 2004. I would say actually **what I understood from the plans is that, on the identification on key custodians, they have implemented systematic merit s to ensure that data is not deleted for the key custodians. And that prior to that, data may not be available back to 2004,** but on the other hand may, depending on the procedures that they have implemented on the staff level.

I will note that there was—the point of discussion around the retention of data and sort of following on a comment by Mr. Tigh, around the practicality of implementing measures that would require attention of all information coming into or out of an e-mail system, or whether the litigation hold and preservation requirements speak to reasonable system measures to retain data and procedures to retain responsive information without requiring some of these plans that are large and national in nature, require any and every e-mail that comes in and out of their system to be retained, whether it's responsive or not.

So I think there is a point of clarification for the parties to address at some point around what the ultimate requirement is on retention and, in fact, whether it requires retaining everything or implementing reasonable measures retain responsive information, through both systematic and procedural measures.

But I generally agree with Mr. Tigh that we have continued to make progress, although we have the discussion of search ahead of us, which could promise to be substantial.

THE COURT: Okay. Do any of the other private contractors want to add any additional comments to what has been said by plaintiffs expert and the State's expert? Feel free to. Yes, sir. Identify your name.

MR. HOLDREN: Mike Holdren with First Health Services. I agree with the comments on the transactional data. I think we have a good plan in place for that. And hopefully I speak for some of the other contractors, when we have the discussion, particularly around the e-mail, the harvesting of the e-mails.

As I walked through just the nine custodians that we've identified who receive an average of 90 e-mails a day, and in over an 1,100 day period, that's over 900,000 e-mails that we would have to go through. And these people work on other accounts.

So if we got hits on ten percent of those, using a tool, which I really am personally not confident in the accuracy of, but I haven't seen it fully executed, that's still 90,000 e-mails that we would have to go through [m]anually to cull out protected health information for some of our client and recipients and things like that.

So that's a difficult conversation. That's the only feedback I wanted to give you there, sir.

\* \* \*

**[Second Report]**

THE COURT: Why don't you restate the agreement. Peggy, mark this one.

MR. TIGH: **Within two weeks from today, we will have from the MCCs their suggested revisions to the search terms, suggested revisions to the key custodian list, and suggested filters, as opposed to searches, that will reduce the number of messages or electronic documents that need to be reviewed.**

Within one week after the plaintiffs receive that information, they will respond with acceptance or additional revisions to the list of search terms, acceptance or additional modification of the key custodians, acceptance or additional modification to the filters that have been suggested by the MCCs.

At that point, the MCCs would be responsible for identifying a schedule under which they could, in fact, do the searches, only identifying a schedule under which they could do the searches and extract the information for delivery to the review team. That schedule is what we would get the two weeks after the last—the last two weeks, the two weeks after the plaintiffs revised search terms.

THE COURT: Is that restatement of what the agreement is acceptable to all of the MCCs?

MR. KUBLY: That's acceptable here, I believe, yes.

THE COURT: Does anybody else have any objection to that?

MR. ELKINS: Matt Elkins, Memphis Managed Care. The only other thing I think we'd like to ask is that that list become a final list. We've had three or four iterations of a key word list search here. So if each organization is going to go through that, I think we would like to, at the point the plaintiff compiles that information from all of the organizations, let's finalize that key word search so we don't keep trying to hit a moving target.

THE COURT: Any objection?

MR. TIGH: Not at all.

THE COURT: So it will be modified to reflect that. Anything else?

MR. HOLDREN: Mike Holdren with First Health Services. One thing I think was not mentioned but we did agree on. Even though it hasn't been determined if the plaintiffs would accept 13 separate lists from the MCOs, we did agree that, due to the disparate lines of business, that there would be at least one list accepted from the MCOs, one from the PBM, the dental, and Magellan for behavioral health. Is that not a correct interpretation?

MR. TIGH: That is correct.

MR. HOLDREN: Thank you.

THE COURT: So there will be a common list of similarly situated entities?

MR. TIGH: There will be four lists, Your Honor. The search terms will essentially be consistent across the floor, but there may be some modifications, depending upon the type of business. So there will be one for the seven health care organizations. There will be one for—that will be essentially similar, but with some slight modifications for the dental, and so on.

THE COURT: Is that acceptable to the MCCs? Is there anything else any member of the MCC, any MCC, wants to address? We heard two. Are there any others?

MR. MOSER: Your Honor, one thing we really—

THE COURT: Your name and company.

MR. MOSER: Excuse me, Dave Moser with Blue Cross Blue Shield. One thing we really haven't gotten to yet is formats with a different number of organizations. We all run different kind of systems, different kind of e-mails. Formats are going to be somewhat different. And we would like to produce the data and—

THE COURT: Would this work? If when you provide this two week period of reporting to the State on what you all have come up with, that you include in that your proposed format?

MR. MOSER: I think we should be able to.

THE COURT: Okay. Would that address that issue?

MR. MOSER: I think it would. I just hated for a format to be set when we didn't know whether or not we could produce that.

THE COURT: Okay. I would hope that in this exchange between search terms, that you all would finalize that before any run.

MR. TIGH: We'll certainly do that, Your Honor.

\* \* \*

THE COURT: ... I would like to have plaintiffs and defendants and anyone from the MCCs summarize again the agreement on the transactional data.

DR. RAY: I guess I can do that. **The agreement on the transactional data is by Monday, I will provide to Brent Antony, who will pass it on to the others, a generic but specific list of the kind of variables and the values of those variables I'm hoping to get from the transactional data. Then one week after that, we will have a general conference call to ask questions. And in addition to that, any of the MCOs that want to contact me individually will be able to do that to ask questions.**

MR. MOSER: The HEDIS people were going to be involved with that call also.

DR. RAY: And the HEDIS people, that's correct. **There were three kinds of information that we put together: The information around the HEDIS measures, specifically, the kind of information that's not** contained in the claims data that I'll already be getting; information relating to requests for services and denial of services; and the third is information related to individual case management.

DR. RAY: Does anyone want to add to that, for the State?

MR. ANTONY: Your Honor, Brent Antony again for the State. I think Dr. Ray provides—has given an accurate summary of the discussion on transactions systems with respect to the MCCs. I would add that we did address a couple of other points with respect to the State systems, and specifically have a course of action to follow for discussion around the TennKids system from the Department of Children's Services, wherein DCS will provide additional information to Dr. Ray around the data that she has requested from that system. And she will provide some further guidance to them on the specifics of what she is seeking that will allow them to respond regarding their production.

Dr. Ray did also clarify, with respect to the Department of Health and the PTBMIS managed care module, and specifically the CFS cases that the plaintiffs were agreeable to the sampling methodology that the parties had previously discussed.

We also touched on the incidents database, which had been the subject of discussion and which Your Honor will recognize the State had asserted was protected by state law for peer review privilege. So that's still an open matter.

There are no technical matters there, with the exception of potentially being able to identify the members of the class, should the parties reach an

agreement on that peer review issue. So that's the only items I would have.

\* \* \*

MR. ANTONY: Yes, Your Honor. There is one issue with respect to that incidence database, which is still an open issue, beyond the peer review issue. There is minimal identifying information stored in that system. It is maintained for the purposes of peer review. So there are social security numbers and other things that might allow us to definitively identify class members. So there will be some complexity of that, should we get past the peer review issue.

DR. RAY: I didn't finish describing the schedule for the transaction data, I'm sorry. **One week after we have the conference call, then the MCOs were to provide their estimate of when they would be able to provide the transaction data and in what format.**

THE COURT: Do any of the MCCs want to add to the transactional data production? Well, there is a transcript of this, and I'm going to ask that the last session of this be made available as soon as we can practically get it done, to Mr. Tigh and to—Mr. Helton?

MR. ANTONY: Antony, Your Honor, for the State.

THE COURT: Antony, I'm sorry. **To reflect a summary of the memorandum of what were the deadlines and the agreements. And send that to you all of the technical people who were present during the discussion, for them to have comments and suggestions. And then, if you all would, after you've done that process, submit it to the Court,** and it will just be a preservation and perhaps a much more cohesive than this truncated process we've been going through.

(Docket Entry No. 872, Transcript at pp. 165–168, 216–219, 224–228) (emphasis added).

After a period of time, Antony had not filed the report and the Court entered an Order directing him to do so. The Defendants' counsel responded that there was no such directive. The Court then cited the pages of the transcript setting forth the Court's directive. Defendants' counsel then contended that their prior notice of the experts' activities after the April 11th conference satisfied the Court's directive. At the June 2006 hearing, Antony testified, in essence, that he distributed the transcript of the April 11th conference to the MCCs and that the "Notice" filed by his counsel was all that the Court required of him.

Upon review of the Defendants' Notice (Docket Entry No. 875) that is relied upon by Antony and defense counsel, the Court notes that this "Notice" does not contain any reference to the MCCs' institution of a litigation hold nor the MCCs' implementation of systems to ensure that the ESI of key custodians is not deleted. Of particular note is that the Defendants' "Notice" omits the request of Mr. Elkins's of Memphis Managed Care (that was adopted without objection) that the list of search terms and key custodians become finalized after the Plaintiffs make revisions and suggestions. Specifically, the record reflects the following: "MR. ELKINS: Matt Elkins, Memphis Managed Care. The only other thing I think we'd like to ask is that that list become a final list ... THE COURT: Any objection? MR. TIGH: Not at all. THE COURT: So it will be modified to reflect that." (Docket Entry No. 872 at pp. 217–218). None of the MCCs objected to Elkins' request nor to the Court's modification to the stated

agreement. The Defendants' counsel's Notice, however, states: "By May 16, 2007 . . . The MCCs have commented, however, that this proposed schedule does not provide for a mechanism for resolving any dispute(s) that may remain after the MCCs propose (1) search terms, (2) custodians, and (3) filters to be applied in searching the MCCs' ESI, and because, at this point, the MCCs do not know the 'final' list that will be used. . . ." (Docket Entry No. 875–1 at p. 3). Another effect of the Defendants' Notice is to set aside what was an agreement on a final list of search terms.

### 8. Other ESI Production Issues

The Plaintiffs next contend that the Defendants and the MCCs can complete their ESI productions within 90 to 100 days. (Docket Entry No. 882 at 10). Subject to the analysis of the Defendants' and MCCs' legal challenges, the Court finds that 60 days is sufficient time for these MCCs to produce the ESI sought by the Plaintiffs. This finding is based upon the Court's limitations for the ESI search for those MCCs who lack an agreement with the Plaintiffs on ESI production and the cost saving technological methods for such production and any privilege review. Based upon the estimates of BlueCross, the Defendants' largest MCC and the cost saving technology for ESI production and privilege review, the Court finds the 100 days limitation is a reasonable deadline for the Defendants to produce their ESI. Given the extraordinary delays with ESI discovery, the Court will not grant any extension of these deadlines.

### B. Conclusions of Law

### 1. Discovery from The MCCs

■ A threshold legal issue is the Defendants' and MCCs' argument that the MCCs are not parties and are not subject to Plaintiffs' ESI discovery requests nor the Court's Orders to produce ESI. In *Tennessee Assn. of Health Maintenance Orgs. Inc. v. Grier,* 262 F.3d 559, 565 (6th Cir.2001), the Sixth Circuit held that where, as here, a Consent Decree grants injunctive relief, the common law and Fed. R.Civ.P. 65(d) bind not only the State, but its contractors that participate in the implementation of the Consent Decree. The MCCs "are agents of the State and are bound by the consent decree to which the state was a party." *Id.* Here, as in *Grier,* the Consent Decree contains several paragraphs setting forth the responsibilities of the MCCs. (Docket Entry No. 12 Consent Decree at ¶¶ 18, 22, 60, 61, 74–83). To be sure, *Grier* limited the contractors' liabilities to the extent of their contract with the State. 262 F.3d at 565.

As to the scope of MCCs' obligations under the Consent Decree, for these discovery requests, the Court deems a brief reference to the rules of construction for such a decree to be necessary. As the Sixth Circuit stated that "[s]ettlement agreements are a type of contract subject to principles of state law." *Grand Traverse Band of Ottawa and Chippewa Indians v. Director, Michigan Dept. of Natural Resources,* 141 F.3d 635, 641 (6th Cir. 1998) (quoting *Vanguards of Cleveland v. City of Cleveland,* 23 F.3d 1013, 1017, 1018 (6th Cir.1994)). Tennessee's longstanding principle is that the clear language of a contract controls. *Petty v. Sloan,* 197 Tenn. 630, 277 S.W.2d 355, 358 (1955).

The Consent Decree here requires that the Defendants and MCCs maintain a reliable "tracking system" with "the capability of tracking each child in the plaintiff class, for purposes of monitoring that child's receipt of the required screening, diagnosis and treatment." (Docket Entry No. 12, Consent Decree at ¶¶ 94 and 95). The Consent Decree also require that the MCCs' tracking system must "have the capacity to generate an immediate report on the child's EPSDT status, "reflecting all

encounters reported to the contractor more than 60 days prior to the date of the report." " *Id.* at ¶ 94. In addition, the Consent Decree expressly provides that "all such records shall be obtained, if necessary, and provided to plaintiffs' counsel through TennCare, rather than through individual MCOs." *Id.* at ¶ 105.

Given, the MCCs' contractual obligations to maintain a reliable monitoring and reporting system of each MCC's services to children, the Court concludes that Plaintiffs' ESI discovery requests for the Defendants' and MCCs' transactional data clearly fall within the scope of the Consent Decree. Moreover, given the express and expansive language of the MCCs' contracts with the State to perform duties under the Consent Decree and to provide any information "pertaining to" the TennCare program (Plaintiffs' Exhibit 28), the Court concludes that this express language in the Defendants' contract with the MCCs grants the Defendants unrestricted access to the MCCs' data systems for any information "pertaining to" a TennCare member. This language negates testimony about the Defendants' not requesting emails from MCCs. The Court concludes that Plaintiffs' other ESI discovery requests, including emails, also fall within the scope of the Consent Decree and the MCCs' contracts thereunder.

The MCCs insist that any ESI discovery from them must be obtained by a subpoena under Fed.R.Civ.P. 45. Yet, several discovery rules permit discovery from a party's "agent", or "managing agent," including "documents and tangible things otherwise discoverable," Fed.R.Civ.P. 26(b)(1) and Rule 26(b)(3); depositions, Fed.R.Civ.P. 30(b)(6); and interrogatories. Fed.R.Civ.P. 33(a). The term "managing agent" is in several current Rules and was utilized in prior rules of civil procedure. For the purposes of Rule 4(h)(1), the Sixth Circuit defined: "[A] managing agent [as]

one authorized to transact all business of a particular kind at a particular place and must be vested with powers of discretion rather than being under direct superior control." *Bridgeport Music Inc. v. Rhyme Syndicate Music,* 376 F.3d 615, 624 (6th Cir.2004). Under the former Fed.R.Civ.P. 43(b), the Eighth Circuit defined a "managing agent" is an individual: "(1) [whose] interests in the litigation are identified with his principal, and (2) He acts with superior authority and general autonomy, being invested with broad powers to exercise his discretion with regard to the subject matter of the litigation." *Lowry v. Black Hills Agency, Inc.,* 509 F.2d 1311, 1315 (8th Cir.1975) (quoting *Skogen v. Dow Chemical Company,* 375 F.2d 692, 701 (8th Cir.1967)). The Sixth Circuit cited *Skogen* approvingly in *Jones v. Hancock Mut. Life Ins. Co.,* 416 F.2d 829, 833 (6th Cir.1969).

Here, the MCCs are independent and sophisticated companies with contracts with the Defendants to provide medical and related services in different areas of the state, as required by the Consent Decree and federal law. The Consent Decree expressly refers to their responsibilities to provide these services. (Docket Entry No. 12, Consent Decree at ¶¶ 18, 22, 60, 61, 74–83). By their nature, these services require a degree of autonomy and superior skills. As the actual providers of these services, the MCCs possess critical information on the named Defendants' compliance with the Consent Decree. The Court concludes that the MCCs are managing agents subject to discovery under Rule 26(b)(1) and (3), Rule 30(b)(1) and (b)(6) and Rule 33(a).

Moreover, Fed.R.Civ.P. 34(a) permits document requests for documents in a party's "possession, custody or control." "Control" has been broadly construed to mean "the legal right, to obtain the documents requested upon demand ... even

though [the party] presently may not have a copy of the document in its possession." 7 Moore's Federal Practice at § 34.14[2][b] (Matthew Bender 3d Ed.) (hereinafter cited as "Moore's"). In their post hearing Memorandum, the Defendants argue that the MCCs' ESI is not under their control. (Docket Entry No. 997, Defendants' Supplemental Memorandum at pp. 24–28). "[I]t is well settled that a party has no obligation to preserve evidence that is not in its possession, custody or control." *Id.* at p. 25. Yet, at the November 6th conference, Defendants' counsel told the Court:

> MS. MOSS: And I want to be clear on the State's position. We're not saying that these documents are not in the State's custody or control or that we can't produce documents from our contractors. In fact, we've produced—our response to details, entire categories of documents that we have produced from our contractors.

(Docket Entry No. 734, Transcript at p. 42). Moreover, the Consent Decree expressly provides that "All such records shall be obtained, if necessary, and provided to plaintiffs' counsel through TennCare, rather than through individual MCOs." (Docket Entry No. 12, Consent Decree at ¶ 105). The Court concludes that this express language in the Defendants' contract with the MCCs grants the Defendants unrestricted access to the MCCs' data systems for any information "pertaining to" a TennCare member.

Another Court reached a similar conclusion. In *In re NTL, Inc. Securities Litigation*, 244 F.R.D. 179, 195 (S.D.N.Y.2007), the district court sanctioned a defendant who argued, as the Defendants do here, that the ESI and other relevant documents were not in its "control," because a nonparty with whom the defendant contracted had the ESI. The district court ruled that when a duty to preserve evidence arises, a defendant is required to issue a litigation hold to maintain responsive information

and materials. *Id.* at 197. Second, if the defendant's agreement with the third party grants access to any documents necessary litigation then the defendant had control over document held by its contractors. Finally, the Court concluded that even without an agreement, the defendant still retained control over the relevant documents because a party cannot nullify its contract to "evade the rules of procedure." *Id.* at 196 (citing *Bank of New York v. Meridien BIAO Bank Tanzania Ltd.*, 171 F.R.D. 135, 148 (S.D.N.Y.1997)).

The Court concludes that the MCCs' ESI is within the Defendants' possession or control within the meaning of Rule 34(a) and was so at the time of the Court's discovery orders to produce ESI.

As a practical matter, even if the Plaintiffs had issued subpoenas under Rule 45, the Court is at a loss to understand what procedural benefits would enure to the MCCs that have not been provided. Under Rule 45, the MCCs have an opportunity to identify and offer proof on why the ESI discovery sought by the Plaintiffs should not be had. The only real difference is that under Rule 45, the Plaintiffs would have to go to the districts where the information is located, if more than 100 miles from the site of this Court. For those courts in other districts and states to decide these issues would require a multiplication of these discovery proceedings throughout other districts. The Court would not wish that misfortune on any of its colleagues. In any event, the Sixth Circuit has consolidated issues in institutional litigation in this district affecting different districts of this state as a matter of judicial efficiency. *See e.g., Carver v. Knox County, Tenn.*, 887 F.2d 1287, 1293 (6th Cir.1989).

Further, as a matter of law, the TennCare Bureau, is the "single state agency" designated by federal law to administer

Tennessee's Medicaid program, TennCare. *Linton v. Commissioner of Health and Environment*, 779 F.Supp. 925, 936 (M.D.Tenn.1990), *affd. on other grounds* 65 F.3d 508 (6th Cir.1995). The Defendants cannot delegate the administration of this program nor vest the MCCs with ultimate control over information necessary to determine compliance with federal law. The Defendants must provide any records the Secretary requires. 42 C.F.R. 431.17(c). Federal regulations also require that the TennCare agency maintain or supervise the maintenance of the records necessary for the proper and efficient operation of the program, including individual records on each applicant and recipient as well as statistical and fiscal records necessary for reporting and accountability as required by the Secretary of Health and Human Services. 42 C.F.R. 431.17(a)-(b). To receive federal funding, a State's contract with any provider must grant the State the right to audit and inspect any books and records for services provided by the MCO. 42 U.S.C. § 1396h(m)(2)(A)(iv). Under 42 C.F.R. 434.6, the MCC's contract must "provide that the contractor maintains an appropriate records system for services to enrolled recipients" that are accessible "through inspection or other means." 42 C.F.R. § 434.6(a)(5) and 7. A state must have a plan for maintenance of records to ensure the "proper and efficient operation of the plan." 42 C.F.R. § 431.17(b)(1)(ii).

The Court concludes that as a matter of federal law, the Defendants and the MCCs operate as a single entity, with the Defendants responsible for the plan's ultimate performance. These federal statutes and regulations grant the Defendants the legal right to these documents directly related to services to the class members. Thus, aside from *Grier*, with the rules permitting discovery of a party's managing agent or agent, the Consent Decree and the MCCs contracts, the Court concludes that these federal laws clearly require the submission of any relevant MCCs' information to the State. Thus, the Court concludes that MCCs are the Defendants' agents, not independent third parties, and also stand in the shoes of the Defendants so as to be subject to Plaintiffs' discovery requests as are the Defendants.

### 2. Discovery Standards

With the notice pleading standard under the Federal Rules of Civil Procedure for most actions, the relevancy standard for discovery has been "construed broadly." *Oppenheimer Fund Inc. v. Sanders*, 437 U.S. 340, 351, 98 S.Ct. 2380, 57 L.Ed.2d 253 (1978). A party may seek any information that is not privileged and is relevant to his claims or defenses. Fed. R.Civ.P. 26(b)(1). For discovery purposes relevant means information that is probative on a party's claim or defense and information that the Court determines could "lead to the discovery of admissible evidence." Fed.R.Civ.P. 26(b)(1).

In addition, "a presumption is that the responding party must bear the expense of complying with discovery requests." *Oppenheimer*, 437 U.S. at 358, 98 S.Ct. 2380. Yet, district courts can limit discovery, if the information sought is overly broad or imposes an undue burden upon the party from whom discovery is sought. Fed.R.Civ.P. 26(b)(2) allows the Court to relieve any undue burden on the responding party. In *Surles v. Greyhound Lines, Inc.*, 474 F.3d 288, 305 (6th Cir. 2007), the Sixth Circuit observed that: "Th[e] desire to allow broad discovery is not without limits and the trial court is given wide discretion in balancing the needs and rights of both plaintiff and defendant." (quoting *Scales v. J.C. Bradford*, 925 F.2d 901, 906 (6th Cir.1991)).

As to the judge's role in discovery disputes, "[t]he revisions in Rule 26(b)(2) are intended to provide the court with broader discretion to impose additional restrictions on the scope and extent of discovery."

*Surles,* 474 F.3d at 305. The Advisory Committee notes reflect that the 1983 and 1993 amendments to Rule 26(b) "contemplate[ ] greater judicial involvement in the discovery process." Fed.R.Civ.P. 26(b), advisory committee's notes (1993). For example, one court appointed a special master to supervise electronic discovery. *Medtronic Sofamor Danek, Inc. v. Michelson,* 229 F.R.D. 550, 558–59 (W.D.Tenn. 2003). Given the Defendants' history of creating collateral litigation in this action on the Court's appointment of a special master and the state of these proceedings, the Court deemed the appointment of a special master to resolve ESI discovery disputes counterproductive.

■ The Court also possesses inherent authority to manage litigation. As the

First Circuit observed, "[a]s lawyers became more adept at utilizing the liberalized rules", "[t]he bench began to use its inherent powers to take a more active, hands-on approach to the management of pending litigation." *In re San Juan Dupont Plaza Hotel Fire Litigation,* 859 F.2d 1007, 1011 (1st Cir.1988). "The judiciary is 'free, within reason to exercise this inherent judicial power in flexible pragmatic ways'." *Id.* at 1101 n. 2 (quoting *HMG Property Investors, Inc. v. Parque Industrial Rio Canas, Inc.,* 847 F.2d 908, 916 (1st Cir.1988)).[30]

### 3. Discovery Rules on Electronic Discovery

As to relevant discovery rules, since 1970, Fed.R.Civ.P. 34 has expressly re-

---

**30.** As to legal authority for the "experts only conference," to resolve discovery disputes, the Court, on its own motion, can convene a discovery conference and "may order the parties or attorneys to attend the conference in person." Fed.R.Civ.P. 26(f). (emphasis added). The purpose of a discovery conference is "to address and discuss the propriety of asserted objections. [The parties] must deliberate, confer, converse, compare views, or consult with a view to resolve the dispute without judicial intervention." *Cotracom Commodity Trading Co. v. Seaboard Corp.,* 189 F.R.D. 456, 459 (D.Kan.1999).

In addition, Fed.R.Civ.P. 16(c)(12) authorizes the district court to adopt "special procedures for managing potentially difficult or protracted actions that may involve complex issues, multiple parties, difficult legal questions, or unusual proof problems". For such procedures, Rule 16 grants the district court the authority to require attendance of any party to the case at any session of the court where the judge deems his presence to be necessary. *In re LaMarre,* 494 F.2d 753, 756 (6th Cir.1974) (citations omitted).

These authorities collectively support the "experts only" conference to allow an unrestricted dialogue among the most knowledgeable persons, the parties' computer experts. The "experts only" conference was conducted in the same format as the earlier successful discovery conference to which

neither the parties, their agents nor counsel objected. Given the historical successes of this format in this district, the number of Defendants' contractors, the multiple and different computer systems of the Defendants' and their contractors, and the broad scope of the discovery disputes, the Court deemed the "experts only" conference an effective and efficient method to resolve these discovery disputes. There was not any prospect of the Plaintiffs' two experts pressuring the Defendants' and contractors' experts who numbered twenty or more. The participants are highly skilled persons so that there was not any prospect for abuse or overreaching by any participant and none was reported at the end of the conference. At the end of the conference, the experts were uniform in their comments that the conference was productive. One expert suggested that an earlier conference, such as this one, would have been beneficial. The Defendants acknowledge that the right to counsel applies to formal proceedings. The Court sealed the record of that conference (Docket Entry No. 872), but without leave of Court, the Defendants' counsel violated that seal with public disclosures in their Memorandum that led to other disclosures of that conference. At least Plaintiffs' counsel sought leave of court and filed their submissions referring to statements at the conference under seal.

ferred to "data compilations," and the Advisory Committee comments to the 1970 amendments to Rule 34 clearly reflect that the "data compilations" included electronic discovery.

> *Rule 34 applies to electronic data compilations from which information can be obtained only with the use of detection devices,* and that when the data can as a practical matter be made usable by the discovering party only through respondent's devices, respondent may be required to use his devices to translate the data into usable form.

*Williams v. Sprint/United Management Co.,* 230 F.R.D. 640, 648 (D.Kan.2005) (emphasis added and footnotes omitted). In addition, former Fed.R.Civ.P. 33(d) allowed a party to rely upon a "compilation to answer an interrogatory." The 2006 amendments to Rule 34 added the phrase "electronically stored information" to that Rule.

The current discovery motion was first filed in June 2006, but the current controversy over ESI production arose on February 21, 2006 with the Defendants' motion for a protective order concerning the Special Master's request for utilization data (Docket Entry No. 604). The Defendants' motion was granted, in part and denied, in part, (Docket Entry No. 615), at the February 28, 2006 conference. (Docket Entry No. 616 at pp. 42–102). At the April 17, 2006 conference, the Court "suggested" that the Defendants provide to the Plaintiffs any ESI that the Defendants provided to the monitors. (Docket Entry No. 646 at p. 33). On November 6 and 21, 2006, the Court ordered the production of the ESI subject to a protocol to be determined by the parties' computer experts. (Docket

Entry No. 734 at p. 65–66, 74). These orders were prior to the December 1, 2006 effective date of the new amendments on ESI.

The Supreme Court's Order adopting the 2006 amendments on ESI states that these amendments "shall take effect on December 1, 2006, and shall govern ... insofar as just and practicable, all proceedings then pending." Order of the Supreme Court of the United States, April 12, 2006. Defendants note that the Supreme Court announced the 2006 amendments in April 2006, and therefore, the parties were on notice that the amendments "would take effect long before the close of the discovery period in this litigation," (Docket Entry No. 907 at p. 4) (*citing In Re Payment Card Interchange Fee and Merch. Disc. Antitrust Litig.,* No. MD 05–1720, 2007 WL 121426, *3, 2007 U.S. Dist. LEXIS 2650, *13 (E.D.N.Y. Jan. 12, 2007) (applying new ESI amendments to pending Rule 34 issue)).

■ Yet, the law of the case doctrine provides that a prior order of the Court in an action controls unless a showing of a manifest injustice arises. *Arizona v. California,* 460 U.S. 605, 618, 103 S.Ct. 1382, 75 L.Ed.2d 318 (1983). Here, in February 2006, the Court directed ESI to be made available to Plaintiffs. Prior to the November, 2006 rulings and Order on Plaintiffs' earlier motion to compel, the parties had extensively briefed the ESI issues. (Docket Entry Nos. 709, 720 and 727). The parties argued several of the same decisions on ESI, as they do on the Plaintiffs' renewed motion to compel. *Id.* This Court's published rules of local practice require any party asserting an undue burden of a discovery request[31] to present

---

31. Of course, absent a contrary order, the Sixth Circuit rule has been that for any party that contends discovery requests present an undue burden, the appropriate response is a motion for protective order. *Tarleton v. Me-* *harry Medical College,* 717 F.2d 1523, 1534 n. 4 (6th Cir.1983). The wisdom of this rule is that the party asserting an undue burden is in the better position to explain what the undue burden is.

quantitative proof of that asserted burden. The Defendants offered only conclusory affidavits. (Docket Entry No. 720, Exhibits B and C thereto). Only after the November 2006 Orders were entered did the Defendants provide necessary quantitative evidence of what they contend is an undue burden for any ESI production. The Defendants did not move to seek relief from the November 2006 Orders.

To be sure, the November 2006 rulings left some issues on the ESI protocol to be decided, namely the search terms and the protocol for the MCCs. From the Court's perspective, the Defendants stalled on any unresolved issues until the 2006 amendments to the discovery rules on ESI became effective, because after the 2006 amendments became effective, the Defendants agreed to accept Plaintiffs' search terms. By this delay, the Defendants were able, in effect, to shift the burden of proof at the June 2007 hearing to the Plaintiffs on the absence of an undue burden under the revised rules[32] In some cases, such a strategic decision may be appropriate, but here there were outstanding Orders in November 2006 to produce this ESI. With the 2006 amendments, the Defendants can now argue that such production imposes an undue burden measured principally by monetary costs, whereas the earlier judicial standards, as discussed *infra*, were based primarily on technical availability.

The Court is reluctant to reward the Defendants for their intransigence, but in the event of an appeal of these rulings, the Court will consider the 2006 amendments because the Court lacks any interest in repeating this costly, time-consuming analysis, if the 2006 amendments were ruled to be controlling on appeal.

These 2006 amendments on electronic discovery amended several discovery rules that as pertinent here, are as follows:

**Rule 26(b)(2)(B)**

A party need not provide discovery of electronically stored information from sources that the party identifies as not reasonably accessible because of undue burden or cost. **On motion to compel discovery or for a protective order, the party from whom discovery is sought must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C).** The court may specify conditions for the discovery.

**Rule 26(b)(2)(C)**

The frequency or extent of use of the discovery methods otherwise permitted under the rules and by any local rule shall be limited by the court if it determines that:

\* \* \*

(i) the discovery sought is unreasonably cumulative or duplicative, or is obtainable from some other source that is more convenient, less burdensome, or less expensive;

(ii) the party seeking discovery has had ample opportunity by discovery in the action to obtain the information sought; or

(iii) the burden or expense of the proposed discovery outweighs its likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the

---

**32.** As it were with prior law, *see* n. 28, under amended Ruled 26(b)(2)(B), the Defendants could have filed a motion for a protective order on ESI before June 2007 hearing on the rulings, but did not do so.

litigation, and the importance of the proposed discovery in resolving the issues.

**Rule 26(b)(5)(B)**

**Information Produced.** If information is produced in discovery that is subject to a claim of privilege or of protection as trial-preparation material, the party making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has and may not use or disclose the information until the claim is resolved. A receiving party may promptly present the information to the court under seal for a determination of the claim. If the receiving party disclosed the information before being notified, it must take reasonable steps to retrieve it. The producing party must preserve the information until the claim is resolved.

**Rule 34**

**(a) Scope.** Any party may serve on any other party a request (1) to produce and permit the party making the request, or someone acting on the requestor's behalf, to inspect [and], copy, test or sample any designated documents or electronically stored information—including writings, drawings, graphs, charts, photographs, [phonorecords] sound recordings, images, and other data or data compilations stored in any medium from which information can be obtained[,]—translated, if necessary, by the respondent [through detection devices] into reasonably usable form [ ], or to inspect [and], copy, test, or sample and designated tangible things which constitute or contain matters within the scope of Rule 26(b) and which are in the possession, custody or control of the party upon whom the request is served.

**(b) Procedure.** The request shall set forth, either by individual item or by category, the items to be inspected, and describe each with reasonable particularity. The request shall specify a reasonable time, place, and manner of making the inspection and performing the related acts. **The request may specify the form or forms in which electronically stored information is to be produced** . . .

. . . The response shall state, with respect to each item or category, that inspection and related activities will be permitted as requested, unless the request is objected to, [in which event] **including an objection to the requested form or forms for producing electronically stored information, stating** the reason for the objection. If objection is made to part of an item or category, the part shall be specified and inspection permitted of the remaining parts. If objection is made to the requested form· or forms for producing electronically stored information or if no form was specified in the request—the responding party must state the form or forms it intends to use. The party submitting the request may move for an order under Rule 37(a) with respect to any objection to or other failure to respond to the request or any part thereof, or any failure to permit inspection as requested.

Unless the parties otherwise agree, or the court otherwise orders:

(i) a party who produces documents for inspection shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the request;

(ii) if a request does not specify the form or forms for producing electronically stored information, a responding party must produce the information in a form or forms in which it is ordinarily maintained or in a form or forms that are reasonably usable; and

(iii) a party need not produce the same electronically stored information in more than one form.

**(c) Persons Not Parties. A person not a party to the action may be compelled to produce documents and things or to submit to an inspection as provided in Rule 45.**

**Rule 37**

**Failure to Make Disclosure or Cooperate in Discovery; Sanctions.**

\* \* \*

*(f) Electronically stored information.*

Absent exceptional circumstances, a court may not impose sanctions **under these rules** on a party for failing to provide electronically stored information lost as a result of the routine, good-faith operation of an electronic information system.[33]

(emphasis added).[34]

Under the 2006 amendments to Rule 26(b)(2), if the party from whom ESI is

**33.** By the underscored language in Rule 37(f), the court retains its inherent authority to impose sanctions. *See First Bank of Marietta v. Hartford Underwriters, Ins. Co.*, 307 F.3d 501, 513 (6th Cir.2002).

**34.** These amendments are not without critics as to their need and potential for abuse. As to need for the amendments:

Amendments to the Federal Rules are not warranted today because there is no clear demand for reform. In its case study of electronic discovery issues, the Federal Judicial Center found that seven out of the ten judges interviewed for the study believed no changes were necessary. While a majority of attorneys believed that the Federal Rules should be changed to address electronic discovery, almost half of the participants expressed that the "problems" that arise in electronic discovery are not unique to electronic discovery ... Arguably, the need for reform of the discovery of electronic information is limited to the defense bar's need to further limit the scope and amount of discovery.

Henry S. Noyes, *Is E–Discovery So Different that it Requires New Discovery Rules An Analysis of Proposed Amendments to the Federal Rules of Civil Procedure*, 71 TENN. L.REV 585, 615–16 (2004).

As to potential abuses:

If adopted, the proposed Rules may enable litigants to engage in discovery abuse by hiding or destroying incriminating digital evidence. The proposed Rules also provide greater protection to data that is not reasonably accessible and restrict the judiciary's ability to impose sanctions on litigants. By providing greater protection for data that is not reasonably accessible, the proposed Rules encourage both software programmers and system architects to design and develop software storage solutions that render data "not reasonably accessible" by making access to the data fiscally or technically impractical. By re-characterizing accessible data as "not reasonably accessible," these parties obviate their production duties pursuant to the proposed Rules. These litigants would store data on inefficient storage systems, making it unduly burdensome or expensive to (1) search for data, (2) restore data, or (3) change the data's format, therefore, making discovery more difficult....

The first loophole created by Rule 26(b)(2)(B) promotes the development of digital document storage systems that enable litigants to re-characterize their data by saving it in inaccessible forms to eliminate discovery production obligations while maintaining access to their data. Thus, the first loophole is likely to provide an advantage to wealthy litigants and will likely create a software market that allows companies to re-characterize their data with the hopes of subverting the judicial process. The second potential loophole created by proposed Rule 26(b)(2)(B) is created by the requirement that the Rule requires requesting parties demonstrate "good cause" to permit a court to consider ordering discovery of "not reasonably accessible" information. This Rule not only restricts the actions of the bench, it also fails to define what constitutes "good cause," creating further ambiguity Specifically, if a producing party fails to disclose the existence of certain documents, a discovering party will not know they exist, thereby making it difficult to show good cause to compel production based upon the value of discovering specific electronic documents.

requested, considers the ESI request unduly burdensome, then that party can file a motion for a protective order [35] or the requesting party can file a motion to compel. Upon the filing of either motion, the Court first assesses whether the ESI production is an undue burden. If so, then the Court considers whether the ESI discovery request is duplicative or available elsewhere or whether the requesting party could have sought the ESI earlier. If an undue burden is shown, the requesting party must show "good cause" to justify the ESI production. For the "good cause" determination, the Court is to consider whether the discovery request's "burden or expense ... outweighs its likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance

Proposed Rule 26(b)(2)(B)'s two loopholes in its provisions placing "not reasonably accessible" data presumptively beyond the scope of discovery and requiring a showing of "good cause" to compel production of "not reasonably accessible data" may be exploited if the proposed Rules are adopted in their current form. Instead of merely expediting and facilitating electronic discovery production requests, proposed Rule 26(b)(2)(B) threatens to strengthen the hand of wealthy litigants by giving them additional tools to evade electronic discovery requests and to wear down their opponents financial resources.
Daniel B. Garrie, et al., *Hiding the Inaccessible Truth: Amending the Federal Rules to Accommodate Electronic Discovery*, 25 Rev. Litig. 115, 118–19, 125, 126 (2006). *See also* Rebecca Rockwood, Note, *Shifting Burdens and Concealing Electronic Evidence: Discovery in the Digital Era*. 12 Rich. J.L. & Tech. 16, 34 (2006) ("The combined effect of proposed Rules 26(b)(2)(B) and 37(f) is that companies can get the "benefits of a data deletion policy" without actually deleting anything. Although these new rules will help corporate defendants get through the litigation process without incurring a great deal of expense, it will also allow them more room to conceal important files and electronic documents. In the future, technically savvy defendants will have a distinct advantage in evading discovery of potentially damaging documents. In many cases, this could change the entire outcome of the litigation.") (internal citations omitted).

**35.** Prior to the 2006 amendment, in *Hopson v. Mayor and City Council of Baltimore*, 232 F.R.D. 228 (D.Md.2005), the court summarized the American Bar Association litigation section's protocol for counsel's approach to addressing the issue of ESI discovery. These measures were accomplished here primarily by the discovery conferences.

Indeed, the newly revised Civil Discovery Standards for the American Bar Association Section on Litigation contain detailed information about the issues that the parties should discuss in their effort to agree upon an electronic records discovery plan. At a minimum, they should discuss: the type of information technology systems in use and the persons most knowledgeable in their operation; preservation of electronically stored information that may be relevant to the litigation; the scope of the electronic records sought (i.e. e-mail, voice mail, archived data, back-up or disaster recovery data, laptops, personal computers, PDA's, deleted data) the format in which production will occur (will records be produced in "native" or searchable format, or image only; is metadata sought); whether the requesting party seeks to conduct any testing or sampling of the producing party's IT system; the burdens and expenses that the producing party will face based on the Rule 26(b)(2) factors, and how they may be reduced (i.e. limiting the time period for which discovery is sought, limiting the amount of hours the producing party must spend searching, compiling and reviewing electronic records, using sampling to search, rather than searching all records, shifting to the producing party some of the production costs); the amount of pre-production privilege review that is reasonable for the producing party to undertake, and measures to preserve post-production assertion of privilege within a reasonable time; and any protective orders or confidentiality orders that should be in place regarding who may have access to information that is produced.
*Id.* at 245.

of the proposed discovery in resolving the issues." Fed.R.Civ.P. 26(b)(2)(C)(i)(ii) and (iii)

In contrast, prior to the 2006 amendments, courts determined accessibility of ESI production based primarily on the technical availability of the data. If the data were not technically available, then the courts would consider whether to apportion costs to retrieve the ESI based on several factors, with some exceptions, discussed *infra*. Prior to the 2006 amendments, factors similar to Rule 26(b)(2)(B) were referred to as the "proportionality" test. *Zubulake v. UBS Warburg*, 217 F.R.D. 309, 316 (S.D.N.Y. 2003) [36] ("*Zubulake I*"). Under prior law, an undue burden did not arise merely be- cause the discovery request involved an ESI production. *Id.* at 318 n. 48.

### 4. Duty to Preserve

In the Court's view, the critical and threshold issue that impacts the undue burden analysis is the Defendants' breach of their legal duty to preserve ESI relevant to this action. As set forth below, if such a hold were accomplished here, then this extensive commitment of the parties', the MCCs' and the Court's resources would have been mooted.

■ With the 2006 amendments on electronic discovery, the Advisory Committee Notes to Rule 26(b)(2) emphasize that: "A party's identification of sources of electronically stored information as not reasonably accessible does not relieve the party of its common-law or statutory duties to preserve evidence." Independent of the rules of procedure, a legal duty to preserve relevant information arises when a person "knew or should have known that the documents would become material at some point in the future then such documents should have been preserved." *Stevenson v. Union Pac. R.R. Co.*, 354 F.3d 739, 746 (8th Cir.2004).

■ As to when this duty arises, the federal courts have held that the duty to preserve relevant information clearly arises when a complaint is filed with a court. *Computer Associates Intern., Inc. v. American Fundware, Inc.*, 133 F.R.D. 166, 169 (D.Colo.1990); *Telectron Inc. v. Overhead Door Corp.*, 116 F.R.D. 107, 127 (S.D.Fla.1987). A duty to preserve may also arise before the filing of the com- plaint, if a party has notice that litigation of a matter is likely to be filed. *Capellupo v. FMC Corp.*, 126 F.R.D. 545, 551 (D.Minn.1989); *Alliance to End Repression v. Rochford*, 75 F.R.D. 438, 440 (N.D.Ill.1976). The duty to preserve does not include evidence that the party "had no reasonable notice of the need to retain." *Danna v. New York Tel. Co.*, 752 F.Supp. 594, 616 n. 9 (S.D.N.Y.1990), but includes information that party "has control and reasonably knew or could reasonably fore- see was material to a potential legal ac- tion." *Krumwiede v. Brighton Associates, LLC*, No. 05 C 3003, 2006 WL 1308629 at *8 (N.D.Ill. May 8, 2006) (citations omit- ted).

---

**36.** Another often cited decision is *Rowe Enter- tainment, Inc. v. William Morris Agency*, 205 F.R.D. 421 (S.D.N.Y.2002), but the Court finds *Zubulake I* and its related decisions more persuasive on the factors to be consid- ered on whether electronic discovery is inac- cessible. For example, "*Rowe* makes no men- tion of either the amount in controversy or the importance of the issues at stake in the litigation." Courts applying *Rowe* have uni- formly favored cost-shifting largely because of assumptions made concerning the likelihood that relevant information will be found .... such proof will rarely exist in advance of obtaining the requested discovery. The sug- gestion that a plaintiff must not only demon- strate that probative evidence exists, but also prove that electronic discovery will yield a "gold mine," is contrary to the plain language of Rule 26(b)(1) which permits discovery of "any matter" that is "relevant to [a] claim or defense." *Zubulake*, 217 F.R.D. at 321, 323.

Clearly with the filing of Plaintiffs' complaint in February 1998, the duty of preservation arose for all parties to take reasonable measures to preserve all relevant evidence. Here, the Defendants' duty to preserve evidence probably arose at least several months before the filing of the Consent Decree in 1998, given the extensive and negotiated details in the Consent Decree. The Consent Decree provides ample guidance and clarity on what information is relevant and material and therefore should be retained. The MCCs' information "pertaining to" a TennCare enrollee was under the Defendants' control under federal law and their contracts with the MCCs. Yet, the proof establishes the Defendants did not create any meaningful litigation hold until the March 17, 2004, Memorandum when this action was more than six years old.

Despite defense counsel's assertions that prior to 2004 a litigation hold was not required because this is a consent decree action, not litigation, the decisions cited above are to the contrary. Moreover, on December 18, 2000, the Defendants moved to modify the Consent Decree (Docket Entry No. 69) and on January 29, 2001, the Plaintiffs moved for contempt (Docket Entry No. 79). The contempt hearing started in June 2001 and Judge Nixon entered his findings and conclusions on December 19, 2001. (Docket Entry No. 227). The parties were involved in other contested issues in 2002 and 2003. (Docket Entry Nos. 238, 251, 258, 266, 275, 291, 301 and 319). These docket entries clearly undermine the Defendants' contention on the appropriate timing of a litigation hold. Even after a written and detailed March 17, 2004 memorandum/litigation hold, the proof establishes that the Defendants did not implement this litigation hold, as outlined in the March 17th memorandum.

 "Once on notice [that evidence is relevant], the obligation to preserve evidence runs first to counsel, who then has a duty to advise and explain to the client its obligations to retain pertinent documents that may be relevant to the litigation." *Telecom International Am. Ltd. v. AT & T Corp.*, 189 F.R.D. 76, 81 (S.D.N.Y.1999) (citing *Kansas–Nebraska Natural Gas Co. v. Marathon Oil Co.*, 109 F.R.D. 12, 18 (D.Neb.1983)). Neither a preservation demand letter nor a court order is required. *Wiginton v. Ellis*, 2003 WL 22439865 at **4, 5 (N.D.Ill. Oct. 27, 2003). A preservation order only clarifies the parties' particular obligation. *Treppel v. Biovail Corp.*, 233 F.R.D. 363, 369 (S.D.N.Y.2006).

This preservation duty extends to potential evidence relevant to the issues in the action, including electronic information. *Zubulake v. UBS Warburg, LLC*, 229 F.R.D. 422 (S.D.N.Y.2004) (*"Zubulake V"*); *Renda Marine, Inc. v. United States*, 58 Fed. Cl. 57, 60–61 (2003). As the *Zubulake V* Court explained in an ESI controversy and the lack of preservation thereof:

> Once a party reasonably anticipates litigation, [the defendant] must suspend its routine document retention/destruction policy and put in place a "litigation hold" to ensure the preservation of relevant documents. **As a general rule, that litigation hold does not apply to inaccessible backup tapes (e.g., those typically maintained solely for the purpose of disaster recovery)**, which may continue to be recycled on the schedule set forth in the company's policy. **On the other hand, if backup tapes are accessible (i.e., actively used for information retrieval), then such tapes would likely be subject to the litigation hold.**

*Id.* at 431 (emphasis added) (quoting *Zubulake v. UBS Warburg, LLC*, 220 F.R.D. 212, 218 (S.D.N.Y.2003) (*"Zubulake IV"*)).

In *Zubulake V*, the Court excluded from the back-up tapes exception, the back-up tapes of "key players" that exist:

> "[I]t does make sense to create one exception to this general rule. If a company can identify where particular employee documents are stored on backup tapes, then the tapes storing the documents of 'key players' to the existing or threatened litigation should be preserved if the information contained on those tapes is not otherwise available. This exception applies to **all** backup tapes."

229 F.R.D. at 431 (quoting *Zubulake IV*, 220 F.R.D. at 218) (emphasis in original).

This preservation duty extends to the parties' outside counsel and beyond the mere issuance of a litigation hold. In *Zubulake V*, contrary to outside and in-house counsel's instructions, key employees of the defendant deleted e-mails that the plaintiff alleged would support her claims. In *Zubulake V*, the court summarized its 2003 decision in *Zubulake IV*[37] and delineated the types of measures stated therein as necessary for outside counsel to monitor his client's behavior and the timely production of information. 229 F.R.D. at 435. The Court regrets the following lengthy quotation, but its purpose is to illustrate the level of guidance available to counsel on the preservation of ESI, including that occasionally telling clients that they need to preserve relevant ESI is legally insufficient.

> A party's discovery obligations do not end with the implementation of a "litigation hold" to the contrary, that's only the beginning. **Counsel must oversee compliance with the litigation hold, monitoring the party's efforts to re**tain and produce the relevant documents. **Proper communication between a party and her lawyer will ensure (1) that all relevant information (or at least all sources of relevant information) is discovered, (2) that relevant information is retained on a continuing basis; and (3) that relevant non-privileged material is produced to the opposing party.**
>
> 1. Counsel's Duty to Locate Relevant Information
>
> Once a "litigation hold" is in place, a party and her counsel must make certain that all sources of potentially relevant information are identified and placed "on hold," to the extent required in Zubulake IV. To do this, counsel must become fully familiar with her client's document retention policies, as well as the client's data retention architecture. **This will invariably involve speaking with information technology personnel, who can explain system-wide backup procedures and the actual (as opposed to theoretical) implementation of the firm's recycling policy. It will also involve communicating with the "key players" in the litigation, in order to understand how they stored information.** In this case, for example, some UBS employees created separate computer files pertaining to Zubulake, while others printed out relevant e-mails and retained them in hard copy only. **Unless counsel interviews each employee, it is impossible to determine whether all potential sources of information have been inspected.** A brief conversation with counsel, for example, might have revealed that Tong maintained "archive"

---

**37.** There are a series of *Zubulake* decisions on ESI discovery issues that are summarized in *Zubulake v. Warburg, LLC,* 229 F.R.D. 422, 425 n. 5 (S.D.N.Y.2004). District courts, in the Sixth Circuit, have recognized that although *"Zubulake IV* is not technically binding on this court, it has received wide recognition at the federal bar as authoritative." *Kemper Mortgage, Inc. v. Russell,* 2006 WL 2319858 (S.D.Ohio Apr. 18, 2006).

copies of e-mails concerning Zubulake, and that "archive" meant a separate on-line computer file, not a backup tape. Had that conversation taken place, Zubulake might have had relevant e-mails from that file two years ago.

To the extent that it may not be feasible for counsel to speak with every key player, given the size of a company or the scope of the lawsuit, counsel must be more creative. **It may be possible to run a system-wide keyword search; counsel could then preserve a copy of each "hit." Although this sounds burdensome, it need not be. Counsel does not have to review these documents, only see that they are retained. For example, counsel could create a broad list of search terms, run a search for a limited time frame, and then segregate responsive documents.** [FN75] When the opposing party propounds its document requests, the parties could negotiate a list of search terms to be used in identifying responsive documents, and counsel would only be obliged to review documents that came up as "hits" on the second, more restrictive search. The initial broad cut merely guarantees that relevant documents are not lost.

n.75 It might be advisable to solicit a list of search terms from the opposing party for this purpose, so that it could not later complain about which terms were used.

■ **In short, it is not sufficient to notify all employees of a litigation hold and expect that the party will then retain and produce all relevant information. Counsel must take affirmative steps to monitor compliance so that all sources of discoverable information are identified and searched. This is not to say that counsel will necessarily succeed in locating all such sources, or that the later discovery of new sources is evidence of a** lack of effort. **But counsel and client must take some reasonable steps to see that sources of relevant information are located.**

2. Counsel's Continuing Duty to Ensure Preservation

**Once a party and her counsel have identified all of the sources of potentially relevant information, they are under a duty to retain that information (as per Zubulake IV) and to produce information responsive to the opposing party's requests. Rule 26 creates a "duty to supplement" those responses.** Although the Rule 26 duty to supplement is nominally the party's, it really falls on counsel. As the Advisory Committee explains,

Although the party signs the answers, it is his lawyer who understands their significance and bears the responsibility to bring answers up to date. In a complex case all sorts of information reaches the party, who little understands its bearing on answers previously given to interrogatories. **In practice, therefore, the lawyer under a continuing burden must periodically recheck all interrogatories and canvass all new information.**

To ameliorate this burden, **the Rules impose a continuing duty to supplement responses to discovery requests** *only* when "a party[,] or more frequently his lawyer, obtains actual knowledge that a prior response is incorrect. This exception does not impose a duty to check the accuracy of prior responses, but it prevents knowing concealment by a party or attorney."

The *continuing* duty to supplement disclosures strongly suggests that parties also have a duty to make sure that discoverable information is not lost. Indeed, the notion of a "duty to

preserve" connotes an ongoing obligation. Obviously, if information is lost or destroyed, it has not been preserved.

> See OXFORD ENGLISH DICTIONARY (2d ed.1989) (defining "preserve" as "[t]o keep safe from harm or injury; to keep in safety, save, take care of, guard"); *see also id.* (defining "retain" as "[t]o keep hold or possession of; to continue having or keeping, in various senses").

The tricky question is what that continuing duty entails. What must a lawyer do to make certain that relevant information—especially electronic information—is being retained? Is it sufficient if she periodically re-sends her initial "litigation hold" instructions? What if she communicates with the party's information technology personnel? Must she make occasional on-site inspections?

Above all, the requirement must be reasonable. A lawyer cannot be obliged to monitor her client like a parent watching a child. At some point, the client must bear responsibility for a failure to preserve. At the same time, **counsel is more conscious of the contours of the preservation obligation; a party cannot reasonably be trusted to receive the "litigation hold" instruction once and to fully comply with it without the active supervision of counsel.**

There are thus a number of steps that counsel should take to ensure compliance with the preservation obligation. While these precautions may not be enough (or may be too much) in some cases, they are designed to promote the continued preservation of potentially relevant information in the typical case. *First,* counsel must issue a "litigation hold" at the outset of litigation or whenever litigation is reasonably anticipated. The litigation hold should be periodically re-issued so that new employees are aware of it, and so that it is fresh in the minds of all employees.

*Second,* counsel should communicate directly with the "key players" in the litigation, i.e., the people identified in a party's initial disclosure and any subsequent supplementation thereto. Because these "key players" are the "employees likely to have relevant information," it is particularly important that the preservation duty be communicated clearly to them. As with the litigation hold, the key players should be periodically reminded that the preservation duty is still in place.

*Finally,* counsel should instruct all employees to produce electronic copies of their relevant active files. Counsel must also make sure that all backup media which the party is required to retain is identified and stored in a safe place. In cases involving a small number of relevant backup tapes, counsel might be advised to take physical possession of backup tapes. In other cases, it might make sense for relevant backup tapes to be segregated and placed in storage. Regardless of what particular arrangement counsel chooses to employ, the point is to separate relevant backup tapes from others. One of the primary reasons that electronic data is lost is ineffective communication with information technology personnel. **By taking possession of, or otherwise safeguarding, all potentially relevant backup tapes, counsel eliminates the possibility that such tapes will be inadvertently recycled.**

229 F.R.D. at 432–34 (emphasis added) (some footnotes omitted). *See also* Rebecca Rockwood, Note, *Shifting Burdens and Concealing Electronic Evidence: Discovery in the Digital Era,* 12 RICH. J.L. & TECH. 16, 22 (2006) ("It is counsel's respon-

sibility not just to tell the client that they have to retain and produce all information relevant to the case, but also to follow up with the client and continuously remind them of what they are required to do.... Clients must be aware of all duties to preserve information, 'whether imposed by litigation or state or federal regulation.' Until the client begins to realize the impact of technology in litigation, the lawyer must educate them to provide the best service and avoid sanctions litigation that could be damaging.") (emphasis added and footnotes omitted)

In *Zubulake V*, that Court noted cases where counsel and the clients failed to understand each other on ESI issues:

> *Keir v. UnumProvident Corp.* [2003 WL 21997747 (S.D.N.Y. Aug. 22, 2003)] provides a disturbing example of what can happen when counsel and client do not effectively communicate. In that ERISA class action, the court entered an order on December 27, 2002, requiring UnumProvident to preserve electronic data, specifically including e-mails sent or received on six particular days. What ensu[ ]ed was a comedy of errors. First, before the court order was entered (but when it was subject to the common law duty to preserve) UnumProvident's technical staff unilaterally decided to take a "snapshot" of its servers instead of restoring backup tapes, which would have recovered the e-mails in question. (In fact, the snapshot was useless for the purpose of preserving these e-mails because most of them had already been deleted by the time the snapshot was generated.) Once the court issued the preservation order, UnumProvident failed to take any further steps to locate the e-mails, believing that the same person who ordered the snapshot would oversee compliance with the court order. But no one told him that. Indeed, it was not until January 13, when senior UnumProvident legal personnel inquired whether there was any way to locate the e-mails referenced in the December 27 Order, that anyone sent a copy of the Order to IBM, who provided "email, file server, and electronic data related disaster recovery services to UnumProvident." By that time, UnumProvident had written over 881 of the 1,498 tapes that contained backup data for the relevant time period. All of this led to a stern rebuke from the court. Had counsel in *Keir* promptly taken the precautions set out above, the e-mails would not have been lost. [FN87]
>
> FN87. *See also Metropolitan Opera Assoc. Inc. v. Local 100, Hotel Employees & Restaurant Employees International Union*, 212 F.R.D. 178, 222 (S.D.N.Y.2003) (ordering default judgment against defendant as a discovery sanction because **"counsel (1) never gave adequate instructions to their clients about the clients' overall discovery obligations, [including] what constitutes a 'document' ...; (2) knew the Union to have no document retention or filing systems and yet never implemented a systematic procedure for document production or for retention of documents, including electronic documents; (3) delegated document production to a layperson who ... was not instructed by counsel[ ]** that a document included a draft or other nonidentical copy, a computer file and an e-mail; ... and (5) ... failed to ask important witnesses for documents until the night before their depositions and, instead, made repeated, baseless representations that all documents had been produced.")

*Zubulake V*, 229 F.R.D. at 434 (emphasis added and some footnotes omitted).

The Court concludes that the proof establishes that the Defendants did not issue any litigation hold in this action until March 17th, 2004 and then did not implement that March 17th litigation hold memorandum. Significantly, the March 17th Memorandum required collection of relevant documents by the assigned custodian for each working group and the ongoing segregation and review of relevant documents for privileges by the State Attorney General's Office. The Defendants now assert that to respond to Plaintiffs' ESI request, as ordered by the Court, will cost them millions of dollars and a number of years due to their need to segregate documents and to conduct a privilege review of massive amounts of information. This evidence establishes that the March 17th Memorandum was never implemented.

The proof, at best, is that on "several occasions," Defense counsel told state employees to save emails and responsive documents. In their earlier papers, Defendants' counsel insisted that "[k]ey state officials have **periodically** been reminded of their duty to preserve documents and the instructions have even been expanded as the potential issues in dispute have expanded." (Docket Entry No. 720 at p. 27) (citing Docket Entry No. 720, Moss Declaration at ¶¶ 7–8) (emphasis added). Moss's 2006 declaration actually states that "state officials had been reminded on **several occasions** about their continuing obligation to preserve responsive documents." "Periodically" connotes "communications at regular intervals of time," Webster's Third New International Dictionary at p. 1680 (1981), "several occasions" does not.

In any event, the proof is that Defendants left their employees to decide on their own what to retain without evidence of any written instruction or guidance from counsel on what is significant on material information in this complex action. Under the State's computer system, after six to seven months emails were destroyed. Some key custodians did not have backup tapes for their work station computer. Given the complexity of this action, isolated statements about the litigation hold over a period of several years are equivalent to a lack of any meaningful litigation hold. The inadequacy of these isolated occasions is evidenced by the detail in the March 17th memorandum that describes reasonable methods to accomplish effective preservation of relevant information in this action.

Significantly, the Defendants did not provide the MCCs with any instruction to preserve relevant information until November 2006. The significance arises because, as Judge Nixon found, all of the substantive activities under the Consent Decree occur, at least initially, at the MCC level. The MCCs are the sites for services and where all of the substantive decisions are initially made. Without a litigation hold, the MCCs' ESI data has been regularly destroyed from 1998 to 2006, when the MCCs issued their litigation holds in 2006 to halt the loss of their ESI. The Defendants did not undertake any efforts to ensure the systemic preservation of the MCCs' data that is particularly disturbing in light of Judge Nixon's findings in 2001 and 2004.

▮ In their post hearing submission, the Defendants argue that they did not have any obligation to preserve the MCCs' data because the MCCs' ESI is not within their possession, custody, or control. (Docket Entry No. 997 at pp. 24–28). "[I]t is well settled that a party has no obligation to preserve evidence that is not in its possession, custody or control." *Id.* at p. 25. At the November 6th conference, Defendants' counsel told the Court:

MS. MOSS: And I want to be clear on the State's position. We're not saying

that these documents are not in the State's custody or control or that we can't produce documents from our contractors. In fact, we've produced—our response to details, entire categories of documents that we have produced from our contractors.

(Docket Entry No. 734 at p. 42).

For these reasons stated earlier, since the entry of the Consent Decree, the Defendants had control over the MCCs because paragraph 105 of the decree expressly states that "All such records shall be obtained, if necessary, and provided to plaintiffs' counsel through TennCare, rather than through individual MCOs." (Docket Entry No. 12, Consent Decree at ¶ 105). Under their contracts with their MCCs, the Defendants and "any other duly authorized state or federal agency shall have immediate and complete access to all records pertaining to the medical care and services provided to TennCare enrollees". (Plaintiffs' Exhibit 28) (emphasis added). To repeat the governing legal principle: "Control" has been broadly construed to mean "the legal right, to obtain the documents requested upon demand ... even through it presently may not have a copy of the document in its possession." 7 Moore's § 34.14[2][b]. Under the evidence and applicable law, the Court concludes that the Defendants possessed the clear legal right and control over the MCCs' ESI and thereby owed a duty to take reasonable measures to preserve the MCCs' relevant information, but the Defendants breached that duty.

Courts have imposed sanctions for a party's failures to preserve electronic information. As to sanctions for failure to preserve ESI, as stated earlier in *Zubulake V,* the defendant deleted e-mails that the plaintiff alleged would support her claim. 229 F.R.D. at 425. This destruction occurred contrary to outside and in-house counsel's instructions to key employ-

ees not to deleted relevant e-mail. *Id.* at 426–28. For sanctions, the court ruled that it would give an adverse inference instruction at trial, and required the defendant to restore backup tapes and to pay for depositions that had to be retaken as well as granting an award of attorney fees and costs. *Id.* at 437.

In other courts, in *United States v. Philip Morris USA, Inc.,* 327 F.Supp.2d 21, 23 (D.D.C.2004), the Court entered a broad preservation order, but for at least two years under company practices, the defendant's employees continued to delete e-mail messages more than sixty days old. Defense counsel later learned of this destruction, but waited four months to inform the Court. *Id.* Upon a motion for sanctions, the court found that eleven of the company's highest officers and supervisors violated not only the court order, and the company's stated policy for electronic records retention. *Id.* at 25. The court fined each defendant $250,000 per employee, and precluded the defendant from calling any of the eleven employees as witness at trial. *Id.* at 26, n. 1. In *In re Cheyenne Software, Inc., Securities Litigation,* 1997 WL 714891, at *2 (E.D.N.Y. Aug. 18, 1997), a securities action, the court ordered the defendant to pay $15,000 in fees and fines for the routine recycling of computer storage media. In *Renda Marine,* 58 Fed. Cl. 57 (2003), the court granted the plaintiff's motion to compel to order the U.S. Army Corps of Engineers to produce the backup tapes at its own expense and to provide access to the contracting officer's computer hard drive. There, the Defendant's policy was that after an e-mail was read, the e-mail had to be deleted or moved to a personal folder immediately. Despite the notice of litigation, this practice continued resulting in the court's sanctions.

Where a defendant contends that business necessity required or caused the destruction of relevant electronic discovery, a court rejected this defense because the party did not make a prior request for judicial relief on this issue. As stated in *Cheyenne Software:*

> [t]he defendants, not entirely unreasonably, argue that they cannot "freeze" their business by maintaining all hard drives inviolate, but rather must erase and reformat their computer hard drives as people leave and as business needs dictate. The documents could have been preserved, however, without keeping the hard drives inviolate; the information on those drives could simply have been copied to other relatively inexpensive storage media. If the defendants found that to be so burdensome, an application to the court was the appropriate procedure, not ignoring the court's orders.

1997 WL 714891 at *1. Defendants sought no such relief here.

The Court reserves any discussion of sanctions for the Defendants' failure to implement an effective litigation hold until completion of the ESI discovery ordered by the Court.

### 5. The Undue Burden Analysis

The undue burden analysis will discuss the types of ESI subject to production, the Defendants' databases subject to the ESI searches, the costs of that production and an application of the Rule 26(b)(2)(C) factors to the circumstances of this controversy.

### (i) Types of ESI Data

As to what ESI must be produced, at the time of the November 2006 Order, the issues of the accessibly of the ESI was determined primarily based on the technical availability of the ESI This analysis was formulated in *Zubulake I,* and its progeny, often cited decisions. Under *Zubulake I,* the issue of undue burden due to costs of production was reserved for data that was technically inaccessible.

**Whether electronic data is accessible or inaccessible turns largely on the media on which it is stored.** Five categories of data, listed in order from most accessible to least accessible, are described in the literature on electronic data storage:

1. **Active, online data:** "On-line storage is generally provided by magnetic disk. It is used in the very active stages of an electronic records [sic] life—when it is being created or received and processed, as well as when the access frequency is high and the required speed of access is very fast, i.e., milliseconds." Examples of online data include hard drives.

2. **Near-line data:** "This typically consists of a robotic storage device (robotic library) that houses removable media, uses robotic arms to access the media, and uses multiple read/write devices to store and retrieve records. Access speeds can range from as low as milliseconds if the media is already in a read device, up to 10–30 seconds for optical disk technology, and between 20–120 seconds for sequentially searched media, such as magnetic tape." Examples include optional disk.

3. **Offline storage/archives:** "This is removable optical disk or magnetic tape media, which can be labeled and stored in a shelf or rack. Off-line storage of electronic records is traditionally used for making disaster copies of records and also for records considered 'archival' in that their likelihood of retrieval is minimal. Accessibility to off-line media involves manual intervention and is much slower than on-line or near-line storage. Access speed may be minutes, hours, or

even days, depending on the access-effectiveness of the storage facility." The principled difference between nearline data and offline data is that offline data lacks "the coordinated control of an intelligent disk subsystem," and is, in the lingo, JBOD ("Just a Bunch Of Disks").

4. **Backup tapes:** "A device, like a tape recorder, that reads data from and writes it onto a tape. Tape drives have data capacities of anywhere from a few hundred kilobytes to several gigabytes. Their transfer speeds also vary considerably ... The disadvantage of tape drives is that they are sequential access devices, which means that to read any particular block of data, you need to read all the preceding blocks." As a result, "[t]he data on a backup tape are not organized for retrieval of individual documents or files [because] ... the organization of the data mirrors the computer's structure, not the human records management structure." Backup tapes also typically employ some sort of data compression, permitting more data to be stored on each tape, but also making restoration more time-consuming and expensive, especially given the lack of uniform standard governing data compression.

5. **Erased, fragmented or damaged data:** "When a file is first created and saved, it is laid down on the [storage media] in contiguous clusters ... As files are erased, their clusters are made available again as free space. Eventually, some newly created files become larger than the remaining contiguous free space. These files are then broken up and randomly placed throughout the disk." Such broken-up files are said to be "fragmented," and along with damaged and erased data can only be accessed after significant processing.

*Id.* at 318–19 (emphasis added).

Applying this technical viewpoint on the accessibility of ESI, the *Zubulake* Court deemed the first three types of ESI, presumptively accessible.

> **Of these, the first three categories are typically identified as accessible, and the latter two as inaccessible. The difference between the two classes is easy to appreciate. Information deemed "accessible" is stored in a readily usable format.** Although the time it takes to actually access the data ranges from milliseconds to days, the data does not need to be restored or otherwise manipulated to be usable. **"Inaccessible" data, on the other hand, is not readily usable. Backup tapes must be restored using a process similar to that previously described, fragmented data must be de-fragmented, and erased data must be reconstructed, all before the data is usable. That makes such data inaccessible.**

*Id.* at 319–20.

One commentator cited the number of custodians to be searched as posing the risk of increasing production costs. Kenneth J. Withers, *Electronically Stored Information: The December 2006 Amendments to the Federal Rules of Civil Procedure*, 7 Sedona Conf. J. 1 (2006) (hereinafter "Withers"):

> **To the extent that the appropriate technology is readily available to render the electronically stored information intelligible, it is considered "accessible."** However, much of the electronically stored information that may be subject to discovery is not easily rendered intelligible with the computers, operating systems, and application software available in every-day business and personal environments. This electronically stored information may be

considered "not reasonably accessible" due to the cost and burden associated with rendering it intelligible.

\* \* \*

**Electronically stored information, if kept in electronic form and not reduced to paper printouts, can be very inexpensive to search through and sort using simple, readily available technologies such as word or "string" searching. The cost of copying and transporting electronically stored information is virtually nil. The costs for the producing side, however, have increased dramatically, in part as a function of volume, but more as a function of inaccessibility and the custodianship confusion.** Organizations without state-of-the art electronic information management program in place, which classify information and routinely cull outdated or duplicative data, face enormous (often self-inflicted) costs and burdens.

\* \* \*

While we may informally refer to "accessible data," **the emphasis is really on the data source—the media and formats in which the data is kept. This subtle distinction becomes more important when we consider the second tier of discovery of electronically stored information—data from sources that are "not reasonably accessible." We concentrate on the characteristics of the data source, as opposed to the data, because the difficulties presented by a data source that it "not reasonably accessible" prevent us from knowing anything about the data itself. Most importantly, the medium or the format prevents us from knowing whether the data itself is relevant to the litigation. Costs must be incurred and burdens borne before** that threshold determination of relevance can reasonably be made.

*Id.* at pp. 5, 9 and 21 (emphasis added).

Special mention, however, is necessary for two types of discoverable ESI sought by the Plaintiffs, namely "deleted" data and "metadata". To the extent that any information of 50 key custodians work station has been deleted, the reference to "deleted" information from a computer system is a misnomer.

> The term "deleted" is sticky in the context of electronic data. " 'Deleting' a file does not actually erase that data from the computer's storage devices. Rather, it simply finds the data's entry in the disk directory and changes it to a 'not used' status-thus permitting the computer to write over the 'deleted' data. Until the computer writes over the 'deleted' data, however, it may be recovered by searching the disk itself rather than the disk's directory. Accordingly, many files are recoverable long after they have been deleted—even if neither the computer user nor the computer itself is aware of their existence. Such data is referred to as 'residual data.' " Deleted data may also exist because it was backed up before it was deleted. Thus, it may reside on backup tapes or similar media. Unless otherwise noted, I will use the term "deleted" data to mean residual data, and will refer to backed-up data as "backup tapes."

*Zubulake,* 217 F.R.D. at 313, n. 19 (quoting Shira A. Scheindlin & Jeffrey Rabkin, *Electronic Discovery in Federal Civil Litigation: Is Rule 34 Up to the Task?*, 41 B.C. L.Rev. 327, 337 (2000) (footnotes omitted)).

■ Deleted information in a party's computer's backup tapes is as discoverable as electronic documents in current use.

"[I]t is a well accepted proposition that deleted computer files, whether they be e-mails or otherwise, are discoverable.... [C]omputer records, including records that have been 'deleted,' are documents discoverable under Fed.R.Civ.P. 34." *Zubulake*, 217 F.R.D. at 317 n. 38 (quoting *Antioch Co. v. Scrapbook Borders, Inc.*, 210 F.R.D. 645, 652 (D.Minn.2002) and *Simon Property Group L.P. v. mySimon, Inc.*, 194 F.R.D. 639, 640 (S.D.Ind.2000)). *See also Renda Marine, Inc. v. United States*, 58 Fed. Cl. 57 (2003) (U.S. Army Corps of Engineers ordered to produce backup tapes at its own expense and to provide access to the contracting officer's computer hard drive) and *Williams v. Armstrong*, 2007 WL 1424552 *2 (W.D.Mich. May 14, 2007) ("Typically speaking, [email], even when deleted is maintained in a computer system as replicant data, archival data or residual data, which is subject to production and discovery") (citations omitted).

Thus, the Court concludes that any deleted data recoverable from the work stations of the 50 key custodians is technically accessible. The Court cannot find the same for the statewide email server for lack of proof.

Another type of electronic data at issue in these discovery disputes that impacts the costs issue is "Metadata" that is a different type of ESI.

Metadata, commonly described as "data about data," is defined as "information describing the history, tracking, or management of an electronic document." Appendix F to *The Sedona Guidelines: Best Practice Guidelines & Commentary for Managing Information & Records in the Electronic Age* defines metadata as "information about a particular data set which describes how, when and by whom it was collected, created, accessed, or modified and how it is formatted (including data demographics such as size, location, storage requirements and media information.)" Technical Appendix E to the *Sedona Guidelines* provides an extended description of metadata. It further defines metadata to include "all of the contextual, processing, and use information needed to identify and certify the scope, authenticity, and integrity of active or archival electronic information or records." Some examples of metadata for electronic documents include: a file's name, a file's location (e.g., directory structure or pathname), file format or file type, file size, file dates (e.g., creation date, date of last data modification, date of last data access, and date of last metadata modification), and file permissions (e.g., who can read the data, who can write to it, who can run it). Some metadata, such as file dates and sizes, can easily be seen by users; other metadata can be hidden or embedded and unavailable to computer users who are not technically adept. *Sprint/United Management Co.*, 230 F.R.D. at 646 (emphasis added and footnotes omitted).

*Sprint/United Management Co.* directed that if the metadata is viewable in the ordinary usage in the defendant's business, and probative then the metadata should be produced absent an agreement of the parties or order of the court.

Certain metadata is critical in information management and for ensuring effective retrieval and accountability in record-keeping. Metadata can assist in proving the authenticity of the content of electronic documents, as well as establish the context of the content. Metadata can also identify and exploit the structural relationships that exist between and within electronic documents, such as versions and drafts. Metadata allows

organizations to track the many lay-
ers of rights and reproduction infor-
mation that exist for records and
their multiple versions. Metadata
may also document other legal or secu-
rity requirements that have been im-
posed on records; for example, privacy
concerns, privileged communications or
work product, or proprietary interests.

\* \* \*

It is important to note that metadata
varies with different applications. As a
general rule of thumb, the more interac-
tive the application, the more important
the metadata is to understanding the
application's output. At one end of the
spectrum is a word processing applica-
tion where the metadata is usually not
critical to understanding the substance
of the document. The information can
be conveyed without the need for the
metadata. At the other end of the spec-
trum is a database application where the
database is a completely undifferentiat-
ed mass of tables of data. **The metada-
ta is the key to showing the relation-
ships between the data; without such
metadata, the tables of data would
have little meaning.**

*Id.* at 647 (emphasis added and footnotes
omitted). "*See also* Bahar Shariati, *Zubu-
lake v. UBS Warburg:* Evidence that the
Federal Rules of Civil Procedure Provide
the Means for Determining Cost Allocation
in Electronic Discovery Disputes," 49 VILL.
L.REV. 393, 404 n. 49 (2004) (hereinafter
"Shariati") ("[F]ormatting codes and other
information are means to manipulate elec-
tronic data ... and metadata tells 'when
the document was created, the identity of
the user who have accessed the document,
[and] whether the document was edited'.")

To be sure, the 2006 amendment to Rule
34(a) no longer requires production of ESI
in its native format that would include
metadata. The Defendants note an
emerging judicial trend that metadata
should not be produced, absent some
showing of necessity. "[E]merging stan-
dards of electronic discovery appear to
articulate a general presumption against
the production of metadata" and "[i]t is
likely to remain the exceptional situation in
which metadata must be produced."
*Sprint/United Management Co.,* 230
F.R.D. at 652. *Accord Wyeth v. Impax
Labs., Inc.,* 248 F.R.D. 169, 171 (D.Del.
2006) ("Emerging standards of electronic
discovery appear to articulate a general
presumption against the production of me-
tadata. The Default Standard for Discov-
ery of Electronic Documents utilized in
this District follows this general presump-
tion."); *Kentucky Speedway, LLC v. NAS-
CAR, Inc.,* No. 05–138–WOB, 2006 WL
5097354, at *8, 2006 U.S. Dist. LEXIS
92028, at *22–23 (E.D.Ky. Dec. 18, 2006)
("Emerging standards of electronic discov-
ery appear to articulate a general pre-
sumption against the production of meta-
data ... [T]his court is convinced—at least
on the facts of this case—that the produc-
tion of metadata is not warranted. The
issue of whether metadata is relevant or
should be produced .... ordinarily should
be addressed by the parties in a Rule 26(f)
conference.").[38] By Administrative Order,
this Court joined the Default Standard
under which the need for metadata must
be shown.

A noted treatise on federal practice ex-
plained the value of "metadata" in the
context of litigation:

---

**38.** The Defendants' counsel too often attempt
to ignore the history of this case and seek to
recast this action and its discovery dispute as
if this were a recently filed action. With the

filing of a Consent Order contemporaneous
with the filing of a complaint, a Rule 26(f)
conference was not required.

A printout or hard copy version of a computer-generated document does not contain all the embedded metadata. Similarly, the metadata, other than a file name, is not shown on the document when viewed on the monitor screen, but it can be easily retrieved. Different software applications may generate different types of metadata. In some cases, metadata can include significant information essential to a full understanding of the document. For example, metadata or system data in computer-generated information can reveal the evolution of a document. A record of earlier drafts, dates of subsequent revisions or deletion, and the identity of persons revising a document are routinely captured in software applications. System data may also identify anyone downloading, printing, or copying a specific document. Metadata may also assist in evaluating the authenticity of a document. For example, the relationship and arrangement of a particular file with other electronic files in a directory listing may offer helpful information regarding its authenticity. This data can be particularly useful when earlier drafts differ or the authenticity of an original document is disputed.

A document produced electronically may be more useful than a hard copy of the data or document in certain cases because it may contain metadata that is not revealed in a printout but that can be essential to a full understanding of the document. For example, a printout of an email message may include only a generic reference to a distribution list that fails to refer to the individuals who received the message.

Metadata that identifies the author, creation date, and dates when the document was modified remain on a computer's hard drive and can be retrieved when the information is stored on a CD–ROM, floppy diskette, or other media.

7 Moore's § 37a.03[1] (footnotes omitted).

Although the Defendants contend that metadata cannot be "Bates stamped" and is subject to alteration as a live document, Tigh described the "Hash" coding that can be attached to metadata to ensure its integrity. The Honorable Shira Scheindlin, the author of the *Zubulake* opinions, likewise observed that:

"Native format, on the other hand, may create authenticity problems, as careless handling (or intentional alteration) can affect the integrity of the data. Unless protective measures are taken, the data may change each time the information is viewed or sorted. Thus, it is difficult to be sure that the information is maintained as it is produced and it is difficult to identify, or "Bates stamp" the original production, *although technologies now exist to solve this problem.*"

Shira A. Scheindlin, U.S. District Judge Southern District of New York, "E–Discovery: The Newly Amended Federal Rules of Civil Procedure," Moore's Federal Practice (2006) (emphasis added).

 The significance of metadata in litigation is evidenced in *Williams,* an employment class action suit involving layoffs, where the defendant produced spreadsheets showing reduction-in-force calculations in a static image format that had been "scrubbed" to eliminate metadata that included the mathematical formulae behind the spreadsheets. Referring to the "Sedona Principles" as well as then proposed Rule 34(b), the district court determined that the defendant should have produced the spreadsheets "as they are maintained in the regular course of business," that is, in native format. 230 F.R.D. at 654. The court also stated that other measures should have been taken to preserve the metadata within the electronic files because such information, such as

calculations and text would be relevant and material to the claims in the action. *Id.* at 652–53. *Accord In re Verisign, Inc. Securities Litigation,* No. C 02–02270, 2004 WL 2445243 (N.D.Cal. March 10, 2004). Metadata in this action will assist in understanding the tracking data required by the Consent Decree and what Judge Nixon found to be unreliable statistics. Metadata may disclose any attachments to email and assist in tying related documents with their respective custodians. Metadata would be necessary to understand the multiple policies and reports prepared and published by the Defendants. ESI is also necessary in light of the inconsistencies and gaps in Defendants' 2006 paper production and the Defendants' failure to preserve relevant data, as discussed above. The Metadata will facilitate understanding changes and alterations of documents, particularly reports filed with the Court. Here, the Court credits Tigh's testimony that metadata is important to understand the path of a document. Metadata is especially important to understand what remedial measures the Defendants took after this Court's repeated findings of the Defendants' non-compliance with the Consent Decree.

The amended version of Fed.R.Civ.P. 34(b)(iii) reflects that a party can produce ESI in one format, "unless the Court orders otherwise." The Court concludes that the metadata here is technically accessible and that Plaintiffs have satisfactorily shown that metadata is relevant and necessary for meaningful ESI production. Thus, pursuant to Rule 34(b)(iii), the Court concludes that the Defendants' and the MCCs's ESI production must include metadata.

### (ii) The Defendants' and MCCs Databases

The proof here establishes that the Defendants have two servers: a document server and an email server. In addition, the Defendants agreed to establish a storage facility for the ESI on the computers of the Defendants' 50 key custodians. These work stations have separate folders for which there is no backup, but whatever relevant ESI remains, has been collected. Thus, from a technical viewpoint, the information under the November, 2006 Orders remains accessible. All information on these media storage devices that are not found to be privileged is discoverable and all transactional data is discoverable.

Subject to privileged information, all other ESI data bases are discoverable, but several of the MCCs' systems do not possess the same capabilities as the Defendants' systems. With the Court's modifications of the ESI production for those MCCs that have not resolved the ESI search conditions, the cited differences in those MCCs' systems will not affect those MCCs' ESI searches.

### (iii) The Costs of Production

The issue remains of whether the ESI production sought of the Defendants and MCCs imposes an undue burden upon them. In their Opposition Brief, Defendants describe this "undue burden" in terms of "multiple millions of pages" and hundreds of gigabytes of information as well as exorbitant amounts of attorney time for privilege reviews. (Docket Entry No. 907, Defendants' Response at pp. 22, 24).

The Defendants' costs of production can be substantial depending upon the scope of the search and the number of custodians included in the search:

> [e]lectronically stored information, if kept in electronic form and not reduced to paper printouts, can be very inexpensive to search through and sort using simple, readily available technologies such as word or "string" searching. **The cost of copying and transporting**

electronically stored information is virtually nil. **The costs for the producing side, however, have increased dramatically, in part as a function of volume, but more as a function of inaccessibility and the custodianship confusion.**

Withers at p. 9 (emphasis added).

■ For the custodian factor in the undue burden analysis, the Court concludes that the 50 agreed custodians for the Defendants and the Plaintiffs' acceptance of the MCCs' designated custodians are reasonable and will not create an undue burden for the Defendants or the MCCs.

As to the search terms, the Defendants agreed to accept the Plaintiffs' 50 search terms. The ESI that Plaintiffs request is targeted by these 50 select key words that should eliminate a substantial amount of documents. Here, the Defendants' and MCCs' proof establishes that the ESI sought by the Plaintiffs is on active and stored data, except for the ESI that was destroyed as part of the Defendants' and MCCs' routine business practices. To the extent this data is on an active system, *Zubulake*[39] supports the Court's earlier Order requiring the production at the Defendants' expense, but given the 2006 amendments, the Court must consider whether the Defendants can show an undue burden. For the reasons stated below, the Court deems the Defendants' proof does not establish an undue burden their proof submitted prior to the earlier Order was conclusory and insufficient. *See* Docket Entry No. 720, Exhibits A and B thereto.

As to the Defendants' proof of an undue burden, the Defendants' computer search based upon Plaintiffs' 50 word search with 50 key custodians reflects a total of 493 gigabytes of information which equals approximately 15 million pages with a maximum cost of $10 million. (Docket Entry No. 907 at pp. 2, 9). Assuming the estimates are reliable, for a class size of more than 550,000 children, the unit cost for this ESI discovery is approximately 25 pages per class member at a cost of $ 16.66 per Plaintiff class member. If Plaintiffs were individuals with unproven claims, then the expenditure of millions of dollars for electronic discovery, after balancing equities, might be unjustified. Yet, with repeated judicial findings of the Defendants' violations of children's rights, this cost of ESI discovery is not an undue burden for the Defendants. Moreover, as to whether this expense for ESI discovery outweighs its benefits, Congress has authorized in excess of $7 billion dollars to the Defendants to provide the medical services at issue in this action. Of the Defendant's two systems, the Defendants and most of the MCCs reached an agreement on the ESI

---

39. Prior to the 2006 amendments, the district court in *Zubulake* set forth a tri-part test to resolve these discovery issues. The first two factors are as follows:

First, it is necessary to thoroughly understand the responding party's computer system, both with respect to active and stored data. For data that is kept in an accessible format, the usual rules of discovery apply: the responding party should pay the costs of producing responsive data. **A court should consider cost-shifting only when electronic data is relatively inaccessible, such as in backup tapes.**

Second, because the cost-shifting analysis is so fact-intensive, it is necessary to determine what data may be found on the inaccessible media. **Requiring the responding party to restore and produce responsive documents from a small sample of the requested backup tapes is a sensible approach in most cases.**

*Id.* at 324. (emphasis added). *Zubulake I* factors are similar to Rule 26(b)(2)(C)(iii)'s provisions on whether ESI discovery imposes an "undue burden or expense on the responding party." 217 F.R.D. at 318.

production of transaction data, the Defendant concerns about privilege is for ESI on the State's email server and the individual computers of key custodians. The significant costs identified by the Defendants is for privilege review.

As to the costs of privilege review, "the most significant contributor to the cost of privilege screening, however, is fear." Withers at p. 11. As Tigh noted, a word search can be employed using the names of counsel and other search terms, such as "privileged" and "confidential" to identify clearly of course, privileged information before any production defense counsel's computer can identify clearly privileged information. Courts recognize that scanning of vast amounts of ESI utilizing key words to identify privileged information can significantly reduce the costs of a privilege review. *Zubulake I*, 217 F.R.D. at 318 ("key words can be run for privilege checks"). " 'By comparison [to the time it would take to search through 100,000 pages of paper], the average office computer could search all of the documents for specific words or combination[s] of words in minute[s], perhaps less.' " *Id.* at n. 50 (quoting Scheindlin & Rabkin, *Electronic Discovery in Federal Civil Litigation: Is Rule 34 Up to the Task?* 41 B.C. L.REV. 327, 364 (2000) and citing *Public Citizen v. Carlin*, 184 F.3d 900, 908–10 (D.C.Cir. 1999)).

The Court finds that the Defendants have unduly exaggerated the costs for their ESI collection and any privilege reviews of this ESI. As stated earlier, courts have recognized computers' capabilities to perform select word searches from massive ESI material on privilege in a matter of seconds. The Court agrees with Tigh that selective word searches of ESI are viable options to reduce privilege review costs significantly for the Defendants and the MCCs. The Court also deems the defense counsel's internal data system and

the availability of selective word searches to eliminate any excessive costs or undue burden arising from any privilege search of the ESI that the Court ordered to be produced.

For those MCCs that did not reach an agreement with the Plaintiffs, as stated in Rule 34(a), a threshold measure, before consideration of any undue burden is a sampling of the databases, particularly backup tapes to determine the likely yield of the information sought, as to avoid the costs of an extended search. Prior to the 2006 amendments, courts engaged in this analysis. As *Zubulake I* observed, "by requiring a sample restoration of backup tapes, the entire cost-shifting analysis can be grounded in fact rather than guesswork." 217 F.R.D. at 324, *accord Bills v. Kennecott Corp.*, 108 F.R.D. 459, 461 (D.Utah 1985) ("[S]ome courts have required the responding parties to develop programs to extract the requested information and to assist the requesting party in reading and interpreting information stored on computer tape.") and *McPeek v. Ashcroft*, 202 F.R.D. 31, 34 (D.D.C.2001) ("The more likely it is that the backup tape contains information·that is relevant to a claim or defense, the fairer it is that the [responding party] search at its own expense the less likely it is, the more unjust it would be to make the [responding party] search at its own expense. The difference is 'at the margin . . .' "). *See also Zubulake I*, 217 F.R.D. at 323 (the "test run" established in *McPeek* is the best solution for preventing courts from basing cost-shifting analysis on assumptions).

With the lack of a preservation or litigation hold, the Court questions the viability of sampling for the Defendants' and the MCCs' data bases. The Defendants' actual ESI search based upon Plaintiffs' 50 word search with 50 key custodians reflects a total of 493 gigabytes of information which equals approximately 15 million

pages (Docket Entry No. 907 at p. 9) with an estimated maximum cost of $10 million. *Id.* at 2. With Defendants' estimates, the unit cost for this ESI discovery is approximately 25 pages per class member at a cost of $16.66 per class member for this class. This cost is not an undue burden. As to the MCCs', with the Court's modification of the MCCs' ESI search, Plaintiffs' expert and Unison's expert agreed that this modified ESI search would not be unduly burdensome nor costly.

### 6. Good Cause and The Rule 26(b)(2)(C) Factors

Even if the Court agreed with the Defendants that this ESI discovery presents an undue burden, Rule 26(b)(2) also states that if the party seeking discovery can show "good cause," then the ESI production can be ordered. Fed.R.Civ.P. 26(b)(2)(C)(i)(ii) and (iii). Amended Rule 26(b)(2)(C)(i) requires consideration first of whether the ESI is duplicative or available elsewhere as less burdensome and less expensive.

The Defendants contend that their 2004 paper production provides the identical or the same data as the ESI production for that period and therefore, Plaintiffs' ESI discovery is duplicative. The Court disagrees. Since 1972, courts have held that a paper production does not preclude an ESI production of the same material. *Adams v. Dan River Mills, Inc.*, 54 F.R.D. 220 (W.D.Va.1972). See also; *National Union Electric Corp. v. Matsushita Electric Industrial Co., Ltd.*, 494 F.Supp. 1257 (E.D.Pa.1980). In *In re Honeywell International Inc. Securities Litigation*, 230 F.R.D. 293, 297 (S.D.N.Y.2003), despite the defendant's prior paper production, the district court ordered ESI production that would cost $30,000. The court reasoned the prior paper production was "insufficient because they were not produced as kept in the usual course of business." *Id.* In *In re Verisign* the court ordered the

defendant to convert existing TIFF images that had to be searchable in electronic format and ordered the production of metadata. 2004 WL 2445243 at *3.

The reasons for this difference between paper production and ESI production may be explained in *Sprint/United Management Co.*, 230 F.R.D. at 646. To be sure, some courts differ on this issue. *Compare Williams v. Owens–Illinois*, 665 F.2d 918 (9th Cir.1982) (denying such a request) and *Anti–Monopoly, Inc. v. Hasbro, Inc.*, 1995 WL 649934 at *2 (S.D.N.Y. Nov. 3, 1995) (ordering production of hard-copy and computerized data). Commentators recognize that "paper copies of e-mail differ from electronic copies of e-mail." Shariati at 405, n. 49.

Given the technical and substantial differences in ESI and paper production, the Court adopts the *Hasbro* ruling: "the rule is clear: production of information in "hard copy" documentary form does not preclude a party from receiving that same information in computerized/electronic form." *Id.* at *2. The inconsistency and gaps in the Defendants' 2006 paper production for this time period, discussed *supra*, further demonstrate that the ESI sought and ordered by the Court is neither duplicative nor otherwise obtainable by other means. As discussed earlier on metadata, paper production does not provide the same information as does ESI. The ESI here contains metadata that is invaluable to Plaintiffs' understanding of the Defendants' data and reports. Some emails originally contained attachments, but those attachments generally are not included in reply messages in the paper version of reply messages.

Further, a paper document may not disclose hidden data that an ESI production may disclose. "Selected passages, which are not visible when the document is printed, can be marked as hidden text under options in various software programs." 7

Moore's § 37a.03[1] *citing* Robins, "Computers and the Discovery of Evidence—A New Dimension to Civil Procedure", 17 J. MARSHALL J. COMPUTER & INFO. L. 411, 414–415 (1999).

Another commentator noted the historical importance of electronic data. "[E]lectronic data, especially e-mail, often contains damaging evidence cause of its informal nature. Commentators state that e-mail has proven to contain the 'smoking gun' in many cases. One commentator asserts that e-mail is the source of such honest and important information because it is quick medium for dialogue that appears secure from eavesdroppers, due to the lack of personal interaction and minimal likelihood of being reduced to paper form." *Shariati* at 406. These collective authorities and the serious deficiencies found in the Defendants' 2004 production render meritless the Defendants' contention that ESI production for the same period is duplicative.

The Defendants' related argument is that the prior discovery in this action and related actions establishes that paper production was the agreed method of discovery production. The Defendants elicited proof on this issue at the June 2007 hearing. *See also* Docket Entry No. 997, Defendants' Supplemental Memorandum at p. 36, citing *United States v. Jenkins,* No. 99–4451, 2000 WL 296307, at *1, 2000 U.S.App. LEXIS 4472, at *2 (4th Cir. Mar. 22, 2000) (noting that "prior dealings between the parties" in discovery may control the parties' discovery obligations); *Sty–Lite Co. v. Eminent Sportswear Inc.,* No. 01.Civ.3320 (CBM), 2002 WL 15650, at *5, 2002 U.S. Dist. LEXIS 119, at *13 (S.D.N.Y. Jan. 4, 2002) *Harris Corp. v. Amperex Elec. Corp.,* No. 86 C 6338, 1987 WL 7477, at *1, 1987 U.S. Dist. LEXIS 14055, at *2–3 (N.D.Ill. Feb. 24, 1987). *See also* Docket Entry No. 734, Transcript at pp. 32–33.

The Court disagrees for several reasons. First, the Consent Decree expressly provides that the Defendants would create and provide Plaintiffs extensive data in an electronic format:

91. Upon request, **the evaluators shall be afforded access to such records (including electronic data files) or persons as necessary to fulfill the responsibilities imposed by this order. Each party shall have access to information and materials obtained by the evaluators;** however, except for information which originated with the parties' counsel, the evaluators may withhold the source of any information they have received. The evaluators may communicate *ex parte* with the parties, their agents or counsel; upon request, the evaluators shall disclose to the opposing party the general substance of such communications. The evaluators shall otherwise treat all records as confidential.

\*　　\*　　\*

97. **The state shall compile, in a standardized electronic format capable of supporting flexible, customized analysis and reporting, data on all pertinent provider encounters which involve children,** and which are covered by the TennCare program.

98. **The state shall conduct ongoing audits for the purpose of authenticating such encounter data.** In order to ensue the integrity of the audit reports, such audits shall be conducted by qualified personnel and shall meet generally accepted standards regarding sample size and selection.

(Docket Entry No. 12, Consent Decree at ¶¶ 91, 97 and 98) (emphasis added).

Second, in an earlier discovery dispute in this action, the Defendants filed a motion for a protective order on April 13, 2001. *inter alia,* on Plaintiffs' document request No. 34 for "encounter data for class members in electronic media, in AS-CII format, for the calendar years 1993–2000". (Docket Entry No. 92, Defendants' Memorandum at p. 9). With a modification of subject matter, the Magistrate Judge denied the Defendants' motion and ordered production on document request no. 34. (Docket Entry No. 103, Order at pp. 7–8). Since at least the February 28, 2006 conference, the Court has entertained ESI issues. (Docket Entry No. 616, Transcript at pp. 82–100). The Plaintiffs' definitions for their 2006 discovery requests clearly reflect that Plaintiffs sought ESI. See the quotation *supra* at pp. 813–14.

Third, ESI issues did arise in *Rosen* where testimony was taken on the State's computer system's capabilities to provide notice and reverification data. *Rosen v. Goetz,* No.3:98cv0627, Docket Entry No. 277, November 9, 2001 Transcript at pp. 72–84; Docket Entry No. 279, November 14, 2001 Transcript at pp. 8, 17–20; Docket Entry No. 286, November 13, 2001 Transcript at pp. 12, 16–17.

Fourth, the Court is uncertain about the substantive issues in the *Grier* and *Newberry* actions, but *Rosen* was a procedural due process case. This action involves complex substantive issues of detailed medical treatment of children. Given the size of the class at the time of the Consent Decree (550,000) and with the extensive terms of the Consent Decree, the Court concludes that it is unreasonable to assume

that only paper discovery would be provided. To do so would overwhelm counsel and the Court. By its nature, ESI enables parties to manage and evaluate efficiently massive and detailed information on the complex issues in this action. Such purposes are the essential value of ESI. In these circumstances, the legal authorities and limited testimony cited by the Defendants, do not justify limiting discovery to a paper production.

As Tigh explained, a party cannot search a paper production, and to manage the massive amounts of information in this action requires an ESI production. In this action, information must be in a computer format for any effective understanding and searching of discovery material. The Court is gravely concerned that the Defendants' insistence on paper discovery is to obscure the ascertainment of material information on their compliance with the Consent Decree.

As to Rule 26(b)(2)(C)(ii), the Plaintiffs made their ESI discovery requests because it was not until February 2006 that the Defendants' counsel insisted that the Defendants were in compliance with the Consent Decree. As discussed earlier, Plaintiffs sought and were awarded ESI, but only for the earlier time period. (Docket Entry No. 103).

Amended Rule 26(b)(2)(C)(iii) requires the Court to consider whether the burden or expense of the proposed discovery outweighs its likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues.[40]

---

**40.** The comparable *Zubulake I* factors are:

1. the likelihood of discovering critical information;
2. the availability of such information from other sources;

3. the amount in controversy as compared to the total cost of production;
4. the parties' resources as compared to the total cost of production;
5. the relative ability of each party to control costs and its incentive to do so;

As to the likely benefits of the ESI production, if Plaintiffs were individuals with unproven claims, then the expenditure of the Defendants' estimated millions of dollars for electronic discovery, after the balancing equities, might be unjustified. Yet, with repeated judicial findings of the Defendants' violations of children's rights to medical care under federal law, any cost of ESI discovery is far outweighed by the benefits of the improved health of the children in this state. On this weighing factor, the Congress appropriated in excess of $7 billion dollars to the Defendants to provide these medical services to the children in this action. The proper and effective use of this amount of federal funds is yet another indicator of the likely benefits in this action

The "needs of the case" factor weighs heavily in Plaintiffs' favor. The Defendants and the MCCs possess virtually all of the critical information on whether the Plaintiffs' class members are receiving medical services required by federal law and the Consent Decree. The magnitude of the issues here is reflected in the more than 550,000 members in the Plaintiffs' class. Without this discovery from the Defendants and MCCs, the Court cannot assess whether the Defendants are in compliance with Consent Decree and have taken all reasonable measures to address the Court's prior findings on the deficiencies in the Defendants' system for meeting the requirements of the Consent Decree and federal law.

As to the amount in controversy, since the entry of the Consent Decree, more than $7 billion of federal funds have been distributed to the Defendants and the MCCs to provide the medical services to the Plaintiffs' class. The Consent Decree provides injunctive relief until the Defendants meet the stated percentages of screenings. The fact that the Defendants have never been found to meet those standards in over nine years, leads the Court to conclude that in all likelihood, additional time for compliance is necessary so that the actual amount in controversy could be additional billions of dollars.

■ As to the parties' resources, the class consists of 550,000 children whose economic resources are non-existent. For the Defendants to argue that Plaintiffs should pay the costs of production is outrageous. Plaintiffs' lead counsel are in a not-for-profit organization that has limited financial resources and relies significantly on the *pro bono* services of large law firms and *pro bono* experts to protect the interests and rights of this large class of children. The Defendants are public officials who have received well in excess of a half of a billion dollars in federal funds for the administration of the EPSDT program alone, and additional undisclosed amount of federal funds for the administration of the TennCare program. Hopefully from state funds, the Defendants have retained two private law firms and computer experts. Defendants also have the services of the staffs of the State Attorney General's office, the TennCare program, the Department of Finance and Administration, the Department of Children's Services and the Department of Mental Health. The resources of the parties are grossly disproportionate in the Defendants' favor.

As to the "importance of the issues at stake,"[41] the Consent Decree provides in-

---

6. the importance of the issues at stake in the litigation; and
7. the relative benefits to the parties of obtaining the information.
217 F.R.D. at 322. Under *Zubulake* each factor is not considered equally and "cannot be mechanically applied." *Id.* at 323. Yet,

"[t]he first two factors—comprising the marginal utility test are the most important." *Id.*

41. *Zubulake* suggested an exception to the proportionality test for institutional litigation on public policy issues.

junctive relief to enforce a Congressional mandate finding that the public interest requires children to have early screenings for their medical needs and to provide any medically necessary care, as revealed by those screenings. For these purposes, Congress appropriated and the Secretary distributed more than $7 billion in federal funds to the Defendants to benefit the Plaintiffs' class of children who are located throughout the State. The health of any child, particularly a child in economic and medical need, is immensely important. In addition, the Consent Decree awarded injunctive relief to enforce Congress' mandate, but on two prior occasions, this Court has found that the Defendants have not honored the Court's Orders. Judge Nixon also found that the Defendants have failed to comply with the Court's Order to submit an Initial Action Plan ("IAP") to cure the deficiencies cited by the Court. Judge Nixon stated:

> As recently as August 2004, the Special Master concluded in his status report to the Court that no feasible plan yet exists to achieve compliance for an indispensable section of the Consent Decree. **The Special Master reported that the State has failed to honor its renewed commitment to produce an IAP satisfactory to the Special Master, last made in September 2004, and still refuses to engage its key officials in planning efforts to achieve compliance, verification of the quality of its data, and evaluation of the successes or failures in attaining compliance.** The Special Master also reports that the State is incapable of reporting progress to the Court because it lacks a valid and reliable system of measuring progress in such key areas as provider network adequacy, case management, outreach, the effective use of information systems, and system level coordination, to name a few.

(Docket Entry No. 465, Memorandum at p. 5) (emphasis added).

The combination of the Defendants' violations of this Congressional mandate for children's medical care, the medical needs of the children, the Defendants' receipt of $7 billion dollars of federal funds to meet this mandate and the Defendants' violations of this Court's Orders to enforce that mandate, presents issues of utmost importance.

As to the importance of the ESI discovery in resolving these important issues, the Plaintiffs' discovery requests seek information to assess the Defendants' insistence that they are in compliance with the Consent Decree. As the officials charged with operating and managing this program, the Defendants and the MCCs are the only sources for this information. To assert that they are in compliance and then refuse to permit full discovery to test that assertion is unfair. With the structural deficiencies in the Defendants' management and statistical systems found by Judge Nixon and the absence of a coherent remedial plan or even the Initial Action Plan that Judge Nixon ordered to be filed, the Plaintiffs present a compelling need for this ESI discovery. The importance of the issues at stake are the health and welfare of needy children who thus far, have not been receiving the medical services that federal law requires and that

Last, "the importance of the issues at stake in the litigation" is a critical consideration, even if it is one that will rarely be invoked. For example, **if a case has the potential for broad public impact, then public policy weighs heavily in favor of permitting extensive discovery.** Cases of this ilk might include toxic tort class actions, environmental actions, so-called "impact" or social reform litigation, cases involving criminal conduct, or cases implicating important legal or constitutional questions.
*Zubulake I*, 217 F.R.D. at 321 (emphasis added).

federal funds have been appropriated to provide. The expenditure of these federal funds without delivery of the requisite services to a significant percentage of class members present a serious issue. Neither the members of the class, children nor Plaintiffs' counsel possess anywhere near the resources of the Defendants. At stake are billions of federal funds that are not being expended to comply with federal law.

Thus, the Court concludes that to provide the ESI required by the Court's directives and Orders is not an undue burden [42] and to the extent any burden exists, the Plaintiffs have amply demonstrated good cause to order this ESI production.

## 7. Privilege Issues

The Defendants and MCCs assert several privileges as barring Plaintiffs' ESI discovery. To assert privileges in response to a discovery request, Fed.R.Civ.P. 26(b)(5)(A) requires a privilege log:

When a party withholds information otherwise discoverable under these rules by claiming that it is privileged or subject to protection as trial-preparation material, the party shall make the claim expressly and shall describe the nature of the documents, communications, or things not produced or disclosed in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the applicability of the privilege or protection.

The 1993 Advisory Committee Notes are informative on a party's failure to submit a privilege log with all privilege assertions:

A party must notify other parties if it is withholding materials otherwise subject to disclosure under the rule or pursuant to a discovery request because it is asserting a claim of privilege or work product protection. **To withhold materials without such notice is contrary to the rule, subjects the party to sanctions under Rule 37(b)(2), and may be**

---

**42.** The *Zubulake* remaining factors also support this conclusion that is wholly in accord with the Court's earlier rulings. The third *Zubulake* factor, the "total cost of production, compared to the amount in controversy," disfavors cost-shifting. 216 F.R.D. 280, 287–88 (S.D.N.Y.2003). Under *Zubulake* "a responding party should not be required to pay for the restoration of inaccessible data if the cost of that restoration is significantly disproportionate to the value of the case." *Id.* at 288. Here, the amount in controversy is literally *billions* of federal funds that the Defendants agreed to administer for Tennessee's children's health care through the TennCare program. These funds dwarf the State's estimated $10 million cost of their ESI production. (Docket Entry No. 907 at p. 6). The "total cost of production, compared to the resources available to each party," the fourth *Zubulake* factor, counsels against cost-shifting. 216 F.R.D. at 284. Here, the Defendant's resources are extensive and Plaintiffs' resources are minuscule. Therefore this factor, weighs against cost-shifting.

The fifth *Zubulake* factor concerns the "relative ability of each party to control costs and its incentive to do so." *Id.* In *Zubulake*, the court found that this factor was neutral because the requesting party "already made a targeted discovery request" and the producing party had already selected the vendor to restore its backup tapes, so neither party could do anything more to reduce costs. Similarly, Plaintiffs here narrowed their search request to 50 terms that will produce relevant electronic responsive documents, so there is nothing else Plaintiffs can do to reduce the cost of production. The Defendants overly exaggerated their cost estimates with failure to utilize key word searches and filters to reduce the cost of reviewing for privilege. This factor has neutral effect in this case.

The sixth *Zubulake* factor, "importance of the issues at stake in the litigation." *Id.* at 289. The issue here involves mismanagement of billions of federal dollars intended for the health and welfare of over half a million of Tennessee's most vulnerable and needy children. This issue is of paramount importance.

**viewed as a waiver of the privilege or protection.**

(emphasis added).

Courts have held that a party's failure to assert a privilege on a privilege log constitutes a waiver of that privilege. *Bowling v. Scott County, Tenn.,* 70 Fed.R.Evid. Serv. 959, 2006 WL 2336333 at *3 (E.D.Tenn. Aug.10, 2006); *Carfagno v. Jackson National Life Ins. Co.,* 2001 WL 34059032 at *2 (W.D.Mich. Feb. 13, 2001); *Butler Mfg. Co. v. Americold Corp.,* 148 F.R.D. 275, 277 (D.Kan.1993); *Hampton v. City of San Diego,* 147 F.R.D. 227, 228–29 (S.D.Cal.1993); *Gottlieb v. Wiles,* 143 F.R.D. 241, 246 n. 9 (D.Colo.1992); *Carey–Canada, Inc. v. California Union Ins. Co.,* 118 F.R.D. 242, 249 (D.D.C.1986).

In their privilege log, the Defendants asserted only the work product and attorney client privileges. (Docket Entry No. 707–2). Although not asserted, the deliberative privilege was recognized by Judge Nixon in an earlier ruling, (Docket Entry No. 401), but in the Defendants' response to Plaintiffs' first motion to compel, the Defendants unequivocally stated that they "waived" their deliberative process privilege in their objections to discovery in *Rosen,* a related action. (Docket Entry No. 720, Defendants' Memorandum at p. 3)

Under paragraph 105 of the Consent Decree, the Defendants waived any state law privilege because Plaintiffs were granted access to the Defendants' data "subject to any applicable federal law." (Docket Entry No. 12 at ¶ 105). In their response to the Plaintiffs' first motion to compel, the Defendants cited only Tenn. Code Ann. §§ 68–142–101, 68–142–105(3) and 68–142–108(a) involving child fatality review and did not argue for privilege based upon any state law. (Docket Entry No. 720, Defendants' Memorandum at pp. 6). In their response to Plaintiffs' renewed motion to compel, the Defendants now cite Tenn.Code Ann. §§ 63–6– 219(b)(1), 37–5–107(b), (d) and 37–1–409(a)(2) as well as 42 U.S.C. § 5106(b)(2)(A). (Docket Entry No. 920 at pp. 27–38).

■ The Court concludes first that all privileges, other than attorney client and work product privileges, have been waived for defense counsel's failure to assert them in the Defendants' privilege log. Yet, in the interests of judicial economy, the Court addresses the merits of the waived privileges in the event of an appeal.

Before addressing the substantive issues of privilege, the Court first addresses a procedural issue on privilege. The Defendants now argue that any clawback agreement on ESI discovery to avoid a waiver of privilege is available only upon a voluntary agreement of the parties. (Docket Entry No. 907, Defendants' Response at pp. 11–13). "[A] mandatory clawback cannot be justified." *Id.* at p. 13. Thus, Defendants argue that without their consent, a clawback provision is unavailable to the Court thereby reinforcing the need for the time consuming privilege review, as described by the Defendants. *Id.*

As to the clawback option for any privileged material in the Defendants' ESI production, the Court notes the following colloquy with Nicole Moss, defense counsel at the November 6, 2006 hearing:

> THE COURT: And if we've got a claw back provision, as I understood the plaintiffs agreed to, then, if something sort of slips through, then you have the right to come back and claim it as privileged. I mean, that's what I understood you wanted, isn't it?
>
> MS. MOSS: We do, Your Honor. Certainly that would be part of the provision.

(Docket Entry No. 734, Transcript at p. 80). The Court then entered an Order granting the ESI discovery with a claw-

back provision for any post-production assertion of privilege. (Docket Entry No. 734, Order at p. 2)

The 2006 ESI amendments to the rules of civil procedure expressly contemplate a clawback protection for ESI discovery to address post-production privilege issues and to avoid any finding of waiver by the producing party in any other litigation:

> If information is produced in discovery that is subject to a claim of privilege or of protection as trial-preparation material, the party making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has and may not use or disclose the information until the claim is resolved. A receiving party may promptly present the information to the court under seal for a determination of the claim. If the receiving party disclosed the information before being notified, it must take reasonable steps to retrieve it. The producing party must preserve the information until the claim is resolved.

Fed.R.Civ.P. 26(b)(5)(B).

Defendants quote the Advisory Committee on this rule provision referring to clawback agreements as "voluntary arrangements." (Docket Entry No. 907, Defendants' Response at p. 11). The Advisory Committee Notes to the 2006 Amendments also reflect that Rule 26(b)(5) was intended "to provide a procedure for a party to assert a claim of privilege or trial preparation material protection after information is produced in discovery," and that Rule 26(b)(5)(B) in conjunction with other rules, "allows the parties to ask the court to include in an order any agreements the parties reach regarding issues of privilege or trial-preparation material protection."

A commentator described the types of agreements in an ESI production that may cause a waiver of any privilege in other actions.

> [A] "claw back," under which counsel on both sides agree to surrender any documents they receive from the other if a privilege claim is asserted in a timely manner after production, and if there is a disagreement, to place the document on a privilege log for review by the judge at an appropriate time. While a claw back agreement may reduce tension in litigation, it might not actually reduce costs. If the issue of privilege waiver comes before the judge, one of the considerations will likely be the degree of care taken by the producing party to avoid such an error. Therefore producing parties will still exercise a high degree of care in the screening process, at a high cost. Perhaps more frightening is the prospect that while the "claw back" agreement may be useful and constructive between the parties, it does not bind non-parties, who may claim in parallel litigation in another court, perhaps operating under a stricter standard, that any privilege claimed over the documents "clawed back" had been waived by the fact of production. A second type of agreement is the "quick peek." Under this agreement, the parties can dramatically reduce the scope and cost of privilege review, and the scope and cost of discovery itself. The parties agree to an "open file" review of each other's data collections prior to formal discovery, reserving all rights to assert privilege when responding to the actual document request. After the review, the parties designate the files or data sources that they believe are most relevant to their case, and submit a formal Rule 34 request listing those items. The producing party then has a much narrower task of privilege

Withers at p. 23.

Courts have adopted both types of agreements on privilege issues and have incorporated such provisions in Orders to avoid any finding of future waiver. *Hopson v. The Mayor and City Council of Baltimore*, 232 F.R.D. 228, 246 (D.Md. 2005) ("claw back" agreement was incorporated into court order to avoid any assertion of waiver of a privilege); *Murphy Oil USA, Inc. v. Fluor Daniel, Inc.*, 2002 WL 246439 at *8 (E.D.La. Feb. 19, 2002) (reciting various options for a "quick peek" agreement).[43]

 Here, the Court first concludes that Moss's statement at the November 6th hearing establishes that the Defendants consented to the clawback provisions in the Court's Order. Second, as stated earlier, the defense counsel's computer should identify any clearly privileged ESI. Third, the Court adopts its earlier finding on the costs of a privilege review and recognizes that a select word search of Defendants' computers is a viable method to ensure that clearly privileged material is not disclosed in the initial ESI production; to avoid initially any waiver of clearly privileged material; and to protect against any inadvertent disclosure. With the clawback provision incorporated into a court order, such protection should insure against any future claim of the Defendants' waiver in any other litigation. The separate protective order prohibits the disclosure or use of material in this action for any other use.

Finally, as to the impact of *In re Columbia/HCA Corporation Billing Practices Litigation*, 293 F.3d 289 (6th Cir.2002) on any clawback arrangement, the Sixth Circuit made it clear that any waiver of any privilege requires a "voluntary disclosure." *Id.* at 294. To the extent any privileged material is produced under an Order of this Court in this action, no reasonable person would consider these Defendants to have made a "voluntary disclosure" of any privileged information.

### a. Attorney Client Privilege

 A party asserting the attorney-client or work product privilege to bar discovery bears the burden of establishing that either or both is applicable. *United States v. Dakota*, 197 F.3d 821, 825 (6th Cir.1999). In evaluating assertions of attorney-client and work product privileges, as procedural matter, the district court should require an *in camera* review of the disputed document(s). *In re Antitrust Grand Jury*, 805 F.2d 155, 169 (6th Cir.1986). ("[W]e hold that the district court erred in not reviewing the documents in Exhibit C *in camera* in order to determine whether they reflect communications or work product made in furtherance of a contemplation or ongoing Sherman Act violation . . ."). The Court instructed defense counsel that for any documents subject to a claim of privilege, those documents should be filed under seal for an *in camera* inspection. (Docket Entry No. 734, November 6, 2006 Transcript at p. 81). The Defendants' counsel did not do so.

 The attorney-client privilege "protects only those disclosures necessary to obtain informed legal advice which might not have been made absent the privilege." *Fisher v. United States*, 425 U.S. 391, 403, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976) (holding *inter alia*, that the mere

---

43. For detailed procedures and protocols for a privilege production, *see Fluor Daniel*, 2002 WL 246439 at *8–9.

transfer of a document to counsel does not render the document subject to the attorney-client privilege). The privilege can be asserted by a governmental entity. *Ross v. City of Memphis*, 423 F.3d 596, 601 (6th Cir.2005) (quoting *United States v. Collis*, 128 F.3d 313, 320 (6th Cir.1997)) "The attorney-client privilege is 'narrowly construed' because it reduces the amount of information discoverable during the course of a lawsuit." *Id.*

Communications, including memoranda or notes on such communications, by corporate employees to corporate counsel and outside counsel are covered by the attorney client and work-product privileges. *Upjohn Company v. United States*, 449 U.S. 383, 391, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981). As the Supreme Court explained, "[t]he client cannot be compelled to answer the question, 'What did you say or write to the attorney?' but may not refuse to disclose any relevant fact within his knowledge merely because he incorporated a statement of such fact into his communication to his attorney.... [T]he courts have noted that a party cannot conceal a fact merely by revealing it to his lawyer." *Upjohn*, 449 U.S. at 396, 101 S.Ct. 677 (citations omitted). The communications at issue in *Upjohn* were questionnaires that were marked clearly as from the corporate general counsel. *Id.* at 394–95, 101 S.Ct. 677. The legal implications of the questionnaires were also readily apparent to the corporate employees and officers. *Id.*

The Sixth Circuit Court described the purposes of the attorney client privilege:

The purpose of the attorney-client privilege is to encourage clients to communicate freely and completely with their attorney. The privilege also serves the purpose of promoting "broader public interest in the observance of law and administration of justice." However, it is not an absolute privilege. It applies only where necessary to achieve its purpose and protects only those communications necessary to obtain legal advice. Under some circumstances the privilege is to be very narrowly construed.

*In re Antitrust Grand Jury*, 805 F.2d at 162 (citations omitted).

 The privilege protects not only the confidentiality of communications by the client to an attorney, but the privilege also includes:

Communications by the attorney to the client in the consultation process when they state or imply facts communicated to the attorney in confidence ... It is true that a client's knowledge of facts may not be cloaked under the attorney-client privilege by incorporating a statement of those facts in a communication to the attorney. But privileged advice does not lose its protection when the client adopts it. To allow a litigant to probe beyond the assertion of privilege to the substance of the legal advice because the client takes that advice to heart and acts upon it would effectively circumvent the protection of the privilege. For this reason when a deponent answered a question about his reasons by saying that he was only relying on his attorney's legal advice, that answer is a sufficient response.

*SCM Corp. v. Xerox Corp.*, 70 F.R.D. 508, 516–17 (D.Conn.1976) (citations omitted).

 In ruling on issues of privilege, "[t]he mere fact that a person is an attorney does not render privileged everything he does for and with a client...." *United States v. Bartone*, 400 F.2d 459, 461 (6th Cir.1968). The Second Circuit stated, "it is important to bear in mind that the attorney client privilege protects communications rather than information; the privilege does not impede disclosure of information except to the extent that the disclosure would reveal confidential

communications." *In re Grand Jury Subpoena Duces Tecum,* 731 F.2d 1032, 1037 (2nd Cir.1984).

*Humphreys, Hutcheson & Moseley v. Donovan,* 568 F.Supp. 161, 175 (M.D.Tenn. 1983), *aff'd,* 755 F.2d 1211 (6th Cir.1985), is instructive on the determination of whether the attorney-client privilege applies. In *Humphreys,* Judge Nixon relied on the doctrine formulated in *United States v. United Shoe Machinery Corporation,* 89 F.Supp. 357, 358–59 (D.Mass.1950) and held that the attorney client privilege applies only if:

> (1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is a member of the bar of a court, or his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client.

*Humphreys,* 568 F.Supp. at 175. *See also* 4 Moore's § 26.60[2]: "communications from a client to his attorney are privileged if legally related and having an expectation of confidentiality so long as the privilege has neither been waived nor lost."

On appeal in *Humphreys,* the Sixth Circuit explained that the attorney client privilege "does not envelope everything arising from the existence of an attorney-client relationship ... [t]he attorney-client privilege is an exception carved from the rule requiring full disclosure, and as an exception, should not be extended to accomplish more than its purpose." 755 F.2d at 1219. (citations omitted). *Accord United States*

*v. Goldfarb,* 328 F.2d 280, 281–82 (6th Cir. 1964) (Attorney-client relationship does not create an automatic "cloak of protection ... draped around all occurrences and conversations which have any bearing, direct or indirect, upon the relationship of the attorney with his client.").

Where the facts suggest combined business and legal advice in a document, courts can inquire about which purpose predominates. "It was also proper ... to inquire into the nature of the 'legal services' rendered by [the Defendant]. Attorneys frequently give to their clients business or other advice that, at least insofar as it can be separated from their professional legal services, gives rise to no privilege whatever." *Colton v. United States,* 306 F.2d 633, 638 (2d Cir.1962); *See also United States v. International Bus. Mach. Corp.,* 66 F.R.D. 206, 212–13 (S.D.N.Y.1974). After such inquiries, if the lawyer acted as a business advisor or agent, then the information is not privileged. *Asset Value Fund L.P. v. Care Group,* No. 97 Civ. 1487, 1997 WL 706320 at *4 (S.D.N.Y. Nov. 12, 1997); *Park Ave. Bank, N.A. v. Bankasi,* No. 93 Civ. 1483, 1994 WL 722690 at *1 (S.D.N.Y. Dec. 30, 1994).

In the context of business dealings, where a lawyer acts as a business advisor, several courts found that there is not any special relationship to give rise to a privilege to protect counsel's advice from disclosure. *In re Grand Jury Subpoena, Duces Tecum Dated September 15, 1983,* 731 F.2d 1032, 1037 (2nd Cir.1984); *Standard Chartered Bank PLC v. Ayala Intern. Holdings, Inc.,* 111 F.R.D. 76, 80 (S.D.N.Y.1986); *Coleman v. American Broadcasting Co., Inc.,* 106 F.R.D. 201, 205–06 (D.D.C.1985). As one court explained,

> [T]he attorney-client privilege protects only communications pertaining to legal assistance and advice and does not ex-

tend to business advice given by an attorney to a client, or to inter-client communications designed to communicate only business or technical data. [Citations omitted.] Where an attorney gives advice of a general nature to a corporate client and also advises on the resolution of troubled loans made by the client, the line between business and legal advice may be fine indeed.

*First Wisconsin Mortg. v. First Wisconsin Corp.*, 86 F.R.D. 160, 174 (E.D.Wis.1980) (emphasis in the original and citations omitted). *Accord SCM Corp.*, 70 F.R.D. at 517 ("To protect the business components in the decisional process would be a distortion of the privilege. The attorney-client privilege was not intended and is not needed to encourage businessmen to discuss business reasons for a particular course of action.").

Other courts have held that the attorney-client privilege does not extend to every memorandum or draft document exchanged between corporate employees and corporate counsel. *Simon v. G.D. Searle & Co.*, 816 F.2d 397 (8th Cir.1987). In *Searle*, the Eighth Circuit held that "Risk management" documents with statistical analysis prepared by non-lawyer corporate officials on the costs of product-liability litigation, not to be privileged.

> Moreover, a number of courts have determined that the attorney-client privilege does not protect client communications that relate only business or technical data. Just as the minutes of business meetings attended by attorneys are not automatically privileged, business documents sent to corporate officers and employees, as well as the corporation's attorneys, do not become privileged automatically. Searle argues, however, that the special master formulated a *per se* rule barring privilege claims where a document is sent to corporate officials in addition to attorneys. We do not read the special

master's report as establishing such an approach. Client communications intended to keep the attorney apprised of business matters may be privileged if they embody "an implied request for legal advice based thereon."

816 F.2d at 403–404. (citations omitted). *See also Christman v. Brauvin Realty Advisors, Inc.*, 185 F.R.D. 251, 256 (N.D.Ill. 1999) (Drafts of proxy statements and comments thereto are not legal advice and are not privileged); *United States Postal Serv. v. Phelps Dodge Refining Corp.*, 852 F.Supp. 156, 163–64 (E.D.N.Y.1994) (copies of drafts edited by attorneys, including counsel's handwritten notes are not privilege because "[a] corporation cannot be permitted to insulate its files from discovery simply by sending a "cc" to in-house counsel."); *Fine v. Facet Aerospace Prods. Co.*, 133 F.R.D. 439, 444 (S.D.N.Y.1990) (lawyer's business advice was not protected from disclosure).

Another district court ruled that the privilege does not extend to communications about "business or technical data" or "technical matters."

> It should be emphasized, however, that no privilege will attach for documents designed merely to communicate non-privileged business or technical data. Nor will the privilege attach when the element of confidentiality is lacking. Furthermore, no privilege will attach to those documents directed to the attorney for the purpose of shielding the documents from disclosure.
>
> * * *
>
> In order to invoke the privilege, however, the party seeking protection must make a clear showing that documents containing technical matters are communicated in confidence and are primarily legal in nature. There must be a finding that each document is involved in the rendition of legal assistance.

896

*Burlington Industries v. Exxon Corporation,* 65 F.R.D. 26, 39 (D.Md.1974). (citations omitted).

The Defendants rely upon *Liberty Environmental Systems, Inc. v. County of Westchester,* 1997 WL 471053 (S.D.N.Y. Aug. 18, 1997) that involved a consent decree where a magistrate judge concluded that "withheld documents ... principally or exclusively to assist in two related litigations" were privileged. *Id.* at *7. The Court notes that in *Liberty Environmental,* the documents at issue were submitted for the magistrate judge's *in camera* inspection, *id.* at *1, and counsel submitted their affidavits to explain the specific circumstances of the privileged communications. *Id.* at *2.

■ Despite the Court's instructions to submit any privileged documents at issue for an *in camera* inspection and the Court's warnings about its prior reliance upon Searle, the Defendants' counsel ignored both. Moreover, unlike *Liberty Environmental* that the Defendants rely upon, the drafts of the documents at issue here were not filed with the Court nor were affidavits of counsel filed (under seal, if necessary) to provide the Court with the factual context for these documents. The Court's concern is that defense counsel are actually writing the policies and plans about the Defendants', EPSDT system and the facts for those policies. The semiannual reports, particularly, are highly technical documents. *See e.g.,* Docket Entry No. 1012. With conclusory descriptions of the purportedly privileged documents and without *in camera* inspection or counsel's affidavits to provide specific factual context, the Court concludes that the Defendants have not carried their burden that the documents listed at pp. 79–85, qualify for the protection of the attorney-client privilege.

**b. The Work Product Privilege**

■ This privilege protects the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party that is usually reflected in a document sought for production. *Hickman v. Taylor,* 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947). Under *Hickman,* this protection does not intend to bar discovery of facts, but rather "the work product of the lawyer" where disclosure of the documents reveals counsel's "mental impressions, personal beliefs," and reflections of what counsel believes to be important, such as in witness statements and documents acquired by counsel and notes on witness interviews conducted by counsel. 329 U.S. at 510–11, 67 S.Ct. 385.

In *Toledo Edison v. G.A. Technologies, Inc.,* 847 F.2d 335 (6th Cir.1988), the Sixth Circuit set forth the procedural framework for assessing the assertion of this privilege:

1. The party requesting discovery must first show that, as defined in Rule 26(b)(1), the materials requested are "relevant to the subject matter involved in the pending litigation" and not privileged. Because the application of subdivision (b)(3) is limited to "documents and tangible things otherwise discoverable under subdivision (b)(1)," the burden of making this showing rests on the party requesting the information.

2. If the party requesting discovery meets this burden and the court finds that the claimed material is relevant and not privileged, the burden shifts to the objecting party to show that the material was "prepared in anticipation of litigation or for trial" by or for that party or that party's representative, including that party's attorney, consultant, surety, indemnitor, insurer or agent. This showing can be made in any of the traditional ways in which proof is produced in

pretrial proceedings such as affidavits made on personal knowledge, depositions, or answers to interrogatories. This showing can be opposed or controverted in the same manner. The determination of this matter is the second sequential determination that must be made by the court.

3. If the objecting party meets its burden as indicated above and the court finds that the material was prepared in anticipation of litigation or for trial by one of the persons named in the rule, the burden shifts back to the requesting party to show that the requesting party (a) has substantial need of the materials in preparation of the party's case, and (b) that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means. In doing this, attention is directed at alternative means of acquiring the information that are less intrusive to the lawyer's work and whether or not the information might have been furnished in other ways.

4. After the application of the shifting burdens, even if the court determines that the requesting party has substantial need of the materials in the preparation of its case and that the requesting party is not able, without undue hardship, to obtain the substantial equivalent of the materials by other means, the rule flatly states that the court is not to permit discovery of "mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of the party concerning the litigation." On this issue, the burden of showing that the nature of the materials are mental impressions, conclusions, opinions or legal theories of an attorney or representative, rests on the objecting party. The term "representative of the party" embraces the same persons as did the term "party's representative" set out earlier

in the rule including "... consultants ... agent...."

5. The court may not order discovery of materials if discovery of such materials would violate Rule 26(b)(4) involving trial preparation, i.e., experts. Different standards and procedures are set forth because of the nature of experts and the different purposes for which they are employed. Experts are used by parties for different purposes just as information is prepared or acquired by parties for different purposes.

*Id.* at 339–40.

Applying these standards, the Court concludes that the Plaintiffs have demonstrated relevance because these drafts involve documents required by the Consent Decree. Given that the filings were required by the Consent Decree, the Court concludes that the Defendants have established the second factor. As to the third factor, because the Court has found that the Defendants have not met their burden of proof on the attorney client privilege for most of these documents, the Court concludes that alternate avenues exist to obtain the substantial equivalent of the information in these related documents. Yet again, the Defendants did not provide any documents for which the work product privilege is asserted, as directed by the Court and as done in *Liberty Environmental* that is relied upon by the Defendants. But for *Toledo Edison,* the Court would conclude that the Defendants have not met their burden to establish the work product privilege for these documents.

### c. The Joint Defense Privilege

 During the June 2007 hearings, the Defendants' counsel and some MCCs' counsel objected to questions about their communications on the ESI discovery matters based upon the joint defense privilege. The joint defense privilege is an extension of the attorney-client privilege and pro-

tects as confidential communications among defendants and their counsel, where defendants are "part of an on-going and joint effort to set up a common defense strategy." *Haines v. Liggett Group, Inc.*, 975 F.2d 81, 94 (3d Cir.1992). Because the privilege may apply outside the context of actual litigation, the "joint defense" privilege is sometimes referred to, in such instances, as the "common interest" privilege. *In re Grand Jury Subpoena*, 274 F.3d 563, 572 (1st Cir.2001) (citing *United States v. Schwimmer*, 892 F.2d 237, 243 (2d Cir.1989)).

■■■ The burden to establish the privilege rests with the Defendants. *United States v. Moss*, 9 F.3d 543, 550 (6th Cir.1993). The Defendants must prove an agreement among its members to share information arising out of a common legal interest in litigation. *Id.* An oral joint defense agreement may be valid, *In re Grand Jury Subpoena, A. Nameless Lawyer*, 274 F.3d 563, 569–70 (1st Cir.2001), and person need not be a named party to join the agreement. *See Russell v. General Electric*, 149 F.R.D. 578 (N.D.Ill.1993); *U.S. v. LeCroy*, 348 F.Supp.2d 375, 381 (E.D.Pa.2004).

■■■ This privilege extends only to the exchanges of information among persons with the shared interest, *In re Santa Fe Intern. Corp.*, 272 F.3d 705, 712 (5th Cir.2001), *In re Grand Jury Subpoenas*, 902 F.2d 244, 249 (4th Cir.1990); *United States v. Duke Energy Corp.*, 214 F.R.D. 383, 388 (M.D.N.C.2003), but usually applies to protect documents. *See Allendale Mut. Ins. Co. v. Bull Data Systems, Inc.*, 152 F.R.D. 132, 140 (N.D.Ill.1993) citing *United States v. McPartlin*, 595 F.2d 1321, 1336 (7th Cir.1979). Any participant in the agreement, however, remains free to disclose his own communications. *See In re Grand Jury Subpoena Duces Tecum*, 112 F.3d 910, 922 (8th Cir.1997). The joint-defense privilege shields some com-

munications between co-defendants made outside of their counsel's presence, but only if the communications were pursuant to specific instructions of their counsel. *United States v. Mikhel*, 199 Fed.Appx. 627, 628 (9th Cir.2006).

For this privilege, parties must have a common legal interest in the subject matter of a communication, *Allendale Mut. Ins.*, 152 F.R.D. at 140, and the communication must be to further the joint agreement. *United States v. Evans*, 113 F.3d 1457, 1467 (7th Cir.1997). The common interest must be identical and not solely commercial. *Allendale Mut. Ins.*, 152 F.R.D. at 140. *See also In re Sulfuric Acid Antitrust Litig.*, 235 F.R.D. 407, 416–17 (N.D.Ill.2006).

The Court will not add unnecessarily to this already lengthy memorandum and adopts and incorporates its rulings at the June 2007 hearing that the Defendants' and MCCs filings of their communications with the Court on substantive matters, operate to waive this privilege as to ESI discovery issues.

### d. Deliberative Process Privilege

Defendants next assert the deliberative-process privilege to prevent disclosure of their planning documents. The Sixth Circuit has recognized this privilege to bar disclosure of executive communications to encourage frank deliberations on governmental policy and to protect federal officials from ridicule. *Schell v. United States Dept. of HHS*, 843 F.2d 933, 939 (6th Cir.1988). The Defendants do not cite any legal authorities applying this federal law privilege to a state official. In any event, despite their recent protestations in this action, the Defendants concede unequivocally that they waived this privilege in *Rosen*, a related action. (Docket Entry No. 720, Defendants' Response to Plaintiffs' Motion to Compel at p. 3) (citing the affidavit of counsel). That waiver applies

in this related action. Thus, any extended analysis of this privilege is unnecessary.

### e. State Statutory Privileges

The Defendants next assert a privilege for information sought from the Department of Mental Health and Developmental Disabilities (DMHDD), the Department of Children's Services (DCS) and the TNKids program (Docket Entry No. 907, Defendants' Response at pp. 31–39). The Defendants contend that these state statutes (that were not asserted in the Defendants' initial response to this motion to compel nor in their privilege log) create substantial and important state interests against disclosure of this information and therefore, such information should qualify as a cognizable privilege under Rule 501 and Fed. R. Civ. P. 26(b) to bar discovery of this information.

The DMHDD has an Incident Reporting System that the Defendants contend falls under Tenn.Code Ann. § 63–6–219(b) that prohibits the disclosure of information contained in the DMHDD Incident Reporting System. This statute was enacted to "encourage committees made up of Tennessee's licensed physicians to candidly, conscientiously, and objectively evaluate and review their peers' professional conduct, competence, and ability to practice." *Id.* at (b)(1); *see* Docket Entry No. 907, Defendants' Response atp. 32. The Defendants assert that this Incident Reporting System is available to quality performance improvement committees and related safety committees of the State's five RMHIs. These committees perform the peer-review functions of monitoring and evaluating the quality of patient care and improving safety by reducing the risk of system or process failures. These Committees report to the quality committee of the DMHDD and are designed to serve as "medical review committee[s]" or "peer review committee[s]," as defined in the Peer Review Law.[44] For such records, Tennessee law deems "confidentiality is essential." Tenn. Code Ann. § 63–6–219(b)(1). Defendants also cite Tenn.Code Ann. § 63–6–219(e) that bars disclosure of peer-review reports:

> All information, interviews, **incident or other reports,** statements, memoranda or other data furnished to any committee as defined in this section, and any findings, conclusions or recommendations resulting from the proceedings of such committee are declared to be privileged. **All such information, in any form whatsoever, so furnished to, or generated by, a medical peer review committee, shall be privileged.** The records and proceedings of any such committees are confidential and shall be used by such committee, and the members thereof only in the exercise of the proper functions of the committee, and shall not be public records **nor be available for court subpoena or for discovery proceedings.**

Tenn.Code Ann. § 63–6–219(e) (emphasis added). The Tennessee Supreme Court deemed the broad language of the Peer Review Law to encompass "any and all matters related to the peer review process." *Stratienko v. Chattanooga–Hamilton County Hosp. Auth.*, 226 S.W.3d 280, 285–86 (Tenn.2007).

As to DCS's reports, the Defendants cite Tenn.Code Ann. §§ 37–1–409(a)(2) and 37–1–615(b) that bar disclosure of the identity of person(s) who reports child abuse and

---

**44.** The statutory definition of "medical review committee" and "peer review committee" "means any committee of a state or local professional association or society, including … a committee of any licensed health care institution … the function of which, or one (1) of the functions of which is to evaluate and improve the quality of health care rendered by providers of health care services …" Tenn.Code Ann. § 63–6–219(c).

related disclosures. (Docket Entry No. 907 at p. 36): DCS issued administrative rules under Tenn.Code Ann. §§ 37–1–409(e)(1) and 37–1–612(f)(1). *See* Rules of the Tennessee Department of Children's Services, Child Protective Services, Chapter 0250-7-9, a violation of section 37–1–409 is a Class B misdemeanor. Tenn Code Ann. § 37–1–409(g). A violation of the confidentiality requirements of section 37–1–612 is a Class A misdemeanor. Tenn. Code Ann. 5 § 37–1–615(b). Defendants note that federal funds for child abuse prevention and treatment are contingent upon complying with the confidentiality requirements of the Child Abuse Prevention and Treatment Act ("CAPTA"), 42 U.S.C. § 5106a(b)(2)(A). (Docket Entry No. 907 at p. 36). Due to the confidential nature of Child Protective Services information, case recordings are inaccessible to DCS employees, except those employees granted security clearance.

From June 1, 2004 through April 30, 2007, there were 29,843 children in DCS custody; 1,110 of those could reasonably be excluded as non *John B.* class members because they were placed in detention or a Youth Development Center (YDC) throughout DCS custody. From May 1, 2006 through April 30, 2007, there were 16,026 children entering DCS custody with 668 placed in a YDC or detention and the latter are not *John B.* class members. Such placement renders them ineligible for TennCare.

Defendants contend that information about these non-class members can include medical, mental health, and substance abuse information that is protected from disclosure by state and federal privacy laws. (Docket Entry No. 907 at p. 38) (*citing* 45 C.F.R. Subtitle A, Subchapter C, Part 164, Subpart E; 42 C.F.R. Chapter I, Subchapter A, Part 2; Title 33 of Tennessee Code). Signed authorizations for release of information, including a HIPAA release, would be required from each individual non-class member. DCS is expressly required by statute to follow state and federal confidentiality laws. Term.Code Ann. § 37–5–107(b), (d).

The third database is the "TNKids" database within DCS. The TNKids database was originally developed for DCS as its State Automated Child Welfare Information System (SAC WIS). This database includes case management information about children in DCS custody, including both child-welfare and juvenile justice cases, as well as children at risk in DCS custody and adopted through DCS. Case recordings can refer to court proceedings involving neglected, unruly, or delinquent children and termination of parental rights, that is confidential under Tenn. Code Ann. §§ 37–5–107, 37–1–409, 37–1–612, 37–2–408, 36–1–125, 36–1–126, 36–1–138 and the Adoption Assistance and Child Welfare Act (AACWA), codified at 42 U.S.C. § 671(a)(8). As stated earlier, the State's federal funding is contingent upon its compliance with the confidentiality requirements of AACWA.

Dr. Ray, Plaintiffs' statistical analyst, requested information from these databases, including case management records for health services for the children. The "case management" records are narrative recordings and written reports with notes of child welfare and juvenile justice case managers. These narratives are not indexed by content and are akin to a journal entry about a child in DCS custody or "biography" of the child in DCS's custody. Dr. Ray utilizes this data to cross-reference with statistical data and thereby validate the statistical studies.

For the Defendants' assertion of state law privileges, Rule 501 of the Federal Rules of Evidence provides as follows:

Except as otherwise required by the Constitution of the United States or pro-

vided by Act of Congress or in rules prescribed by the Supreme Court pursuant to statutory authority, the privilege of a witness, person, government, State, or political subdivision thereof shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience.

Fed.R.Civ.P. 26(b)(1) also provides that "privileged" information is not discoverable absent order of the court.

 Federal courts are not required to recognize state law privileges when deciding cases arising under federal law, but the presence of a state law privilege must be considered, particularly where a significant number of states recognize such a privilege. *Jaffee v. Redmond*, 518 U.S. 1, 12–13, 116 S.Ct. 1923, 135 L.Ed.2d 337 (1996) (state-created psychologist-patient privilege recognized in 50 states). In *Freed v. Grand Court Lifestyles, Inc.*, 100 F.Supp.2d 610 (1998), the district court summarized the governing principles on any privilege based upon state law:

> [E]videntiary privileges are strongly disfavored in federal practice and must be narrowly drawn because they "contravene the fundamental principle that 'the public ... has a right to every man's evidence.'" *University of Pennsylvania v. Equal Employment Opportunity Commission*, 493 U.S. 182, 189, 110 S.Ct. 577, 107 L.Ed.2d 571 (1990); *see also Jaffee*, 518 U.S. at 9, 116 S.Ct. 1923. ("When we come to examine the various claims of exemption, we start with the primary assumption that there is a general duty to give what testimony one is capable of giving, and that any exemptions which may exist are distinctly exceptional, being so many derogations from a positive general rule."); *In re Zuniga*, 714 F.2d 632, 638 (6th Cir.1983) (quoting *United States v. Nixon*, 418 U.S. 683, 711, 94 S.Ct. 3090, 41 L.Ed.2d

1039 (1974), and recognizing that " 'exceptions to the demand for every man's evidence are not lightly created nor expansively construed for they are in derogation of the search for the truth' "). At the same time, comity favors recognizing a state law privilege, as a component of federal common law, to the extent that doing so will not impose a substantial cost on federal policies. *Memorial Hospital for McHenry County v. Shadur*, 664 F.2d 1058, 1061 (7th Cir.1981); *Farley v. Farley*, 952 F.Supp. 1232, 1237 (M.D.Tenn.1997) ("Principles of federalism and comity dictate that, should a federal Court depart from a state law privilege in concluding that discovery may proceed, some deference (and in certain cases a great deal of deference) must be given to the state interests underlying the privilege.").

*Id.* at 618.

The Defendants rely upon *Farley v. Farley*, 952 F.Supp. 1232 (M.D.Tenn.1997), wherein the Honorable Thomas A. Wiseman, Jr. deemed Tenn.Code Ann. §§ 37–1–409 and 37–1–612 to be a cognizable privilege under Rule 501:

> By the enactment of these statutes, the Tennessee General Assembly has asserted in no uncertain terms that the reporting, systematic examination and prevention of child abuse is of fundamental public importance.

> * \* \* \**

> This Court has little difficulty in concluding that T.C.A. §§ 37–1–409 and 37–1–612 establish an evidentiary privilege that is entitled to deference under the principles of federalism and comity that are an implicit component of Rule 501 [of the Federal Rules of Evidence]. The confidentiality provisions at issue in this case have been construed by the Tennessee courts to block discovery in civil actions and are clearly designed to pro-

tect the anonymity of reporters, victims and perpetrators of child abuse. Taken together, these elements fulfill the functional definition of an evidentiary privilege set forth above.

952 F.Supp. at 1238–39. Notwithstanding this conclusion, Judge Wiseman ordered production of the reports with redactions: "The Court finds that redaction of identifying information is a proper and sufficient means of furthering the public policy of Tennessee by protecting the anonymity of those who report child abuse." *Id.* at 1240.

As pertinent here, Judge Wiseman explained that his finding of privilege was not intended to shield state regulators who are responsible for children's welfare and may be liable to them.

> [The statutes'] primary purpose is the protection of the privacy of those who are not likely to be parties to a federal civil rights suit.... the confidentiality of official records is generally guaranteed by statute to protect those who are regulated by a state agency rather than the agency itself. *Lewis v. Radcliff Materials, Inc.,* 74 F.R.D. 102, 104 (E.D.La.1977). **Accordingly, the agency should not be permitted to use a privilege designed to ensure the welfare of those it governs when it is in possession of relevant evidence and is the target of a lawsuit.** *Id.*

> \* \* \*

> T.C.A. §§ 37–1–409 and 37–1–612..... are clearly designed to protect the anonymity of reporters, victims and perpetrators of child abuse. Taken together, these elements fulfill the functional definition of an evidentiary privilege set forth above.

> \* \* \*

> Without full and fair disclosure of relevant proof, the public is likely to lose confidence in the administration of

justice by the federal courts. It is therefore of paramount importance that litigants be accorded the authority to seek out relevant evidence that they have been granted by the federal rules.

> \* \* \*

> **The confidentiality granted child abuse records under Tennessee law may not be invoked as a shield with which to block scrutiny of governmental practices.** The federal courts have repeatedly held that the interest in ensuring governmental compliance with federally-guaranteed civil rights is paramount to the state interest in confidentiality. *See e.g., ACLU of Mississippi, Inc. v. Finch,* 638 F.2d at 1336, 1343–44 (5th Cir.1981) ("The purpose of enacting § 1983 was to ensure an independent federal forum for adjudication of alleged constitutional violations by state officials; ... there is a 'special danger' in permitting state governments to define the scope of their own privilege when the misconduct of their agents is alleged.").

*Id.* at 1238, 1239, 1240 (emphasis added). *Accord Puricelli v. Houston,* 2000 WL 760522, at \*14 (E.D.Pa. Jun. 12, 2000) (granting Plaintiffs' access to redacted versions of child abuse investigations contrary to similar Pennsylvania statute). *Farley* clearly does not support the Defendants' contention here, as the Defendants' liability to the class is plainly at issue here.

In *Seales v. Macomb County,* 226 F.R.D. 572 (E.D.Mich.2005), the District Court rejected a similar Michigan law on juvenile records as a cognizable federal privilege.

> "Merely asserting that a state statute declares that the records in question are confidential does not make out a sufficient claim that the records are privi-

leged within the meaning of Fed. R.Civ.P. 26(b)(1) and Fed R. Evid. 501." *Martin v. Lamb.* 122 F.R.D. 143, 146 (W.D.N.Y.1988). *See also Nguyen Da Yen v. Kissinger,* 528 F.2d 1194, 1205 (9th Cir.1975) ("The records are confidential but not privileged"). Given the absence of any express statutory language or judicial interpretation creating an evidentiary privilege, this Court declines to read one into the above confidentiality statutes.

\* \* \*

Defendants, somewhat ironically, appear to invoke the state laws designed to protect juveniles, to protect themselves from possible liability as a result of their alleged mistreatment of wards. " '[T]here is a. "special danger" in permitting state governments to define the scope of their own privilege when the misconduct of their agents. is alleged.' " *Pearson v. Miller,* 211 F.3d 57, 68 (3d Cir.2000), *quoting ACLU·v. Finch,·* 638 F.2d 1336, 1344 (5th Cir.1981). *See also Longenbach v. McGonigle,* 750 F.Supp. 178, 180–81 (E.D.Pa.1990) ("Nor does it make any sense to allow the state, under whose color of authority officers have allegedly violated rights, to limit unilaterally the availability of evidence.") *Id.* at 576, 577.

For their assertions for an absolute privilege for the peer review information, the Defendants rely upon decisions where the parties who sought the information about the peer review process intended to use the identity of the person who provided the information to prove their claims. *Doe v. UNUM Life Ins. Co. of Am.,* 891 F.Supp. 607 (N.D.Ga.1995) (insurance company sought information about doctor's drug problem to deny his coverage claim for benefits) and *Holland v. Muscatine Gen. Hosp.,* 971 F.Supp. 385 (S.D.Iowa 1997) (plaintiff sought peer review records to prove her hostile work environment claim).

■ The Court adopts the rationale of *Farley* and the other similar decisions to conclude that in this action, particularly with the Court's prior findings of the Defendants' repeated violations of federal law, these Defendants cannot rely upon these state statutes as bars to discovery of this ESI data from DMHDD or the DCS's incident reporting data or the TNKids database. All of this data contains highly relevant information on the Defendants' violation of federal law and Plaintiffs' federal constitutional rights. An appropriate protective order for discovery and trial can avoid disclosures of the identities of the children, doctors and other protected persons.

■ As to the state criminal sanctions for disclosure of certain state data, the fact that another sovereign's laws have criminal sanctions to block disclosure of certain information does not preclude a federal court from ordering disclosure. of that information under federal discovery rules. *United States v. First National Bank of Chicago,* 699 F.2d 341, 345 (7th Cir.1983) ("The fact that foreign law may subject a person to criminal sanctions in the foreign country if he produces certain information does not automatically bar a domestic court from compelling production."); *In re Westinghouse Electric Corp. Uranium Contracts Litigation,* 563 F.2d 992, 997 (10th Cir.1977) ("In our view *Societe* holds that, though a local court has the power to order a party to produce foreign documents despite the fact that such production may subject the party to criminal sanctions in the foreign country ...") (interpreting *Societe Internationale Pour Participations Industrielles et Commerciales, S.A. v. Rogers,* 357 U.S. 197, 78 S.Ct. 1087, 2 L.Ed.2d 1255 (1958)). These courts apply a balancing approach.

This Courts applies these authorities to the State's laws, as an independent sovereign. Here, the Defendants' repeated violations of federal law, as found by Judge Nixon, present compelling circumstances to justify disclosure. The Defendants have already produced the information covered by some of these laws to others, including filing of some of this information in another action in this district without any threat of state prosecution. Any disclosure pursuant to a Court order should render unrealistic any state prosecution.

As to the HIPPA statutes and regulations, it is noteworthy that on April 24, 2001, Judge Knowles denied the Defendants' motion for a protective order, citing HIPPA and its regulations and expressly ruled that "to the extent that [the Defendants' motion] is based upon [42 U.S.C.] § 290dd–2, [it] is hereby DENIED" because "[t]he information sought on behalf of the class members cannot be considered 'confidential' with regard to the class members themselves (or their counsel)." (Docket Entry No. 103, Order at pp. 5–6). The Court adopts that ruling as the law of the case and applies that ruling to 42 U.S.C. § 671(a)(8). Moreover, 42 U.S.C. § 5106a(b)(2)(A)(V) permits disclosures of children's records to a "court, upon a finding that information in the record is necessary for the determination of an issue before the court." Federal law does not bar the ESI production ordered by the Court. To the extent some children are not class members, those individuals are not numerous and those childrens' and others' names shall be redacted by the Defendants as in *Farley*.

### 8. Defendants' Failures to Answer Discovery Requests and to Comply with the January 14th Order

The next controversies involve: (1) the Defendants' failures to obtain all designated custodians' answers to the Plaintiffs' requests for admissions ("RFA"), as authorized by the Court on the issue of destruction of evidence, including the Defendants' refusal to have the Governor personally sign his response to his RFA; (2) the Defendants' misleading answer to Plaintiffs' Interrogatory 22; and (3) the Defendants' failure to file their key custodians' certifications required by the January 14th Order to certify that ESI had not been removed from the key custodians' computers. Issues 1 and 3 are related and will be addressed together.

At the December 20, 2006 discovery hearing, Plaintiffs' counsel raised the issue about the loss or destruction of relevant evidence and the inadequacies in the Defendants' responses to the discovery requests on this issue. (Docket Entry No. 786, Transcript at pp. 31–36). After reviewing the requests, the Court directed Plaintiffs' counsel to simplify the wording of the requests and send the revised requests to all of the Defendants' key custodians as designated by the Defendants. *Id.* at pp. 38–39. The Court denied the Plaintiffs' motion to compel on that point, but without prejudice to renew.

Plaintiffs' revised RFAs asked each custodian whether the search of his or her files had included all private email accounts and computers, including removable drives and storage, where the custodian had stored potentially responsive ESI. The RFAs sought assurances of the adequacy and completeness of the State's document preservation and production. In particular, RFA No. 1 reads as follows: "Other than e-mail that was deleted or destroyed pursuant to the State's routine document retention policy, are you aware of any paper documents or electronic records, stored in any location, that were requested by the plaintiffs, and that were destroyed, deleted, thrown away, or lost for any reason? (This includes e-mails that should have been archived but weren't, or that

were archived and then deleted)." (Docket Entry No. 799–2 at p. 1). RFA No. 2 asked the custodians:

> When you searched for information and documents requested by the plaintiffs, did you search all paper or electronic records in your possession or control (including both state and private email accounts and computers, **including removable drives or storage**) that potentially contained requested information or documents, and did you provide to the State's lawyers all requested information or documents that you found?

*Id.* (emphasis added). If the respondent answered "yes" to these RFAs, Plaintiffs' Interrogatory Nos. 1 and 2 were propounded for follow-up discovery.

Aside from Plaintiffs' RFAs, on January 14, 2007, this Court entered an Order based upon Plaintiffs' computer expert's declaration on the need to be assured that ESI had not been removed from the computers subject to the ESI search ordered by the Court. To do so, Plaintiffs' expert recommended certifications of nonremoval by each custodian. Given that removal of ESI could clearly compromise the ESI production ordered by the Court, the January 14th Order directed that "[t]he defendants shall file certifications of the key custodians as to whether any material has been removed." (Docket Entry No. 789, Order at p. 3) (emphasis added). The Court's Order cited the pertinent paragraph from the Plaintiffs' expert's declaration on this subject. *Id.*

The Defendants did not seek relief from the January 14th Order. Defendants insist that their custodians answers to Plaintiffs' RFAs are the same as any "certifications" required by the January 14th Order. *See, e.g.,* (Docket Entry No. 828, Exhibit 5, February 27, 2007 Letter of Nicole Jo Moss at p. 2) (noting that "these custodians have already been asked to sign and did in fact submit RFA responses which

covered this issue") (emphasis added). The January 14th Order expressly referenced Thomas Tigh's declaration (Docket Entry No. 785–2), about the need for assurances that electronic documents had not been removed from the key custodians' computers. Tigh's specific suggestion was: "The question should ask the same key custodians if they have moved material from their local machine or the network to any nonattached media, such as CDs or USB devices . . . The answer to this question, disclosed with the answers to those in the proposed Order, will provide the information required to determine if material was moved from the network . . .". *Id.*

▇▇▇ Clearly, the January 14th Order's concern was whether ESI material was removed from Defendants' network's computers, such as a compact disks or DVDs, not to the destruction or loss of ESI. Plaintiffs' RFAs asked each custodian whether, he or she had "search[ed] all paper and electronic records in your possession or control (including both state and private email accounts and computers, including removable drives or storage) that potentially contained requested information or documents." *See* Docket Entry No. 799–2 (Request for Admission No. 2) (emphasis added). A gap remains between the RFAs and the January 14th Order because a search by a custodian of a removable drive does not answer whether any ESI was actually removed. Accordingly, the Defendants shall be compelled to have their 160 designated custodians to file certifications that ESI has not been removed from their computers by them or anyone else.

Plaintiffs also note that Defense counsel could not attest to the accuracy or completeness of all answers to their RFAs. (Docket Entry No. 799). At a February 13th meeting of the parties' counsel, Defense counsel stated that the Defendants'

custodians' answers had been filed without personally asking the custodians the questions. (Docket Entry No. 828, Exhibit 4 thereto, Bonnyman Letter Dated 02/23/07 at pp. 3–4 and Exhibit 5 thereto, Moss Letter Dated 02/27/07 at p. 2). The Defendants concede that they did not ask the key custodians who are former employees because defense counsel "has no authority or control over them to require them to submit a response". (Docket Entry No. 907 at 61–62).

The Court agrees with the Plaintiffs that good faith required the Defendants at least to ask those former key individuals, as directed by the Court. The question of authority or control would only arise if the former employees refused to answer. Courts have held that former employees and agents of a party remain subject to discovery. *See e.g., Alcan Intern. Ltd. v. S.A. Day Mfg. Co., Inc.,* 176 F.R.D. 75, 79 (W.D.N.Y.1996) (retired employee); *Boston Diagnostics Dev. Corp. Inc. v. Kollsman Mfg. Co. Div. of Sequa Corp.,* 123 F.R.D. 415, 416 (D.Mass.1989) (former agent). Absent a showing that a former employee refused to answer these RFAs, the Defendants shall request their answers and undertake their best efforts to secure the former custodians personal records or notify Plaintiffs' counsel with the former employees' addresses and telephone numbers. The latter information will be subject to the protective order.

Next, the Defendants identified the Governor as a "key custodian" and Plaintiffs assert that the Governor has had a crucial role in the formulation and implementation of policies on compliance with the Consent Decree. Citing the Governor's counsel's affidavit, the Defendants responded that Plaintiffs' insistence upon the Governor's personal signature to the RFAs "groundlessly impugns the integrity and credibility of the State's and the Governor's legal counsel". (Docket Entry No. 907 at p. 62).

In an October 27, 2006 declaration, Nicole Jo Moss, a defense counsel asserted that she personally spoke with the Governor and other senior officials

> ... to ensure that they had searched their files and produced all responsive documents and to ensure that they had been archiving (i.e. preserving) responsive documents since the last production in 2004. My conversations reconfirmed what Plaintiffs had already been told, that these individuals saved and produced all responsive documents either as part of the production last May or the prior production in the Rosen matter.... **each confirmed that they have not been actively involved in matters directly related to EPSDT; nevertheless, they have been archiving their responsive TennCare documents, but they do not recall having received any documents related specifically to *John B.* or EPSDT.**

(Docket Entry No. 717 at ¶ 5) (emphasis added). Plaintiffs cite the bold portion of Moss's declaration to contend that upon closer examination, Moss's declaration never states that these officials actually searched all of their relevant files for documents responsive to discovery requests, only that they "do not recall" having "received" any responsive information. Plaintiffs deem the omission significant on whether these officials sent any documents related specifically to *John B.* or EPSDT. The ambiguity gives rise to Plaintiffs' concerns that are legitimate.

The discovery standard is not whether a person has been actively involved, but rather whether the person has knowledge of discoverable matters or at this point, whether the person's knowledge could lead to the discovery of relevant information. The Defendants do not cite any legal authority to exclude the Governor from discovery and such exclusion runs counter to

the Supreme Court's principle that "there is a general duty to give what testimony one is capable of giving, and that any exemptions which may exist are distinctly exceptional, being so many derogations from a positive general rule." *Jaffee*, 518 U.S. at 9, 116 S.Ct. 1923. The Defendants' counsel listed the Governor as a key custodian and have disclosed his statements albeit through his counsel. In any event, as a matter of comity, the Court will give the Defendants the option of the Governor's personal signature or an inspection of the Governor's computer by the Plaintiffs' computer expert or his designated expert, to assess if any removal of ESI has occurred.

The next controversy is Plaintiffs' contention that the Defendants deliberately provided a misleading response to Interrogatory No. 22. "INTERROGATORY NO. 22 Wendy this is a tricky one since the MCC's would have files, but we have answered that this is unanswerable." (Plaintiffs' Exhibit 12d at p. 16). The disputed portion of Defendants' actual response to Interrogatory No. 22 is as follows: "because the kinds of services identified are services for which FFP is not available and/or are never medically necessary for children, obtaining claims information regarding possible inappropriate payments by an MCC for these services is impossible." *Id.* at 108–09.

Neither "Wendy" nor the person communicating with her testified about this statement to provide some context to understand its meaning. The Sixth Circuit has stated: " '[E]vasive or incomplete answers to proper interrogatories impede discovery.' *Badalamenti v. Dunham's Inc.*, 118 F.R.D. 437, 439 (E.D.Mich.1987) (citing *Bell v. Automobile Club of Michigan*, 80 F.R.D. 228, 232 (E.D.Mich.1978) (misleading interrogatory answers tantamount to failure to answer interrogatories))." *See also Jackson v. Nissan Motor*

*Corp. in USA*, 888 F.2d 1391, 1989 WL 128639, No. 88–6132 at *2 (6th Cir. Oct. 30, 1989). The Defendants did call Tina Brill, an MCC representative who testified that it might have been possible to run the searches referenced by Plaintiffs' interrogatory by stating that "it depends if they came in as a claim and how they were coded and so forth. We certainly have all of our claims data. So to the extent they are specific enough to be able to responsively show that, then, yes." (Docket Entry No. 988, June 25, 2007 Transcript at p. 31). In response to Plaintiffs' counsel's question, Brill also testified "[i]f we had anything responsive, we were told to provide it." *Id.* at 33. The Court found Brill difficult to understand and the Defendants' failure to call "Wendy" leads the Court to consider this response incomplete.

At the end of the expert's discussions at the April 11, 2007 conference, the Court requested the Defendants' expert and the Plaintiffs' expert to summarize any agreements that had been reached (Docket Entry No. 872, Transcript at pp. 211–228). After those summaries, the Court instructed Antony, the Defendants' computer expert, to prepare a written summary of the experts' agreement and to distribute that summary to all participants for comment and then file the summary agreement with the Court. This filing was to reflect a "summary" of the agreements at the April 11th conference. Antony, however, distributed the transcript of the conference to experts who attended the conference.

The Defendants' April 26, 2007 Notice of Filing (Docket Entry No. 875) announced meeting dates, but was not the written agreement that the Court requested at the end of the April 11th conference. When the Court entered an Order requiring the agreement to be filed, the Defendants disputed the existence of any such Court directive. After another Order, citing the

pages of the transcript of the April 11th conference, Docket Entry No. 982, April 11, 2007 Transcript at p. 228, lines 10–17, the Defendants then responded that their prior Notice was that agreement. The notice, however, reports on the follow-up meeting of the parties' experts and the MCCs' technical and computer experts. (Docket Entry No. 875 at pp. 2, 3–4). Antony testified that he thought the information provided in the April 26, 2007 Notice of Filing satisfied the Court's instructions.

The Court concludes that the April 26th Notice does not comply with the Court's directive at the conclusion of the April 11th conference. The significant omission are the MCCs' implementation of a litigation hold and the MCCs' agreement on the request of Mr. Elkins of Memphis Managed Care that the list of search terms and key custodians become finalized after the Plaintiffs made revisions and suggestions. The Defendants' Notice left the MCCs without knowing the 'final' list to be used. The effect of the Notice is to ignore or set aside significant parts of the experts' agreements at the April 11th conference, and those omissions were by defense counsel, who prepared the Notice, not Antony.

## III. REMEDIES

Plaintiffs' renewed motion to compel was filed under Rule 37(a). (Docket Entry No. 826, Renewed Motion to Compel at p. 1). Fed.R.Civ.P. 37(a)(4) provides, in pertinent part:

(4) Expenses and Sanctions.

(A) *If the motion is granted* or if the disclosure or requested discovery is provided after the motion was filed, *the court shall, after affording an opportunity to be heard, require the party or deponent whose conduct necessitated the motion or the party or attorney advising such conduct or both of them to pay to the moving party the reasonable expenses incurred in making the motion,* *including attorney's fees unless the court finds that the motion was filed without the movant's first making a good faith effort to obtain the disclosure or discovery without court action, or that the opposing party's nondisclosure response, or objection was substantially justified, or that other circumstances make an award of expenses unjust.*

\* \* \*

(C) If the motion is granted in part and denied in part, the court may enter any protective order authorized under Rule 26(c) and may, after affording an opportunity to be heard, apportion the reasonable expenses incurred in relation to the motion among the parties and persons in a just manner.

The Court has granted the Plaintiffs' motion with some modifications for some MCCs, but without prejudice to renew their original ESI requests as to some MCCs.

Thus, the Court concludes that Plaintiffs have prevailed on their renewed motion to compel and consideration of an award to Plaintiffs for their attorney fees and costs on this motion, as well as the production costs and attorney fees of the MCCs, is appropriate. The Defendants are given eleven (11) days from the date of entry of the Order to file their position on whether the Court should award Plaintiffs their attorney fees and costs for their work on this motion as well as the production costs and attorney fees of the MCCs. These costs would be imposed for the Defendants' breaches of their duty to preserve responsive information of its agencies, officers, employees and its contractors with responsibilities under the Consent Decree in this action.

The Defendants insist that any remedies should not include sanctions because Plaintiffs' renewed motion to compel was filed under Rule 37(a). Defendants assert that

without notice and for the "first time" during closing argument at the June 2007 hearing, Plaintiffs' counsel engaged in a "classic bait and switch" by asking for sanctions for the Defendants' spoliation of responsive information. (Docket Entry No. 997, Defendants' Supplemental Memorandum at pp. 1–2). Actually, in their response to Plaintiffs' renewed motion to compel **prior** to the June 2007 hearings, Defendants contended that: "In short, Plaintiffs urge that the Defendants be punished **now** for the alleged spoliation, by adverse rulings on five discovery issues, while postponing Plaintiffs' proof of the alleged spoliation until later." (Docket Entry No. 907–1 at pp. 3–4) (emphasis in the original). By their own brief, the Defendants were well aware of this contention prior to the June 2007 hearing and now complain when Plaintiffs met their evidentiary challenge.

The Court notes that the Defendants again ask the Court to sanction Plaintiffs' counsel, upon its own motion, under Rule 11 for the Plaintiffs' counsel's assertions about the Defendants' response to Interrogatory 22 and Plaintiffs' counsel's assertions about spoliation of evidence. From the Court's perspective, Plaintiffs' counsel's assertions and argument are well within the proof and the realm of advocacy. With the Defendants' raising this issue, if the Court were to sanction upon its own motion, the Court would consider sanctions upon defense counsel, who are responsible for some questionable assertions and argument. As noted earlier, the Court's authority to sanction is not limited to Rule 37(b)(2), *supra* at p. 862, n. 31. Aside from the Defendants' failure to preserve evidence, the Court will discuss certain matters at a conference with lead counsel for the parties and defense firms and the Attorney General of Tennessee.

The Court has shared Judge Nixon's goal of attempting to focus this controversy to ensure that the class gets the benefits owed to them under the Consent Decree that the Defendants agreed to provide and that federal law requires. With these most recent discovery disputes, the Court has come to share Judge Nixon's view of the lead defense counsel, Cooper and Kirk, and their litigation practices on an earlier discovery motion:

> [T]he Court has attempted to steer this case away from the needless and acrimonious litigation and focused on fashioning a solution that would increase compliance with the Consent Decree and federal EPSDT requirements. This constructive approach has been fueled by one goal: to provide the underserved children of Tennessee the entire spectrum of medical benefits to which they are entitled under federal law.
>
> The State's pending Discovery Motion attempts to push this goal to the wayside and refocus the case on wholly unnecessary, time-consuming, costly, and highly divisive litigation. I refuse to condone a path that will waste resources and time in the face of the urgent need to improve healthcare for the children of Tennessee.

(Docket Entry No. 584, Memorandum and Order at p. 4). The Defendants' responses to Plaintiffs' motions to compel raise the same concerns with this member of the Court.

In any event, the Court reserves the exercise of its authority to sanction until after the actual ESI production and complete responses to the January 14th Order as well as a conference with counsel for the parties.

For the above stated reasons, the Plaintiffs' renewed motion to compel should be granted.

An appropriate Order is entered herewith.

ENTERED this the _____ day of October, 2007.